## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LEONARD BRIGGS, et al., )<br><br>Plaintiffs, )<br><br>v. )<br><br>MASSACHUSETTS DEPARTMENT OF<br>CORRECTION, et al, )<br><br>Defendants. ) | C.A. No. 1:15-cv-40162-GAO |

## DOC DEFENDANTS' STATEMENT OF UNDISPUTED FACTS

The DOC Defendants[1] submit this Statement of Undisputed Material Facts and accompanying exhibits in support of their Motion for Summary Judgment.

1. Each facility has written fire safety procedures, which include an emergency evacuation plan.  Under 103 DOC 730.04, each facility's fire and emergency evacuation plan must include "a process to assist inmates in evacuating who may have medical restrictions, including, but not limited to, deaf and hearing impaired, blind and visually impaired, and those with physical disabilities."  The fire and emergency evacuation plan must be certified by an independent, outside inspector trained in the applicable fire codes. (Affidavit of Jeffrey J. Quick, ¶ 4, **Exhibit 1**).

---

[1] The DOC Defendants are the DOC, Commissioner Carol A. Mici, Deputy Commissioner Jennifer A. Gaffney, Superintendent Suzanne Thibault, Superintendent Steven Silva, Superintendent Lisa Mitchell, and Acting Superintendent Kyle Pelletier. The DOC officials, named in their official capacities, have been substituted as successors in office, under Fed. R. Civ. P. 25(d).

2.  If an inmate has been identified as deaf or hearing impaired, a red dot is placed on the lower right corner of his or her bed book card for use by the housing unit officer.  The bed book is a folder stored at the unit's control center that contains the names, commitment numbers, and photographs of all of the inmates in a unit.  The red dot alerts staff that the inmate has a hearing or visual impairment, and may need assistance during an evacuation.  (Affidavit of Jeffrey J. Quick, ¶ 5, **Exhibit 1**).

3.  During an evacuation, a correction officer ("CO") conducts a sweep of the area, which involves a search to make sure that inmates are evacuating, that inmates who require assistance in evacuating receive that assistance, and that no inmate is left behind.  The sweep includes inmate cells as well as other areas, such as showers.  Where the unit has both an upper and a lower tier, the CO does a sweep of each level.   (Affidavit of Jeffrey J. Quick, ¶ 6, **Exhibit 1**).

4.  At the designated evacuation area, a CO will conduct a count of the evacuated inmates to confirm that all inmates are accounted for.   (Affidavit of Jeffrey J. Quick, ¶ 7, **Exhibit 1**).

5.  All locations in each facility have fire drills on at least a quarterly basis.  All fire drills on the 7x3 and 3x11 shifts are required to be evacuation drills (which involve physically evacuating people from the building), except for units housing especially dangerous inmates, specialized medical units, assisted daily living units, and the Lemuel Shattuck Hospital. Shifts and locations that do not have evacuation drills have simulated drills. (Affidavit of Jeffrey J. Quick, ¶ 8, **Exhibit 1**).

6.  The date, shift, and location of each fire drill are documented, as well as whether the drill was simulated or was an actual evacuation.  Each fire drill is documented in a drill report

and incident report.  Issues or problems that arose during the drill are documented.  Issues or problems are addressed by the facility's Fire Safety Officer.  (Affidavit of Jeffrey J. Quick, ¶ 9, **Exhibit 1**).

7.  Each facility is inspected annually by the Department of Public Safety to determine the facility's compliance with state codes and regulations.  Each facility is also inspected annually by a state fire official. (Affidavit of Jeffrey J. Quick, ¶ 10, **Exhibit 1**).

8.  Each facility has a Fire Safety Officer who has completed the Department's annual Fire Safety Officer Training Program.  The Fire Safety Officer conducts a comprehensive monthly inspection of all areas of the facility for compliance with fire safety and prevention standards. (Affidavit of Jeffrey J. Quick, ¶ 11, **Exhibit 1**).

9.  A staff person trained by the facility's Fire Safety Officer conducts weekly fire safety inspections. (Affidavit of Jeffrey J. Quick, ¶ 12, **Exhibit 1**).

10. Each facility has a system for documenting and tracking the monthly fire safety inspections by the facility's Fire Safety Officer and the weekly fire safety inspections by a qualified staff person.  All deficiencies observed in those inspections, along with the date on which corrective action has been scheduled, are noted and tracked.  DRM has a contract with an outside vendor to test fire alarm and suppression equipment.  The Fire Safety Officer keeps records of this testing.  Each facility documents the availability and location of fire protection equipment.  Each facility also has protocols for the safe handling of flammable, toxic, and caustic materials.  (Affidavit of Jeffrey J. Quick, ¶ 13, **Exhibit 1**).

11.  The Department has 16 correctional facilities with over 5,015,309 gross square feet of building space.  Each facility has either full fire suppression systems covering all

buildings, or partial fire suppression systems, covering one or more buildings, with the exception of MASAC@Plymouth, which has a fire detection system and exterior fire hydrants with a fire pump and reservoir.  Each facility has smoke detectors and alarms, carbon monoxide detectors and alarms, fire extinguishers, fire blankets, and smoke/fire evacuation hoods.  Facilities also have smoke evacuation fans -- either portable units or systems built into the building's mechanical systems.  (Affidavit of Jeffrey J. Quick, ¶ 14, **Exhibit 1**).

12. The 2010 ADA Standards for Accessible Design ("2010 Standards") set minimum requirements for newly constructed or altered state and local government buildings, public accommodations, and commercial facilities.  28 CFR § 35.151(c).  The 2010 Standards apply to construction that commenced on or after March 15, 2012.  Id.

13. The only Department buildings constructed or altered so that they are governed by the 2010 Standards are the cottages at MCI-Framingham (renovated in 2016) and MASAC at Plymouth (renovated in 2018). (Affidavit of Jeffrey J. Quick, ¶ 16, **Exhibit 1**).

14. Section 232.2.2 of the 2010 Standards requires that "[a]t least 2 percent, but no fewer than one, of the total number of general holding cells and general housing cells equipped with audible emergency alarm systems and permanently installed telephones within the cell shall provide communication features complying with [Section] 807.3."  (Selections, 2010 Standards, **Exhibit 2-A**).  Section 807.3 states that "cells required to provide communication features" must comply with the provisions of that section.  Section 807.3.1 of the 2010 Standards states that "[w]here audible emergency alarm systems are provided to serve the occupants of cells, visible alarms complying with [Section] 702 shall be provided."  (Selections, 2010 Standards, **Exhibit 2-A**).  However, Section

807.3.1 also contains the exception that "visible alarms shall not be required where inmates or detainees are not allowed independent means of egress." 2010 Standards Section 807.3.1. (Selections, 2010 Standards, **Exhibit 2-A**).

15. The Massachusetts Architectural Access Board ("MAAB") also has accessibility regulations, 521 C.M.R. 1.00 *et seq.*, with which the Department must also comply. (Affidavit of Jeffrey J. Quick, ¶ 19, **Exhibit 1**). With regard to providing accessible cells for deaf or hard-of-hearing inmates, those regulations mirror the communication requirements of the 2010 Standards, providing that "at least 3% but not less than one, or general housing or holding cells or rooms equipped with audible emergency warning systems or permanently installed telephones shall comply with 521 CMR." 521 C.M.R. § 15.9. Like the 2010 Standards, 521 C.M.R. § 15.9 also provides the exception that "visible alarms are not required where inmates or detainees are not allowed independent means of egress."

16. Neither the 2010 Standards nor the MAAB regulations specify what constitutes an "independent" means of egress. 2010 Standards, Section 807.3.1. (Selections, 2010 Standards, **Exhibit 2-A**); 521 C.M.R. § 15.9.

17. The 2010 Standards incorporate by reference the International Building Code. 2010 Standards, §§ 105.1, 105.2.4. (Selections, 2010 Standards, **Exhibit 2-A**). Under the International Building Code and a parallel provision in the Massachusetts State Building Code, correctional centers are categorized as Institutional Group I-3 occupancies. Institutional Group I-3 "occupancy shall include buildings and structures that are inhabited by more than five persons who are under restraint or security. A Group I-3 facility is occupied by persons who are generally incapable of self-preservation due to

security measures not under the occupants' control."  (International Building Code,

Chapter 3, §§ 308.5 (2015 ed.), **Exhibit 2-B**).

18. "Incapable of self-preservation" is a term defined as: "persons, who, because of age,

physical limitations, mental limitations, chemical dependency, or medical treatment,

cannot respond as an individual to an emergency situation."  (International Building

Code, Chapter 2, § 202 (2015 ed.), **Exhibit 2-B**).

19. There are five conditions specified by the Institutional I-3 occupancy group.

(International Building Code, Chapter 3, §§ 308.5 (2015 ed.), **Exhibit 2-B**).  When a state

building inspector issues a certificate of occupancy, a condition will be assigned based on

how restrictive the conditions are.  (Affidavit of Jeffrey J. Quick, ¶ 23, **Exhibit 1**).  The

condition under which a building is categorized is based on the most restrictive condition

experienced by the occupants.  For example, if inmates in a facility have relative freedom

of movement during the day, but are confined to their cells at night and during major

counts, it would be these latter restrictions that would determine the applicable condition.

(Affidavit of Jeffrey J. Quick, ¶ 23, **Exhibit 1**).

20. Condition 1 includes buildings "in which free movement is allowed from sleeping areas,

and other spaces where access or occupancy is permitted, to the exterior via means of

egress without restraint."  (International Building Code, Chapter 3, § 308.5.1 (2015 ed.),

**Exhibit 2-B**).  Minimum and pre-release buildings are typically designated by the state

building inspector as Condition 1 occupancies because the inmates are generally allowed

free movement within the facility and unobstructed movement to exit the facility.

(Affidavit of Jeffrey J. Quick, ¶ 24, **Exhibit 1**).

21. Condition 2 includes buildings "in which free movement is allowed from sleeping areas and any other occupied smoke compartment to one or more other smoke compartments. Egress to the exterior is impeded by locked exits." (International Building Code, Chapter 3, § 308.5.2 (2015 ed.), **Exhibit 2-B**). Smoke compartments are areas of a building with smoke barriers that prevent smoke from traversing from one smoke compartment to another. A minimum or prerelease building may be a Condition 2 dwelling if the locks to the outside are on a fifteen-second delay. (Affidavit of Jeffrey J. Quick, ¶ 25, **Exhibit 1**).

22. Condition 3 includes "buildings in which free movement is allowed within individual smoke compartments, such as within a residential unit comprised of individual sleeping units and group activity spaces, where egress is impeded by remote-controlled release of means of egress from such a smoke compartment to another smoke compartment." (International Building Code, Chapter 3, § 308.5.3 (2015 ed.), **Exhibit 2-B**). A minimum or prerelease facility would be a Condition 3 dwelling if at any time the sleeping quarters are secured. Northeastern Correctional Center's Farm dormitory would be an example. (Affidavit of Jeffrey J. Quick, ¶ 26, **Exhibit 1**).

23. Condition 4 includes buildings "in which free movement is restricted from an occupied space. Remote-controlled release is provided to permit movement from sleeping units, activity spaces and other occupied areas within the smoke compartment to other smoke compartments." (International Building Code, Chapter 3, § 308.5.4 (2015 ed.), **Exhibit 2-B**). Buildings housing medium security inmates and maximum security inmates in general population are Condition 4 occupancies because during major counts and at night they are locked in their cells. (Affidavit of Jeffrey J. Quick, ¶ 27, **Exhibit 1**).

24. Finally, Condition 5 includes "buildings in which free movement is restricted from an occupied space. Staff-controlled manual release is provided to permit movement from sleeping units, activity spaces and other occupied areas within the smoke compartment to other smoke compartments."  (International Building Code, Chapter 3, § 308.5.5 (2015 ed.), **Exhibit 2-B**). The Department Disciplinary Unit is an example of a Condition 5 occupancy because inmates in these units are removed from their cells by COs rather than by a remote release. (Affidavit of Jeffrey J. Quick, ¶ 28, **Exhibit 1**).

25. In both Condition 4 and Condition 5 occupancies, inmates are without an independent means of egress.  The inmates do not have free movement from one smoke compartment to another or from the interior of the building to the outside during the night time, major counts, non-movement periods, and when a major disturbance has occurred.  (Affidavit of Jeffrey J. Quick, ¶ 29, **Exhibit 1**).  Therefore, even in buildings to which the 2010 Standard applied (*i.e*., buildings constructed or modified on or after March 15, 2012), in-cell visual alarms would not be required in medium or maximum security facilities, or in restrictive housing units.

26. The Department has 16 facilities throughout the Commonwealth with each facility having either a single Master panel or a Master panel with multiple sub-panels.  There are a total of 144 panels currently in the Department.  Each panel, whether a Master or sub-panel has a capacity for the number of devices that they can accept.  Once a panel's capacity has been reached, it can be upgraded (if capable) with new boards for added capacity or it will need to be replaced.  In a majority of cases, the panels will need to be replaced based on the on carbon monoxide detection projects that DRM had completed in 2012 in which DRM found that a majority of existing fire alarm panels could not handle the additional

devices required for carbon monoxide detection.  This required sub-panel installations throughout the Department.  A single replacement panel only at today's cost is generally around $34,000.00.  (Affidavit of Jeffrey J. Quick, ¶ 30, **Exhibit 1**).

27. If the Department were to install additional visual alarms to a facility, the Department may need to upgrade existing horn/strobes.  In some instances, the existing horn/strobes are compliant with the code applicable at the time of installation, but would need to be replaced with horn/strobes that comply with the current code.  Visual alarms that comply with existing code requirements must be digital.  Moreover, existing notification devices that are analog would need to be replaced for the additional reason that they are incompatible with digital systems.  The devices themselves cost approximately $60.00 each. (Affidavit of Jeffrey J. Quick, ¶ 31, **Exhibit 1**).

28. DRM would need to determine whether the wiring is compatible since some systems are analog and some are digital.  Visual alarms that comply with current code requirements must be digital.  Where the existing system is analog, the wiring for all notification devices (not just the new horn/strobes) would have to be redone to accommodate a digital system.   Wiring and labor for the devices would cost between $300.00 to $800.00 per device.  (Affidavit of Jeffrey J. Quick, ¶ 32, **Exhibit 1**).

29. Each new system requires a building permit and inspection from the local Fire Department.  Each upgraded panel or new panel must be programmed so that the new devices are accepted.  (Affidavit of Jeffrey J. Quick, ¶ 33, **Exhibit 1**).

30. When a panel is being replaced**,** the system will be down for a period of time.  During that time, the facility will be on a fire watch, which requires staff to make hourly rounds.

During the second and third shifts, overtime may be required.   (Affidavit of Jeffrey J.

Quick, ¶ 34, **Exhibit 1**).

31. To estimate the cost of installing visual notification devices Department-wide, Quick

prepared a pre-study estimate. A pre-study estimate is a basic analysis to determine

potential funding requirements.  A pre-study estimate is conducted on all potential

projects.  Based on the carbon monoxide detection projects DRM had completed in 2012,

which showed the limits of panel capacity, Quick presumed that in most cases, if not all,

the fire alarm systems would need to be replaced.  The pre-study estimate includes the

cost of panel replacement, wiring, and new alarms.  It also includes upgrades to toilet

fixtures on the assumption that the work per building would generally cost more than

$100,000, which would trigger the requirements of 521 CMR §§ 3.3.1, 15.7-15.7.2 and

15.8, which provide that work costing $100,000 or more requires the installation of

handicap accessible toilet fixtures in at least 3% of cells. (Affidavit of Jeffrey J. Quick, ¶

35, **Exhibit 1**).

32. For this pre-study estimate, Quick relied on the cost estimate for the Shirley Food

Services Building prepared by VJ Associates to reach an estimated cost-per-square-foot

for replacement of the fire detection systems.  (Affidavit of Jeffrey J. Quick, ¶ 36,

**Exhibit 1**; Design Development Estimate for the MCI-Shirley Food Services Building,

dated February 6, 2017, **Exhibit 1-B**).  Then, for each building housing inmates

Department-wide, he multiplied that cost-per-square-foot by the square footage of the

building.  The cost for the toilet fixture upgrades is based on prior toilet fixture upgrades

completed in house by DRM.  The total estimated cost was $22,148,045 for all

Department facilities.  (Affidavit of Jeffrey J. Quick, ¶ 36, **Exhibit 1**; Table of Pre-Study

Cost Estimates, **Exhibit 1-A**;  Design Development Estimate for the MCI-Shirley Food

Services Building, dated February 6, 2017, **Exhibit 1-B**;  Purchase Orders for ADA

compliant toilet fixtures, **Exhibit 1-C**).

33. To provide a more detailed estimate and to validate his pre-study estimate, Quick

undertook an estimate of installing visual notification devices at MCI-Shirley Medium.

(Affidavit of Jeffrey J. Quick, ¶ 37, **Exhibit 1**; Quick MCI-Shirley Estimate, **Exhibit 1-**

**D**).  This sort of estimate is completed for every deferred maintenance project funding

request DRM submits to the Division of Capital Asset Management and Maintenance

("DCAMM").  (Affidavit of Jeffrey J. Quick, ¶ 37, **Exhibit 1**).

34. MCI-Shirley Medium has six housing buildings with two housing units per building.

Each housing unit has 59 standard cells and one handicap accessible cell.  Each building

is serviced by a Notifier NFS-320 fire alarm panel, which reports back to a Notifier 640

main panel in the Administration building's control room.  Adding additional

horn/strobes to cells would require the replacement of the Notifier 320 panel to support

the additional devices.  This will also require conduit and wire runs to each of the new

devices for signal and power.  This estimate includes the installation of visual alarms in

the health services building and in the restrictive housing building because under 28 CFR

§ 35.151(k) and 521 CRM §§ 15.7-15.7.2, accessible cells must be provided for each

housing type and classification level.  (Affidavit of Jeffrey J. Quick, ¶ 38, **Exhibit 1**).

35. This estimate assumes the installation of eight visual alarms in each housing unit

building.  At least four visual alarms are required by 521 CMR 15.00, which provides

that at least 3% of the cells have visual alarms, and by a parallel requirement of at least

2% in Sections 232 and 807 of the 2010 Standards, which sets forth accessibility

standards for new construction by public entities.  28 C.F.R. § 35.151.  Adding four

additional devices would add only an incremental cost beyond the expense involved in

installing the first four devices because the wiring would be running down through a pipe

chase that services four upper tier cells and four lower tier cells. (Affidavit of Jeffrey J.

Quick, ¶ 39, **Exhibit 1**).

36. This estimate is based on past project costs and escalating the costs to when it would be

anticipated the work might commence.  Main panel replacement would be estimated at

$90,000.00, eight additional horn/strobes would be $8,000.00, conduit and wire work

would be $22,000.00, and programming of the system and permitting would be

$10,005.00.  The estimated cost of the fire detection system upgrade and additions is

$130,005.00 per building.  This would trigger the requirement under 521 CMR that at

least 3% of cells have handicap accessible toilet fixtures.  Since MCI-Shirley's housing

units already have one handicap accessible toilet already, only three cells would require

additional toilet fixture upgrades.  The toilet fixture upgrades would cost an estimated

$6,750.00.00 per cell or $20,250.00 per building, with the exception of the health

services building, which already has the required number of cells.  The total estimated

cost would be $150,225 per building for the MCI-Shirley housing buildings and the MCI-

Shirley restrictive housing building.  The total estimated cost for the MCI-Shirley health

services building would be $130,005.00.  The estimated cost for all six MCI-Shirley

housing buildings, the MCI-Shirley restrictive housing building, and the MCI-Shirley

health services building is $1,181,790.00. (Affidavit of Jeffrey J. Quick, ¶ 40, **Exhibit 1**;

Quick MCI-Shirley Estimate, **Exhibit 1-D**).

37. To test the soundness of Quick's estimate, Quick requested that JC Lentine Electric Service, Inc., a company which provides electrical contracting services, to submit a proposal for installing visual alarms in MCI-Shirley Medium housing buildings, the MCI-Shirley Special Management Unit ("SMU") building, and the MCI-Shirley health services building. (Affidavit of Jeffrey J. Quick, ¶ 41, **Exhibit 1**).  The cost for the housing buildings is $99,750 per housing unit and $598,500 for all six housing buildings. (Lentine Proposal MCI Shirley Medium Housing Units, dated May 24, 2019, **Exhibit 1-E**).  The cost for the SMU building is $63,250.00.  (Lentine Proposal MCI Shirley Medium SMU Building, dated May 24, 2019, **Exhibit 1-F**).  The cost for the health services building is $132,750.  (Lentine Proposal MCI Shirley Medium Health Services Building, dated May 24, 2019, **Exhibit 1-G**). The proposals do not include the cost of the toilet fixture upgrades because DRM can complete that work in-house. (Affidavit of Jeffrey J. Quick, ¶ 41, **Exhibit 1**).

38. Limiting the installation of visual alarms to only the cells of inmates who request them is not a practical approach to reducing costs.  Installing visual notifications on an as-requested basis would be inefficient and impractical.  This ad hoc approach would still trigger MAAB requirements for accessibility upgrades; and installing even a limited number of devices could necessitate panel upgrades, programming, and rewiring work. (Affidavit of Jeffrey J. Quick, ¶ 42, **Exhibit 1**).

39. Placement of deaf and hard-of-hearing inmates within specific Department facilities or within specific units at Department facilities is also not a solution.  Programs and services offered by the Department vary significantly from facility to facility and are aimed at individualized program needs.  Also conflicts between and among inmates, as well as

gang affiliations, require careful consideration in terms of housing placement.  Even within a particular facility, inmates move between and among general population housing and other housing types, such as restrictive housing or housing in a facility's health services unit, depending on security or medical concerns.  Inmates within general population housing are also routinely transferred from one housing unit to another within the same facility.  There are many reasons for such transfers, such as inmate conflicts, new medical restrictions, and transfers between single and multi-occupant cells. (Affidavit of Jeffrey J. Quick, ¶ 43, **Exhibit 1**).

40. DRM reviewed several potential emergency notification devices that would not require hardwiring for their suitability for use in Department facilities.  Some devices were rejected at the outset because, based on their technical specifications, they were incompatible with the Department's facilities.  For example, the SafeAwake activates upon a T3 alarm pattern, which is a residential device tone pattern.  Devices that were not incompatible with the Department's facilities were tested.  To test these devices, DRM obtained sample devices.  The devices were first subject to a security review to determine whether inmates could remove parts and use them as components for weapons or other contraband devices.  (Affidavit of Jeffrey J. Quick, ¶ 44, **Exhibit 1**).

41. After the security review, four possible emergency notification devices were put through two rounds of beta testing.  The devices were the Krown KA300 Alert System, the Clarity Alertmaster AMAX Audio Transmitter & Compatible Receiver, the Silent Call Signature Series & Fire Alarm Transmitter & Good Vibration Receiver, and the Silent Call Legacy Series White Sidekick II Receiver & Silent Call Legacy Series Pager Transmitter Pendant.  The first round of testing occurred at Souza-Baranowski

Correctional Center.  The second round of testing occurred at MCI-Norfolk, NCCI-Gardner, the Massachusetts Treatment Center, MCI-Shirley Medium, Old Colony Correctional Center, Pondville Correctional Center, and MCI-Shirley-Minimum. In all cases, each device was tested in multiple locations within the facilities. In many instances, the devices failed to activate.  Each device produced several false alarms as a result of ambient noise at the facilities.  (Affidavit of Jeffrey J. Quick, ¶ 45, **Exhibit 1**; DRM Notification Device Beta Testing Results, **Exhibit 1-H**).

42. The costs associated with installing visual alarms fall outside the scope of facilities' maintenance budgets.  Accordingly, the funds must be obtained either from DCAMM though a deferred maintenance request or from the Legislature as a line item in the Commonwealth's budget.  Last year, DOC requested $8,160,945.00 to fund deferred maintenance projects, and received $2,388,608.00 in funding from DCAMM.  The year before, the Department requested $7,534,951.00 and received $5,869,477.00.  The last two construction or infrastructure capital projects for which the Department received funding by the Legislature were the MCI-Shirley Food Services Building ($15,000,000.00) in 2018 and the MCI-Norfolk Water Pollution Control Facility ($12,000,000.00) in 2019. (Affidavit of Jeffrey J. Quick, ¶ 46, **Exhibit 1**).

43. DCAMM is funded by the Legislature to allocate capital costs among state agencies for improvements and repairs.  Each year, the Department, like other agencies of the Commonwealth, makes requests for critical deferred maintenance projects by entering the requests into the Capital Asset Management Information System (CAMIS) database. A study certified by the agency and DCAMM is required for each request over $100,000.00 Department requests are reviewed by the Commissioner of Correction and by the

Executive Office for Public Safety and Security. (Affidavit of Jeffrey J. Quick, ¶ 47, **Exhibit 1**).

44. DCAMM determines which projects it will fund in any given fiscal year.  The Department typically submits between 10 to 15 deferred maintenance projects every year. The Department typically requests several million dollars for critical deferred maintenance projects.  This year, for example, the Department requested approximately $8 Million in deferred maintenance funding.   Approximately half of the Department's requested projects are funded in a given year.  (Affidavit of Jeffrey J. Quick, ¶ 48, **Exhibit 1**).

45. The funding authorization process typically takes between 6 and 11 months.

46. Capital projects are typically multi-million dollar projects, both infrastructure and new building construction. These projects can be requested via legislation or through the Governor's Office after consultation with the Secretariats. Once funding has been authorized, a design firm (architectural, engineering and/or specialty designer) is hired by DCAMM through the Designer Selection Board (DSB) by advertisement. This process can take up to 12 months. The design firm will prepare a study based upon the project's scope. The study will be certified by DCAMM with a projected estimate for construction. The study phase depending on scope can range from 6 to 14 months to complete. The study design firm can then proceed into design development or a new design firm can be procured through the DSB. The design firm will then complete construction documents for advertisement, bid and award. This process can take between 9 and 24 months to complete and is dependent on the size and scope of the project. Construction has a typical range of 12 and 24 months. (Affidavit of Jeffrey J. Quick, ¶ 50, **Exhibit 1**).

47. Plaintiff Leonard Briggs entered Department custody on August 30, 2001, and was released on March 22, 2019.  (Admission and Movement History Records for Leonard Briggs under Commitment Number W69886, **Exhibit 3-A**)

48. In his deposition testimony on January 30, 2018, Briggs testified that a CO has never come to retrieve him during an evacuation.  (Selections, Deposition Testimony of Leonard Briggs, at 148-49, **Exhibit 4**).  Instead, he has relied upon his inmate companion to apprise him of emergency alarms.  Briggs reports that he was left behind during one evacuation: he was in his cell and evidently did not hear the fire alarm when it sounded; a CO came into his room and told him that everyone had evacuated.  (Id. at 199).  Briggs then joined the rest of his unit in the yard.  (Id.).

49. Plaintiff Rolando Jimenez entered Department custody on February 9, 1982. (Admission and Movement History Records for Rolando Jimenez under Commitment Number W38747, **Exhibit 3-B**)

50. In his February 9, 2018 deposition testimony, Jimenez testified that while he was at Bay State Correctional Center, he did not hear an emergency alarm.  (Selections, Deposition Testimony of Rolando Jimenez, at 19, **Exhibit 5**).  A CO came to his room, "screaming" at him that there was a fire drill and that he needed to go outside.  (Id.).  He does not remember whether he was the last individual evacuated from the unit.  (Id. at 20).  Jimenez alleges that, on another occasion, while at MCI-Norfolk, another inmate told him that there was a fire drill.  (Id. at 21-22).  Jimenez testified that he was not the last inmate to evacuate; there was another inmate who had not yet evacuated.  (Id. at 22).

51. Plaintiff Louis Markham was in Department custody from February 16, 1979 and March 27, 1992.  He reentered Department custody on February 17, 1994. (Admission and

Movement History Records for Louis Markham under Commitment Numbers W55913 and W36947, **Exhibit 3-C**)

52. In his November 30, 2017 deposition testimony, Markham identifies two incidents at MCI-Norfolk.   On one occasion, another inmate told him that there was a fire drill and that they had to leave the building.  (Selections, Deposition Testimony of Louis Markham, at 92-93, **Exhibit 6**).  Other inmates, including hearing inmates, evacuated at that time as well.  (Id. at 94-95).  On the other occasion, a CO with protective gear went to Markham's room and told him that he needed to evacuate.  (Id. at 95-96).  Markham believes he was the last inmate evacuated.  (Id. at 95).

53. Markham also alleges three incidents at the Massachusetts Treatment Center.  On one occasion, he had been in the shower and noticed that his unit had been evacuated. (Selections, Deposition Testimony of Louis Markham, at 98-99, **Exhibit 6**).  Two other individuals, he noted, had not made it outside either.  (Id. at 99, 101).  On a second occasion, Markham was again in the shower, as was another inmate.  (Id. at 100).  A CO came into the shower room and told Markham and the other inmate that they needed to evacuate.  (Id.).  The unit, with the exception of Markham and a few other inmates, had already evacuated.  (Id. at 101).  On November 29, 2017, a CO with protective gear told Markham that it was time to leave, at which time Markham saw other people lining up to leave the building. (Id. at 106-07).

54. Plaintiff Francis McGowan was in Department custody between October 12, 2010 and July 27, 2016.  He reentered Department custody on August 24, 2016. (Admission and Movement History Records for Francis McGowan under Commitment Numbers W108454 and W97331, **Exhibit 3-D**).

55. McGowan testified during his November 28, 2017 deposition that COs at the MTC did not alert him to emergencies or fire alarms; he would evacuate when he saw other inmates evacuating.  (Selections, Deposition of Francis McGowan, at 84-85, 132, **Exhibit 7**).  He was "pretty much" the last person out several times. (Id. at 85).

56. Plaintiff Eric Roldan entered Department custody on May 24, 2011 and was released on March 22, 2019.  (Admission and Movement History Records for Eric Roldan under Commitment Number W98685, **Exhibit 3-E**).

57. Roldan testified in his March 5, 2018 deposition that on one occasion, in 2014, he was in the shower and was told by a CO to evacuate.  (Selections, Deposition of Eric Roldan, at 147-49, **Exhibit 8**).  He asserts that everyone in the unit had already evacuated.   (Id. at 148).

58. Plaintiff George Skinder was in Department custody between July 18, 2011 and August 26, 2011 and between September 22, 2011 and March 6, 2017.  He reentered Department custody on January 29, 2018.  (Admission and Movement History Records for George Skinder under Commitment Numbers M109242, W99289, M123973, and W110794, **Exhibit 3-F**).

59. In his March 19, 2018 deposition, Skinder alleges that on one occasion, he was sleeping and was retrieved by a CO who informed him that there was a fire drill.  (Selections, Deposition of George Skinder, at 65-66, **Exhibit 9**).  Markham and a couple of other inmates had not evacuated with the rest of the unit.  Skinder alleges that he and the other inmates were retrieved after COs conducted a head count.  (Id.).

60. Plaintiff Jennifer Ward entered Department custody on December 28, 2007.  (Admission and Movement History Records for Jennifer Ward under Commitment Number F80910, **Exhibit 3-G**).

61. Ward testified in her December 18, 2017 deposition that on one occasion she missed a fire alarm and was retrieved by two officers after everyone else had been evacuated. (Selections, Deposition of Jennifer Ward, at 117-18, **Exhibit 10**).

Respectfully submitted,

NANCY ANKERS WHITE
Special Assistant Attorney General

Dated:  December 20, 2019

/s/ Timothy M. Pomarole
Timothy M. Pomarole
BBO #: 660827
Legal Division
Department of Correction
70 Franklin Street, Suite #600
Boston, MA 02110
(617) 727-3300, ext. 1158
Timothy.Pomarole@doc.state.ma.us

## CERTIFICATE OF SERVICE

I, Timothy M. Pomarole, hereby certify that a true and accurate copy of this document was served via ECF to all registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as nonregistered participants on December 20, 2019.

/s/ Timothy M. Pomarole
Timothy M. Pomarole