# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LEONARD BRIGGS, GEORGE SKINDER, LOUIS MARKHAM, FRANCIS MCGOWAN, ERIC ROLDAN, ROLANDO S. JIMENEZ, AND JENNIFER WARD, *on behalf of themselves and all others similarly situated*, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 1:15-cv-40162-GAO |
| v. | ) ) | |
| MASSACHUSETTS DEPARTMENT OF CORRECTION, *et al.*, | ) ) | **REQUEST FOR ORAL ARGUMENT** |
| Defendants. | ) ) ) ) | |
| | ) ) | |

## PLAINTIFFS' OPPOSITION TO MASSACHUSETTS DEPARTMENT OF CORRECTION DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ...........................................................................................................1

BACKGROUND ............................................................................................................2

LEGAL STANDARD.....................................................................................................5

ARGUMENT .................................................................................................................5

I.      DOC IS NOT ENTITLED TO SUMMARY JUDGMENT BECAUSE
PLAINTIFFS HAVE PRESENTED AMPLE EVIDENCE THAT THE "RED
DOT" PROCEDURE IS NOT A REASONABLE ACCOMMODATION. ......................5

     A.    The Court Should Deny DOC's Motion Because Material Facts Concerning
The Effectiveness Of DOC's "Red Dot" Procedure Are Disputed. ...........................5

     B.    DOC Has Failed To Establish That Providing Plaintiffs Access To Its
Emergency Notification Services Would Result In An Undue Burden.......................11

     C.    DOC's Incorrect Interpretation Of The 2010 Standards Provides No Basis For
Summary Judgment. ................................................................................................16

II.     DOC IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS'
EIGHTH AND FOURTEENTH AMENDMENT CLAIMS..............................................18

III.    PRINCIPLES OF COMITY AND THE PLRA ARE NOT BARRIERS TO
INJUNCTIVE RELIEF................................................................................................19

CONCLUSION............................................................................................................20

CERTIFICATE OF SERVICE .....................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Alexander v. Choate*,
    469 U.S. 287 (1985)........................................................................................6

*Bibbo v. Mass. Dep't of Corr.*,
    2010 WL 2991668 (D. Mass. 2010) .............................................................6

*Borkowski v. Valley Cent. Sch. Dist.*,
    63 F.3d 131 (2d Cir. 1995)...........................................................................13

*Brown v. Plata*,
    563 U.S. 493 (2011)......................................................................................20

*California ex rel. Lockyer v. Cty. of Santa Cruz*,
    2006 WL 3086706 (N.D. Cal. Oct. 30, 2006)...........................................17

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)........................................................................................5

*Chisolm v. McManimon*,
    275 F.3d 315 (3d Cir. 2001).........................................................................12

*Clarkson v. Coughlin*,
    898 F. Supp. 1019 (S.D.N.Y. 1995)................................................1, 2, 8, 20

*Culvahouse v. City of LaPorte*,
    679 F. Supp. 2d 931 (N.D. Ind. 2009) ........................................................14

*Dimarzo v. Cahill*,
    575 F.2d 15 (1st Cir. 1978)..........................................................................18

*Disability Rights Mont., Inc. v. Batista*,
    930 F.3d 1090 (9th Cir. 2019) .....................................................................19

*D.B. ex rel Elizabeth B. v. Esposito*,
    675 F.3d 26 (1st Cir. 2012)............................................................................6

*Farmer v. Brennan*,
    511 U.S. 825 (1994)......................................................................................19

*Fink v. N.Y. City Dep't of Personnel*,
    53 F.3d 565 (2d Cir. 1995)...........................................................................10

*Fulton v. Goord*,
    591 F. 3d 37 (2d Cir. 2009)........................................................................10

*Gray v. Cummings*,
    917 F.3d 1 (1st Cir. 2019)...........................................................................6

*Helling v. McKinney*,
    509 U.S. 25 (1993)....................................................................................18

*Henderson v. Thomas*,
    913 F. Supp. 2d 1267 (M.D. Ala. 2012) ...........................................12, 19

*Holmes v. Godinez*,
    311 F.R.D. 177 (N.D. Ill. 2015)........................................................5, 11, 18

*Kirola v. City & Cty. of San Francisco*,
    860 F.3d 1164 (9th Cir. 2017) ..................................................................16

*Phipps v. Sheriff of Cook Cty.*,
    681 F. Supp. 2d 899 (N.D. Ill. 2009) ..........................................................5

*Pierce v. Cty. of Orange*,
    526 F.3d 1190 (9th Cir. 2008) ..................................................................15

*Pierce v. Cty. of Orange*,
    761 F. Supp. 2d 915 (C.D. Cal. 2011) ........................................................9

*Pierce v. District of Columbia*,
    128 F. Supp. 3d 250 (D.D.C. 2015) ..........................................................14

*Reaves v. Dep't of Corr.*,
    195 F. Supp. 3d 383 (D. Mass. 2016) .................................................19, 20

*Shaheed-Muhammad v. Dipaolo*,
    393 F. Supp. 2d 80 (D. Mass. 2005) ........................................................15

*Theriault v. Flynn*,
    162 F.3d 46 (1st Cir. 1998).........................................................................6

*Turner v. Safley*,
    482 U.S. 78 (1987)....................................................................................20

*United States v. Coloplast Corp.*,
    327 F. Supp. 3d 300 (D. Mass. 2018) .........................................................5

*Wright v. N.Y. State Dep't of Corr.*,
    831 F.3d 64 (2d Cir. 2016).........................................................................14

**Federal Statutes and Regulations**

Americans with Disabilities Act of 1990, codified at 42 U.S.C. § 12101 *et seq.* .................. *passim*

Prison Litigation Reform Act, codified at 42 U.S.C. § 1997e .................................................19, 20

Rehabilitation Act of 1973, codified at 29 U.S.C. § 701 *et seq.* .........................................1, 5, 6, 8

28 C.F.R. § Pt. 35, Appendix A ...............................................................................................16

28 C.F.R. § 35.130(b) ...............................................................................................................6

28 C.F.R. § 35.150 ............................................................................................................ *passim*

28 C.F.R. § 35.151(k) ...............................................................................................................15

28 C.F.R. § 35.160(a)(1) ............................................................................................................6

**State Statutes and Regulations**

M.G.L. c. 127, §§ 1, 17A ..........................................................................................................15

Massachusetts State Building Code, 521 Mass. Code Regs .........................................................15

**Other Authorities**

Dep't of Justice, *2010 ADA Standards for Accessible Design* (2010).........................15, 16, 17, 18

Dep't of Justice, *Guidance on the 2010 ADA Standards for Accessible Design*
    (2010).................................................................................................................................15

## INTRODUCTION

Defendant Massachusetts Department of Correction ("DOC")[1] relies upon automated audible alarms to notify most prisoners of emergencies and evacuations.  In contrast, Plaintiffs and other deaf and hard-of-hearing prisoners, who cannot reliably hear audible notifications, must rely on a "procedure" that is not automatic, but rife with risk of human error.  This procedure requires correctional officers ("CO") to successfully complete all of the following steps during housing unit evacuations, even during life-threatening emergencies: (1) know or discover which prisoners require personal notification of emergencies by looking at the unit's bed book to find prisoners with "red dots," and then determining which prisoners within that subset have hearing disabilities; (2) know or discover where those prisoners are when the alarm sounds (*e.g.*, in their cells, in the showers, etc.); (3) go to those locations; and (4) effectively communicate to deaf and hard-of-hearing prisoners the need to evacuate.  This procedure is not a reasonable accommodation under the Americans with Disabilities Act ("ADA") because it does not provide Plaintiffs with equal access to the automatic emergency notifications available to hearing prisoners or an equally effective alternative.  Courts have found that failing to provide a visual alarm system that automatically alerts hearing disabled persons to emergencies is insufficient as a matter of law.  *See Clarkson v. Coughlin*, 898 F. Supp. 1019, 1046-47, 1052 (S.D.N.Y. 1995) (granting summary judgment in favor of plaintiffs' claims that "the absence of visual safety alarms violates both the ADA and the Rehabilitation Act" and issuing injunction).

At a minimum, DOC's claim that its "red dot" procedure is legally sufficient is hotly disputed and not appropriate for summary judgment.  Plaintiffs have presented ample evidence that they have not been notified of emergencies on many occasions.  In addition, DOC's

---

[1] "DOC" refers to the Department of Correction Defendants, including the Massachusetts Department of Correction, Carol Mici, Jennifer Gaffney, Suzanne Thibault, Steven Silva, Lisa Mitchell, and Kyle Pelletier.

scattershot defenses misconstrue the law and provide no basis for summary judgment. The Court should deny DOC's motion and expedite trial because, ignoring the direct advice of the Massachusetts Commission for the Deaf and Hard of Hearing ("MCDHH") and the findings of its own ADA Committee, DOC refuses to meet its statutory and constitutional duties, leaving Plaintiffs "completely at risk in the event of fire" or other emergency. *See id.* at 1047.

## BACKGROUND

Plaintiffs are seven deaf and hard-of-hearing individuals who are or were in DOC custody during the pendency of this litigation. Plaintiffs seek equal and effective access to the emergency notification systems that DOC makes available to hearing prisoners, which provide automatic alerts that enable prisoners who hear them to immediately evacuate without staff intervention. In the absence of automated visual or tactile systems designed to alert hearing disabled persons of emergencies, Plaintiffs have repeatedly received delayed emergency notifications or, even worse, no notification.

- When Plaintiff Leonard Briggs resided at MCI-Shirley, COs knew that he was deaf, but they made no effort to keep him informed of emergency notifications. RSUF ¶64.[2] On one occasion, Mr. Briggs was left behind during a fire drill when he was watching television and did not know the unit was evacuating. All prisoners and staff exited the building before a CO notified him. *Id.* ¶65. Mr. Briggs does not remember a CO ever coming to get him during a fire drill. *Id.* ¶64.

- Plaintiff Rolando Jimenez was left in his cell during a fire drill at Bay State Correctional Center while he was in his room and not wearing his hearing aids. A CO came to his room screaming and told him to go outside because there was a drill. *Id.* ¶68. Mr. Jimenez now lives at MCI-Norfolk, and has been left in his cell by COs during at least two fire drills. On the first occasion, another prisoner told Mr. Jimenez that he should evacuate. *Id.* ¶¶69, 71. On the second occasion in mid-2019, Mr. Jimenez only knew to evacuate because he felt the vibration of the building's door repeatedly opening and closing and looked out his window to see the COs and other prisoners outside. *Id.* ¶72.

- At the Massachusetts Treatment Center, Plaintiff Louis Markham was left in his unit during several evacuations. *Id.* ¶76. On one occasion, Mr. Markham took a shower and

---

[2] "RSUF" refers to Plaintiffs' Response and DOC Defs.' Statement of Undisputed Material Facts and Statement of Additional Material Facts filed herewith.

returned to his room.  While in his cell, other prisoners returned from outside and asked him where he had been because there had been a fire drill.  *Id.*  Another time, Mr. Markham was again left behind in the shower room while other prisoners were evacuated; Plaintiff Eric Roldan was also showering at the time.  *Id.* ¶77.  At MCI-Norfolk, Mr. Markham was left behind during two fire drill.  The first time, he only learned of it because another prisoner, Plaintiff George Skinder, noticed that he had not been evacuated and came to get him.  *Id.* ¶80.  The second time, a CO wearing a gas mask came to his cell to get him after everyone else had evacuated.  *Id.* ¶81.  Mr. Markham currently resides at NCCI-Gardner; he is unaware of the emergency evacuation procedures or evacuation plan from his unit because no one has explained them to him since his July 2019 arrival.  *Id.* ¶82.

- Plaintiff Frances McGowan was nearly left behind during several fire drills when he resided at the Massachusetts Treatment Center; he eventually evacuated the building only because he noticed everyone else was leaving.  *Id.* ¶87.  Mr. McGowan currently resides at MCI-Norfolk in the Assisted Daily Living unit for prisoners with medical issues; DOC has not evacuated him during a fire drill or told him what to do or expect in the event of an emergency since he joined that unit in 2017.  *Id.* ¶88.

- When Plaintiff Eric Roldan resided at the Massachusetts Treatment Center, the fire alarm activated while he was showering, and Mr. Roldan and Mr. Markham were left behind while their unit was evacuated.  *Id.* ¶93.  In February 2016, at NCCI-Gardner, Mr. Roldan was cleaning his cell when the fire alarm activated.  A CO walked past Mr. Roldan but did not notify him about the alarm.  Mr. Roldan only discovered that the fire alarm was activated because he sensed there was a problem and went to his cell door.  *Id.* ¶95.

- Plaintiff George Skinder has been housed in cells without access to visual alarms at MCI-Shirley, MCI-Norfolk, MCI-Cedar Junction, and the Massachusetts Treatment Center.  *Id.* ¶97.  When Mr. Skinder resided at MCI-Shirley, he was left in his cell during a fire drill when he was sleeping without his hearing aids.  After COs noticed that Mr. Skinder was missing during the head count of evacuated prisoners conducted outside, a CO came back inside the unit, into his cell, and kicked his bed to wake him up.  *Id.* ¶100.  Aside from this delayed notification, Mr. Skinder has not been personally notified by COs to evacuate during fire drills. *Id.* ¶98.  Mr. Skinder has always had to rely on his own observations and other prisoners to know what is happening.  *Id.* ¶98.

- Plaintiff Jennifer Ward, who resided at MCI-Framingham, was left in her unit during several fire drills after everyone else had evacuated.  *Id.* ¶105.  For example, during the week of April 9, 2019, Ms. Ward was left in her cell during a fire drill.  Other prisoners told Ms. Ward that, instead of sounding the alarm system, DOC staff shouted, "Fire! Fire!" in the unit.  Ms. Ward did not hear this message and no officer came to notify her; COs admonished Ms. Ward when they discovered that she had not evacuated.  *Id.* ¶106.  Ms. Ward was left behind again later in 2019 after all the other prisoners evacuated the unit.  Ms. Ward does not remember a single instance during her 12 years at MCI-Framingham when an officer came to her cell to notify her of a fire drill.  *Id.* ¶102, 104.

DOC's assertion that its "red dot" procedure is effective to notify hearing disabled

prisoners of emergencies is disputed.  There is ample evidence from which a reasonable fact-finder could find that the "red dot" procedure—which relies on individual action by COs in lieu of automated alarms—is both facially deficient and not followed in practice.  *See infra* at 7-10. And at a minimum, it is not possible to conclude as a matter of undisputed fact that COs or other DOC staff actually perform the requisite series of steps required by the "red dot" procedure to inform hearing disabled prisoners of emergencies.  *See infra* at 7-8.  On the contrary, the evidence shows that the "red dot" procedure is not reliably carried out with the result that prisoners with hearing disabilities face a much higher risk than their hearing counterparts of receiving delayed emergency alerts or no alerts at all.  *See infra* at 7-10.

      In the face of this evidence, DOC resorts to strawman tactics, mischaracterizing Plaintiffs' accommodation requests as a demand that DOC hard-wire visual alarms into every single housing unit of every single DOC facility, regardless of actual need.  Mem. at 5-8.[3] Unsurprisingly, DOC then argues that installing visual alarms into 164 DOC buildings and housing units would constitute undue financial burden.  *Id.* at 17-20; RSUF ¶135.  But Plaintiffs have never sought DOC to install visual alarms in all of its facilities; they only ask DOC to provide accessible automatic visual or tactile emergency notifications to the deaf and hard-of-hearing prisoners who need that accommodation.  Compl. ¶117 and Prayer for Relief (c); RSUF ¶¶113-14.  Moreover, Plaintiffs have never requested any specific technology, as there is an array of automated devices created for deaf and hard-of-hearing individuals that could provide equal access to emergency alarms.  Far from calling for DOC to upgrade all facilities, Plaintiffs have suggested many different types of accommodations.  These range from various automated notification devices to a suggestion that DOC explore voluntary clustering of deaf and hard-of-

---

[3] "Mem." refers to DOC's Memorandum in support of its Motion for Summary Judgment (Dkt. No. 225).

hearing prisoners of the same classification level within the same facility, or clustering prisoners residing at the same facility within the same housing unit, to economize accommodations where possible.  DOC's strawman attack only serves to emphasize the absence of any valid defenses to Plaintiffs' claims, and the Court should deny DOC's motion.

## LEGAL STANDARD

As the party moving for summary judgment, DOC bears the burden of demonstrating the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Summary judgment is improper if Plaintiffs "present definite, competent evidence to rebut the motion."  *United States v. Coloplast Corp.*, 327 F. Supp. 3d 300, 306 (D. Mass. 2018) (citation omitted).  Where the reasonableness of an accommodation is at issue under the ADA, courts have denied summary judgment because that determination, "especially in the prison context, is highly fact-specific and determined on a case-by-case basis."  *Holmes v. Godinez*, 311 F.R.D. 177, 226, 228 (N.D. Ill. 2015) (internal quotation omitted); *see Phipps v. Sheriff of Cook Cty.*, 681 F. Supp. 2d 899, 914, 920-21 (N.D. Ill. 2009) (denying cross-motions for summary judgment on ADA claim where "the central question concerning the reasonableness of making the plaintiffs' requested accommodations is much too fact-sensitive to be resolved on the basis of any of the parties' arguments").

## ARGUMENT

### I.    DOC IS NOT ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFFS HAVE PRESENTED AMPLE EVIDENCE THAT THE "RED DOT" PROCEDURE IS NOT A REASONABLE ACCOMMODATION.

#### A.    The Court Should Deny DOC's Motion Because Material Facts Concerning The Effectiveness Of DOC's "Red Dot" Procedure Are Disputed.

To establish a violation of either Title II of the ADA or Section 504 of the Rehabilitation Act, a plaintiff must show that (1) he or she "is a qualified individual with a disability;" (2) he or

she "was either excluded from participation in or denied the benefits of [a] public entity's services, programs, or activities or was otherwise discriminated against;" and (3) that such denial was because of his or her disability.[4]  *Gray v. Cummings*, 917 F.3d 1, 15 (1st Cir. 2019); *Theriault v. Flynn*, 162 F.3d 46, 48 n.3 (1st Cir. 1998); *see also* 42 U.S.C. § 12132; 29 U.S.C. § 794(a).  DOC does not dispute that Plaintiffs are qualified individuals with disabilities.  Mem. at 2.  And disputed issues of fact on the remaining elements of Plaintiffs' claims preclude summary judgment for DOC.

With respect to hearing disabilities, Title II regulations require public entities to "take appropriate steps to ensure that communications with . . . participants . . . with disabilities are as effective as communications with others."  28 C.F.R. § 35.160(a)(1).  Additionally, public entities must "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity."  *Id.* § 35.160(b)(1).  Title II requires a prison to make each program and service, "when viewed in its entirety . . . readily accessible to and usable by individuals with disabilities," *id.* § 35.150(a), and to "make reasonable modifications in policies, practices, or procedures" available when they are not.  *Id.* § 35.130(b)(7)(i).  A reasonable modification is one that gives "'meaningful access' to the program or services sought."  *Bibbo v. Mass. Dep't of Corr.*, 2010 WL 2991668, at *1 (D. Mass. 2010) (quoting *Alexander v. Choate*, 469 U.S. 287, 301 (1985)).  In providing meaningful access, prisons are prohibited from affording a prisoner, on the basis of disability, with "an aid, benefit, or service that is ***not as effective in affording equal opportunity*** to obtain the same result, [or] to gain the

---

[4] The Rehabilitation Act contains the additional requirement that the plaintiff be excluded from a "program or activity receiving Federal financial assistance."  *D.B. ex rel Elizabeth B. v. Esposito*, 675 F.3d 26, 39 & n.6 (1st Cir. 2012) (quoting 29 U.S.C. § 794).  DOC does not dispute that it receives federal financial assistance.  RSUF ¶152.

same benefit . . . as that provided to others."  28 C.F.R. § 35.130(b)(1)(iii) (emphasis added).

The crux of DOC's motion for summary judgment is its assertion that the "red dot" procedure works.  *See* Mem. at 3.  But DOC points to no evidence that it has effectively implemented the "red dot" procedure at any facility, that DOC has tested its efficacy, or that any DOC officer has ever performed his or her duties under the "red dot" procedure to evacuate a disabled prisoner.  The record *does*, however, contain ample evidence that the "red dot" procedure does not provide Plaintiffs effective emergency notifications.

Plaintiffs have presented extensive evidence that the "red dot" procedure does not give them equal access to, or the benefits of, DOC's emergency notification systems.  Unlike hearing prisoners who are automatically notified of emergencies by audible alarms, deaf and hard-of-hearing prisoners must rely on COs to come to their cells during an emergency to tell them to evacuate.  RSUF ¶¶111-12, 119.  Even if COs could be relied on to carry out the "red dot" procedure, it clearly disadvantages prisoners with a hearing disability, putting their lives at greater risk in the event of a serious emergency.  Moreover, DOC has rejected Plaintiffs' requests for accommodations that do not depend on COs, such as hard-wired alarms, personal visual or tactile notification devices, or clustering prisoners in housing units or facilities equipped with in-cell visual alarms.  *Id.* ¶118.  DOC instead clings to the fiction that its "red dot" procedure is sufficient, despite overwhelming evidence that it is not.  *Id.* ¶123.

The record contains considerable evidence showing that COs do not follow the "red dot" procedure in practice.  Most critically, since implementing the "red dot" procedure in 2016, Plaintiffs have repeatedly experienced, and continue to endure, delayed or non-existent notifications during fire drills and emergency evacuations.  *Id.* ¶¶71-72, 78, 80-81, 106-07.[5]

---

[5] DOC's own expert admits that to the extent deaf or hard-of-hearing inmates have been left behind recently during a fire drill, this may indicate that the "red dot" procedure is an insufficient accommodation.  RSUF ¶131.

Timely notice from COs has proven unreliable even in the relatively calm and controlled setting of a fire drill, when COs are primed to comply with DOC's policies and procedures. *See id.* ¶129. Contrary to DOC's argument that there are only occasional breakdowns in the "red dot" procedure, several Plaintiffs report that a CO has never come to their cell to notify them of an emergency during all their years in custody. *Id.* ¶¶64, 104. Further, even DOC's ADA Coordinator for Inmates, James O'Gara, admitted that there are situations where a CO does not know that a prisoner is deaf or hard-of-hearing and is not familiar with the prisoners in, and has not reviewed the bed book for, the housing unit at which he or she is stationed. *Id.* ¶¶126-28.

Even if the "red dot" procedure was at times effective (the record contains no evidence of even intermittent efficacy), it does not provide deaf and hard-of-hearing prisoners an equal opportunity to benefit from the automated emergency notifications available to hearing prisoners. Automated alarms produce immediate notification and are not subject to the fallibility of human beings operating under stress. This violates the law. *See Clarkson*, 898 F. Supp. at 1034, 1046-47, 1052 (granting summary judgment in favor of plaintiffs' claims that "the absence of visual safety alarms" violated the ADA and Rehabilitation Act, issuing injunctive relief, and noting that plaintiffs "were completely at risk in the event of fire" where prison failed to provide visual alarms that were "adequate to the needs of deaf inmates").

It should come as no surprise that the "red dot" procedure is ineffective. The procedure, set out in 103 DOC 730, provides:

> If an inmate has been identified as ***deaf and/or hearing impaired, blind, and/or visually impaired*** in the Medical Restrictions screen in IMS, a red dot shall be placed on the lower right corner of his/her bed book card for use by the housing unit officer. This will alert staff that the inmate has impairment, and ***may need*** additional assistance during an evacuation.

RSUF ¶119 (emphasis added). As written, the "red dot" procedure cannot adequately notify COs which prisoners in their assigned unit require assistance due to a hearing disability. Red dots

appear without distinction on the bed book cards of prisoners with hearing and vision disabilities alike, leaving COs to guess what kind of assistance may be effective or necessary for an individual prisoner.  What is more, the red dots do not inform COs which prisoners, in fact, need evacuation assistance, nor does the procedure direct COs to provide additional assistance to all prisoners with a red dot.  Thus, the presence of a red dot does not even signify that a particular prisoner has a hearing disability and must therefore be alerted by a CO of the need to evacuate.[6]

Rather than acknowledge that COs repeatedly fail to provide emergency notifications to deaf and hard-of-hearing prisoners that allow them to evacuate simultaneously with hearing prisoners, DOC argues that the "red dot" procedure is a reasonable accommodation because prisoners with hearing disabilities are sometimes notified about emergency announcements by other prisoners or eventually discovered by COs performing sweeps of the housing unit long after alarms are triggered.  *See* Mem. at 11-12.  For example, DOC argues that in two instances Plaintiffs were not actually "left behind" because fellow prisoners notified them of an evacuation.  *Id*. at 11.  This hardly constitutes evidence that the "red dot" procedure is working.  On the contrary, it shows that DOC's system failed because Plaintiffs were not notified of the need to evacuate by COs, as DOC claims they should be.  Further, relying on fellow prisoners to provide emergency notifications is not equal access to those services as a matter of law.  *See* *Pierce v. Cty. of Orange*, 761 F. Supp. 2d 915, 950 (C.D. Cal. 2011) (finding it was not a reasonable accommodation "for other inmates . . . to assist disabled detainees and inmates").

DOC attempts to minimize the significance of the "red dot" procedure failures that Plaintiffs personally experienced by calculating failure rates.  Mem. at 11.  Of course, even a single failure could be fatal.  Further, the calculations rely on the disputed assertion that each

---

[6] Karen DiNardo, an experienced DOC Facility ADA Coordinator, admitted that the "red dot" procedure's "language is so generic that it may pose an issue for implementation." *Id.* ¶125.

DOC facility conducts fire drills in every unit on a quarterly basis.  While policy may direct this practice, DOC has not produced any admissible evidence to show that such drills are in fact conducted, and based on Plaintiffs' experiences, either fire drills do not occur in every housing unit of every DOC facility every three months or they are not notified of them.  RSUF ¶¶73, 83, 88, 101.

Similarly lacking is DOC's effort to wave off evacuation delays as irrelevant.  Mem. at 11.  Incidents in which a CO discovered that a prisoner with a hearing disability was left in his or her cell only after performing the head count of evacuated prisoners outside of the unit or a deaf or hard-of-hearing prisoner discovers an evacuation has occurred after observing that he or she is alone in the unit, are evidence that the "red dot" procedure has failed to notify him or her.  *See, e.g.*, *id.* ¶¶81, 106-07; *see also id.* ¶¶65, 68, 77, 93, 100, 105.  If a prisoner does not learn of an emergency, such as a real fire, until after everyone else has evacuated the unit, it may be too late. COs are not trained as firefighters and are prohibited from engaging in firefighting.  *Id.* ¶121. Thus, in a genuine emergency, a delay could be the difference between life or death, and there is no expectation that a CO could or would re-enter a burning unit to retrieve a prisoner who is deaf or hard-of-hearing.

Relying on *Fink v. New York City Department of Personnel*, 53 F.3d 565 (2d Cir. 1995), DOC suggests that it cannot be found liable under the ADA merely because its COs fail to carry out the "red dot" procedure to perfection.  Mem. at 10-11.  Defendants ignore the fact that the range of acceptable error depends on what is at stake.  As the Second Circuit has explained, whether an accommodation is "reasonable" is a highly fact-specific and context-sensitive inquiry: "it evaluates the desirability of a particular accommodation according to the consequences."  *Fulton v. Goord*, 591 F. 3d 37, 44 (2d Cir. 2009) (citation omitted).  Here,

Plaintiffs have presented evidence of a systemic failure in DOC's life-saving procedures, where the consequences of a "single misstep," Mem. at 12, could be fatal.[7]

**B.      DOC Has Failed To Establish That Providing Plaintiffs Access To Its Emergency Notification Services Would Result In An Undue Burden.**

DOC misrepresents Plaintiffs' prayer for relief as seeking hard-wired visual alarms in every housing unit of every DOC facility, and then argues that even if the Court finds that the "red dot" procedure falls short of its ADA obligations, the Court cannot require it to install visual alarms because doing so would present an undue financial burden. Mem. at 2, 17-20. This is a fabricated burden of DOC's own making. As discussed *supra* at 4-5, Plaintiffs have never called for DOC to install visual alarms in every facility, let alone in every housing unit. Plaintiffs only seek to ensure that there are accessible emergency notification systems in place for prisoners with hearing disabilities who require them. Compl. ¶117, Prayer for Relief (c); RSUF ¶113-14.

It is unclear how many class members may need emergency notification accommodations. For example, cells in each unit at Souza Baranowski Correctional Center, DOC's maximum-security prison, are already equipped with visual alarms. RSUF ¶148. In addition, many other DOC facilities house prisoners in dorms, rather than cells, where sufficient visual alarms already exist. *Id.* ¶149. Furthermore, DOC has rejected other accommodations that may be less costly to provide that could afford effective emergency notification, such as portable visual alarms or bed-shakers. *Id.* ¶118. DOC could also follow the model used by many other correctional systems and cluster deaf and hard-of-hearing prisoners into specific facilities or within a specific unit in a facility. *Id.* ¶150. This would obviate the need to install visual alarms across all facilities, and enable DOC to more efficiently provide other

---

[7] *See Holmes*, 311 F.R.D. at 235-36 (recognizing that in "a real emergency," like a fire, "late or non-existent notification would place [deaf or hard-of-hearing prisoners] at a substantial risk of bodily harm or even death").

accommodations, allowing prisoners with disabilities better access to DOC programs and services and their peers. *Cf. Henderson v. Thomas*, 913 F. Supp. 2d 1267, 1295-96 (M.D. Ala. 2012) (requiring prison system "to modify its classification system in order to effectuate" compliance with the ADA).

Even if one were to accept DOC's argument that Plaintiffs' requests pose undue burden, DOC has failed to comply with the clear requirements established by 28 C.F.R. § 35.150(a)(3). These require a public entity rejecting a request for reasonable accommodation on undue burden grounds to show, *inter alia*, that (i) the head of the public entity or designee considered all resources available for use in the funding and operation of the service, program, or activity; (ii) the decision was accompanied by a written statement of the reasons for reaching that conclusion; and (iii) the public entity took any other action that would not result in an undue burden but would ensure that, to the maximum extent possible, individuals with disabilities receive the benefits or services provided by the public entity. 28 C.F.R. § 35.150(a)(3). DOC has not presented evidence that it has fulfilled any of these obligations. As a result, DOC cannot succeed on an undue burden defense. *See Chisolm v. McManimon*, 275 F.3d 315, 318, 328 (3d Cir. 2001) (reversing district court's grant of summary judgment and noting that "it [was] not clear from the record that [the prison] complied with the requirements" of § 35.150(a)(3) when it denied plaintiffs "requested auxiliary aids").

*First*, DOC offers no proof that a high-level DOC official with "budgetary authority and responsibility for making spending decisions" considered "all resources available for use in the funding" of visual alarms. 28 C.F.R. § 35.150(a)(3); 28 C.F.R. Part 35, Final Rule (2011). For instance, although DOC seeks funding for a list of deferred maintenance projects and large-scale capital projects annually from the Division of Capital Asset Management and Maintenance

("DCAMM"), it has never requested funding from DCAMM to install in-cell visual alarms or provide any other accessible emergency notification devices for deaf and hard-of-hearing prisoners.  RSUF ¶133.

*Second*, DOC provides no "written statement of the reasons" for concluding that providing emergency alarms effective for deaf and hard-of-hearing prisoners would be burdensome.  28 C.F.R. § 35.150(a)(3).  DOC's disputed and conclusory assertion that the benefits of providing visual alarms to deaf and hard-of-hearing prisoners "would, at most, represent a marginal or incremental advance over the present system," Mem. at 18, is insufficient.  *See Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 140, 142-43 (2d Cir. 1995) (denying summary judgment where no evidence supported defendant's undue burden defense to establish "that the benefits that [the requested ADA accommodation] would give are too small in relation to the cost").

*Finally*, since devising its undue burden affirmative defense, DOC has not "take[n] any other action that would not result in . . . such burdens but would nevertheless ensure that individuals with disabilities receive the benefits or services provided by the public entity."  28 C.F.R. § 35.150(a)(3).  For instance, after developing its self-serving $22 million "pre-study" cost estimate for Department-wide in-cell visual alarms, DOC never bothered to determine the cost for providing in-cell visual alarms only in the housing units where deaf and hard-of-hearing prisoners who requested this accommodation actually live.  RSUF ¶¶136-37.  It is possible that DOC could accommodate some Plaintiffs without needing to replace fire alarm panels, rewire facilities, or upgrade analog fire alarm devices.  *Id.* ¶¶138-40.  DOC does not know whether that is the case because it simply has not checked.  *Id.* ¶140.  As such, DOC has not only failed to meet the requirements of 28 C.F.R. § 35.150(a)(3), it has also failed to perform the

individualized inquiry into the reasonableness of Plaintiffs' accommodation requests that the ADA requires. *See Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 68-69, 77-78 (2d Cir. 2016) (reversing district court's grant of summary judgment in favor of prison on Title II claim where, *inter alia*, prison failed to engage in individualized inquiry into reasonableness of accommodation sought by disabled prisoner and thereby violated ADA); *see also Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 254, 268 (D.D.C. 2015) (finding ADA violation as a matter of law where prison failed to engage in individualized inquiry into accommodation needs of deaf prisoner).

The limited beta-testing of personal emergency notification devices that DOC performed is likewise insufficient to cure its failure to attempt to provide prisoners with hearing disabilities alternatives to hard-wired in-cell visual alarms.  DOC confined its beta-testing to four emergency notification devices.  RSUF ¶145.  When DOC determined that the devices were not sufficiently compatible with its facilities, it was unreasonable to end the inquiry.  DOC did not bother to consult other correctional agencies that have experience with providing accessible notification devices to prisoners who are deaf or hard-of-hearing *or even beta-test the device recommended by its own expert*. *Id.* ¶¶146-47.  Where DOC "fail[ed] to exhaust available resources" or propose "any alternate method(s)" for delivering its services and programs to Plaintiffs, DOC "shouldn't be permitted to ignore its obligations under the ADA by claiming undue financial burden." *Culvahouse v. City of LaPorte*, 679 F. Supp. 2d 931, 945-46 (N.D. Ind. 2009).

DOC's objections to clustering are also inadequate.  DOC claims, without any evidentiary support, that because of the way its facilities are "structured, classified, and organized" it would be necessary to establish clustered units in more than half of its facilities, and that clustering would restrict its ability to meet the program and security needs of individual

prisoners.  Mem. at 19.  These are disputed issues of fact.  There is nothing unique about the

DOC that renders clustering unreasonable in Massachusetts while other states have found it to be

the most efficient and effective way to provide deaf and hard-of-hearing prisoners reasonable

access to programs and services.  *See* RSUF ¶150.  Indeed, DCAMM provided clear guidance to

DOC that, "[a]s the DOC has multiple facilities that house inmates of the same custody level," it

can efficiently meet its ADA program accessibility obligations for prisoners with disabilities "by

targeting specific facilities in each custody level."  RSUF ¶151.[8]  DOC gives no explanation for

why it objects to taking this approach to providing program access to its emergency notification

systems for prisoners with hearing disabilities.[9]  DOC's objections are further undermined by the

fact that it already clusters prisoners with mental illness in Residential Treatment Units within

only a few institutions.  *See* M.G.L. c. 127, §§ 1, 17A.[10]

  In any event, DOC's cost estimates are not undisputed.  As addressed in Plaintiffs'

Motion to Strike, the Court should strike Mr. Quick's Affidavit testimony in support of the $22

million "pre-study" cost estimate because it constitutes impermissible lay opinion testimony.

*See* Motion to Strike at 6, 13.  Further, the $22 million "pre-study" cost estimate is imprecise and

inflated because its scope reaches far beyond actual need.  For example, DOC's "pre-study"

---

[8] The ADA regulations explicitly state that the ADA does not "[n]ecessarily require a public entity to make each of its existing facilities accessible to and usable by individuals with disabilities."  28 CFR 35.150(a)(1); *see also Pierce v. Cty. of Orange*, 526 F.3d 1190, 1221-22 (9th Cir. 2008).  The regulations also contemplate "reassignment of services to accessible buildings" as a permissible means of accommodation. 28 C.F.R. § 35.150(b)(1).

[9] Indeed, DOC's conclusory statements that clustering would pose "programmatic" and security challenges fall far short of demonstrating how "facts specific to this case and this setting" render clustering an unreasonable accommodation under the ADA.  *See Shaheed-Muhammad v. Dipaolo,* 393 F. Supp. 2d 80, 103-04 (D. Mass. 2005).

[10] DOC also argues that clustering prisoners within the same housing unit would be "unsound" because it would contravene the 2010 Standards and the Massachusetts State Building Code ("MASBC").  Mem. at 20.  DOC's interpretation of these regulations is incorrect.  Both the 2010 Standards and the MASBC require newly constructed and altered facilities to meet certain accessibility standards.  *See* 28 C.F.R. § 35.151(k); 521 C.M.R. §§ 15.7-15.7.2.  Retrofitting a building's existing alarm system to add visual alarms would constitute an alteration of a single element under the 2010 Standards and the MASBC; this would not trigger any requirement to make the entire space (let alone an entire building or campus) compliant with the 2010 Standards or MASBC.  *See* Dep't of Justice, *Guidance on the 2010 ADA Standards for Accessible Design* 73-74 (2010), www.ada.gov/regs2010/ 2010ADAStandards/Guidance_2010ADAStandards_prt.pdf; 521 C.M.R. § 3.3.5.

estimate provides for installing visual alarms in two buildings at Bay State Correctional Center at a cost of $1,026,530, but that facility has been closed since 2015.  RSUF ¶142.

Moreover, the detailed quotes that DOC solicited from JC Lentine Electric Service, Inc. ("Lentine") contradict the $22 million "pre-study" estimate and Quick's MCI-Shirley estimate, and show that they are inflated.  Lentine estimated that installing visual alarms in 16 cells would cost $99,750 for each MCI-Shirley housing building.  RSUF ¶143.  But Mr. Quick estimated that installing visual alarms in eight cells would cost $130,005 for each MCI-Shirley housing building.[11]  Mem. at 8; RSUF ¶144.  In other words, Mr. Quick estimated that installing *half* the number of visual alarms in each MCI-Shirley housing unit would cost over *50 percent more* than Lentine.

### C.   DOC's Incorrect Interpretation Of The 2010 Standards Provides No Basis For Summary Judgment.

DOC's claim that the 2010 ADA Standards for Accessible Design ("2010 Standards") absolve it of responsibility to provide adequate emergency notifications is wrong as a matter of law and is not capable of resolution as a matter of undisputed fact.  Mem. at 12, 15-17.

The 2010 Standards, developed by the United States Access Board and adopted by the Department of Justice, establish design requirements for facilities subject to the ADA that are constructed or altered after March 15, 2012.  *See Kirola v. City & Cty. of S.F.*, 860 F.3d 1164, 1176-78 (9th Cir. 2017).  Nothing in the 2010 Standards reduces or eliminates DOC's burden to comply with the ADA program accessibility requirements for existing facilities.  *See* 28 C.F.R. §

---

[11] The $22 million "pre-study" estimate is also overinclusive because it incorrectly assumes that, under Massachusetts Architectural Board ("MAAB") regulations, installing visual alarms would require DOC to upgrade toilet fixtures in at least 3 percent of cells at a cost of $20,250 per building.  Mem. at 6-8.  Where, as here, retrofitting an existing alarm system to add visual alarms would require alteration work that costs less than $500,000 per unit and "is limited solely to electrical . . . systems," the MAAB regulations do not require installation of accessible toilet fixtures.  *See* 521 C.M.R. § 3.3.1(b)(b); Ex. Z (Hilberry Expert Report) at 14.

35.150(a); 28 C.F.R. § Pt. 35, App. A ("[T]he determination of whether a program is accessible

is not frozen at the time of construction or alteration."); *California ex rel. Lockyer v. Cty. of*

*Santa Cruz*, 2006 WL 3086706, at *4 (N.D. Cal. Oct. 30, 2006) (finding that age of a building

"is not directly relevant" to assessing whether defendants violated ADA because "[t]he

defendants' use of older buildings does not relax the analysis under 28 C.F.R. § 35.150").

DOC also misinterprets the meaning of the 2010 Standards.  Section 807.3.1 of the 2010

Standards provides:

> Where audible emergency alarm systems are provided to serve the occupants of
> cells, visible alarms complying with 702 shall be provided.
> EXCEPTION: Visible alarms shall not be required where inmates or detainees are
> not allowed ***independent means of egress***.

*Id.* (emphasis added).  DOC contends that Section 807.3.1 of the 2010 Standards exempts it from

providing visual alarms to deaf and hard-of-hearing prisoners housed in its medium- and

maximum-security facilities because those prisoners lack an "independent means of egress."

Mem. at 15-17.  As DOC acknowledges, the 2010 Standards do not define "independent means

of egress."  *Id.* at 16.  In lieu of such definition, DOC substitutes the meaning of an entirely

different and inapplicable term ("incapable of self-preservation"), as defined by the International

Building Code.  *Id.*  Yet, the sections of the International Building Code that DOC relies on in its

analysis – §202 and §308 – are irrelevant, as they are not included among the provisions of the

International Building Code that are expressly incorporated by reference into the 2010 Standards.

Dep't of Justice, *2010 ADA Standards for Accessible Design* §§ 105.1-105.2 (2010).

Rather, as concluded by Plaintiffs' expert, Gina Hilberry, prisoners housed in general

population units in DOC's medium- and maximum-security prisons do have "independent means

of egress" during evacuations, as DOC both requires and enables them to self-evacuate to a

designated area during an emergency.  Ex. Z (Hilberry Expert Report) at 6-7.  The exception

provided by Section 807.3.1 applies only to prisoners housed in segregation and restrictive

housing units, where self-evacuation and unassisted exiting are impossible because prisoners

must be individually removed from cells under the control of a CO.  *Id.* at 12.  Thus, even if the

2010 Standards were relevant to Plaintiffs' claims (they are not), they provide no basis for

summary judgment.  At a minimum, DOC's assertions raise disputed issues of fact.

## II.   DOC IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' EIGHTH AND FOURTEENTH AMENDMENT CLAIMS.

DOC argues that Plaintiffs cannot establish their Eighth Amendment claim because "the

record does not support the existence of 'a substantial risk of serious harm,'" as there is no

evidence that any prisoner "has ever suffered any harm as a result of a fire or late evacuation."

Mem. at 21.  DOC misstates the law.  To establish an Eighth Amendment claim, Plaintiffs do not

need to show that they have been injured as a result of their unsafe conditions of confinement.

*See Helling v. McKinney*, 509 U.S. 25, 33, 35 (1993) ("It would be odd to deny an injunction to

inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground

that nothing yet had happened to them."); *see also Dimarzo v. Cahill,* 575 F.2d 15, 18 (1st Cir.

1978) (concluding that prisoners had standing to bring claim regarding fire safety, as "[o]ne need

not wait for the conflagration before concluding that a real and present danger exists").  Instead,

it is enough that, as described *supra* at 7-10, the record reflects numerous instances where

Plaintiffs experienced delayed or non-existent emergency notifications, even during the relative

calm of a fire drill.  As the court pointed out in *Holmes*, "[i]n a real emergency situation, such as

a fire or tornado, late or non-existent [emergency] notification would place Plaintiffs at a

substantial risk of bodily harm or even death."  311 F.R.D. at 235-36.

The record is replete with evidence that DOC has known for years that deaf and hard-of-

hearing prisoners face a substantial risk during an emergency – certainly since it has spent more

than four years actively litigating this case.  *See Disability Rights Mont., Inc. v. Batista*, 930 F.3d 1090, 1099 (9th Cir. 2019) (holding that, *inter alia*, allegations of prior lawsuits challenging similar prison conditions impacting mentally ill prisoners supported claim of deliberate indifference against prison).  Indeed, in 2015, MCDHH, which advises state agencies on the needs of people with hearing disabilities, advised DOC to install visual alarms, and in 2016, DOC's ADA Committee identified a "system wide" need for visual alarms.  RSUF ¶116.  This is sufficient evidence of deliberate indifference.  *See Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

## III.   PRINCIPLES OF COMITY AND THE PLRA ARE NOT BARRIERS TO INJUNCTIVE RELIEF.

There is no merit to DOC's claim that Plaintiffs would not be entitled to injunctive relief even if the Court were to find that its emergency notification practices violated the ADA.  DOC first argues that some of the improvements and reforms mandated by the Settlement Agreement in this case, although they "do not directly relate to emergency notifications," make it insufficiently likely that Plaintiffs will be denied access to emergency notifications in the future. Mem. at 12.  Yet DOC has offered no evidence that it has implemented such improvements, let alone that they have afforded Plaintiffs access to emergency notifications.  *E.g.*, RSUF ¶¶70, 84, 110.  *See Reaves v. Dep't of Corr.*, 195 F. Supp. 3d 383, 423 (D. Mass. 2016) (prison's "plan" to mitigate ADA violations did not eliminate threat of irreparable harm because "it remain[ed] to be seen whether [the prison's plan] will occur"); *Henderson*, 913 F. Supp. 2d at 1285-86 (rejecting argument that policy changes mooted ADA claim for injunctive relief where court had not received "any concrete evidence as to whether and how" any changes were, in fact, made).[12]

DOC next argues that principals of comity and the Prison Litigation Reform Act

---

[12] DOC also asserts that Plaintiffs have not shown that DOC's failure to accommodate Plaintiffs is "widespread enough to justify system wide relief."  Mem. at 10.  This contention ignores the extensive record evidence to the contrary.  *See supra* at 2-3.

("PLRA") prohibit the Court from awarding the relief that Plaintiffs seek. Plaintiffs recognize that principles of comity and federalism counsel "a policy of judicial restraint" in prison litigation. *Turner v. Safley*, 482 U.S. 78, 85 (1987). However, where a prison has abdicated its statutory and constitutionally required responsibilities, courts have repeatedly awarded injunctive relief to insure against the risk of inadequate compliance. *See Brown v. Plata*, 563 U.S. 493, 511 (2011) (affirming injunction requiring drastic reductions in California prison population). *See, e.g.*, *Reaves*, 195 F. Supp. 3d at 420-27 (granting preliminary injunction ordering prison to implement reasonable accommodations for quadriplegic prisoner and refusing to allow prison to fashion its own relief); *Clarkson*, 898 F. Supp. at 1046-47, 1052.

The PLRA also does not bar injunctive relief. It simply requires that the relief imposed be "narrowly drawn, extend[ ] no further than necessary . . ., and [be] the least intrusive means necessary to correct the violation of the Federal right[s]." *Brown*, 563 U.S. at 512 (quoting 18 U.S.C. § 3626(a)(1)(A)). Courts faced with the sensitive task of remedying unconstitutional prison conditions must consider a range of available options, but they "may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Id.* at 511.

If this Court concludes after trial that DOC has violated Plaintiffs' right to accessible emergency notifications, it may well be appropriate to require DOC to propose a remedial plan that is tailored to fit the nature and extent of the violation. But ultimately it will be the responsibility of the Court to fashion a remedy that will ensure that DOC protects the lives and safety of prisoners who are deaf and hard-of-hearing. The precise nature and scope of that remedy must await the Court's findings after trial.

## CONCLUSION

For the foregoing reasons, the Court should deny DOC's motion for summary judgment.

Respectfully submitted,

**Plaintiffs Leonard Briggs, George Skinder,
Rolando S. Jimenez, Louis Markham,
Francis McGowan, Eric Roldan, and
Jennifer Ward,**

By their attorneys,

Dated:  January 28, 2020

*/s/ Lisa J. Pirozzolo*
Lisa J. Pirozzolo, BBO #561922
Rachel L. Gargiulo, BBO #690747
Alexandra B. Lavin, BBO #687785
WILMER CUTLER PICKERING HALE AND
DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
lisa.pirozzolo@wilmerhale.com
rachel.gargiulo@wilmerhale.com
alexandra.lavin@wilmerhale.com

*/s/ James R. Pingeon*
James R. Pingeon, BBO #541852
jpingeon@plsma.org
PRISONERS' LEGAL SERVICES
10 Winthrop Square, 3rd Floor
Boston, MA 02110
(617) 482-2773

*/s/ Tatum A. Pritchard*
Tatum A. Pritchard, BBO #664502
tpritchard@dlc-ma.org
DISABILITY LAW CENTER, INC.
11 Beacon Street, Suite 925
Boston, MA 02108
(617) 723-8455

*/s/ Emily Gunston*
Emily Gunston (*pro hac vice*)
WASHINGTON LAWYERS' COMMITTEE FOR
CIVIL RIGHTS & URBAN AFFAIRS
350 S. Grand Avenue
11 DuPont Circle, NW, Suite 400
Washington, DC 20036
(202) 319-1000

## <u>CERTIFICATE OF SERVICE</u>

    I, Lisa J. Pirozzolo, hereby certify that a true and accurate copy of this document was served via ECF to all registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as nonregistered participants on January 28, 2020.

*/s/ Lisa J. Pirozzolo*       
Lisa J. Pirozzolo
