# EXHIBIT BB



# THE COMMONWEALTH OF MASSACHUSETTS
## OFFICE OF THE ATTORNEY GENERAL
ONE ASHBURTON PLACE
BOSTON, MASSACHUSETTS 02108

**MAURA HEALEY**
ATTORNEY GENERAL

TEL: (617) 727-2200
www.mass.gov/ago

June 12, 2018

**BY ELECTRONIC MAIL**
Seth Moskowitz, Esq.
Wilmer Cutler Pickering Hale and Dorr, LLP
60 State Street
Boston, Massachusetts 02109

Victor J. Koufman, Esq.
Koufman & Frederick, LLP
145 Tremont Street, 4th Floor
Boston, Massachusetts 02111

Re: **Briggs, et al. v. Massachusetts Department of Correction, et al., United States District Court – Massachusetts, C.A. No. 1:15-CV-40162-GAO**

Dear Counsel:

Enclosed for service in the above-captioned matter, please find the Expert Report of Eileen D. Baker, M.E.D.

Very truly yours,

Anna Rachel Dray-Siegel

cc: *(by electronic mail)*
Counsel of Record

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LEONARD BRIGGS, GEORGE SKINDER, LOUIS MARKHAM, FRANCIS MCGOWAN, ERIC ROLDAN, ROLANDO S. JIMENEZ, AND JENNIFER WARD, on behalf of themselves and all others similarly situated,<br><br>     Plaintiffs,<br>  v.<br>MASSACHUSETTS DEPARTMENT OF CORRECTION; THOMAS A. TURCO, III[1], COMMISSIONER OF THE MASSACHUSETTS DEPARTMENT OF CORRECTION; CAROL MICI*, DEPUTY COMMISSIONER OF CLASSIFICATION, PROGRAMS, AND REENTRY DIVISION; RAY MARCHILLI*, SUPERINTENDENT OF MCI-SHIRLEY; SEAN MEDEIROS, SUPERINTENDENT OF MCI-NORFOLK; STEVEN O'BRIEN, SUPERINTENDENT OF THE MASSACHUSETTS TREATMENT CENTER; ALLISON HALLET*, SUPERINTENDENT OF MCI-FRAMINGHAM; AND MASSACHUSETTS PARTNERSHIP FOR CORRECTIONAL HEALTHCARE,<br>     Defendants. | C.A. No. 1:15-cv-40162-GAO-JGD |

**EXPERT REPORT OF EILEEN D. BAKER, M.E.D.**

---

[1] These parties, named in their official capacities, have been substituted as successors in office, under Fed. R. Civ. P. 25(d).

that its correctional staff disregard their other job responsibilities or compromise intuitional safety and security in order to provide the inmate with immediate access.

In order to provide meaningful access to those telecommunication auxiliary aids that rely on an intermediary interpreter (such as VRS or TTY/TDD) or on a text display (such as captioned phones or TTY/TDD), deaf and hard-of-hearing inmates who have been approved to use such devices should be allotted twice the amount of time within which to complete a call as is allotted to hearing inmates using a conventional telephone. Indeed, the 408 Policy recognizes this and provides that deaf and hard-of-hearing inmates' access to TTY/TDD "shall be equivalent to access to telephones by hearing inmates except that additional time allowances shall be provided within reason for deaf, hard of hearing or late deafened inmates in order to facilitate communication via keyboard." 103 DOC 408.12(1)(a).

Additionally, DOC should ensure that the cost to a deaf or hard-of-hearing inmate to use any of the telecommunication auxiliary aids is not greater than the cost to a hearing inmate to use the conventional telephones.

E.  **Visual Alerts and Notification of Emergency and Non-Emergency Events.**

1.  **Emergency Notifications.**

In cases of emergencies, DOC must have an effective way to communicate the emergency notification to deaf and hard-of-hearing inmates. Currently, visual alarms are installed in the common areas of all of DOC's facilities that can alert deaf and hard-of-hearing inmates in those areas when there is a fire or other emergency. DOC Defendants' Supplemental Answers to Plaintiffs' First and Second Sets of Interrogatories at 4. I personally observed these visual alarms during site visits at MCI-Cedar Junction, MCI-Norfolk, and MCI-Framingham. It is my opinion that the visual alarms in DOC's common areas are an adequate and effective way to alert deaf and hard-of-hearing inmates who are in those areas when there is a fire.

25

With the exception of at the Souza-Baranowski Correctional Center, DOC does not provide visual alarms in individual inmate cells. DOC Defendants' Supplemental Answers to Plaintiffs' First and Second Sets of Interrogatories at 4. In case of emergencies, DOC's current practice is to rely on the correctional officers on duty to conduct rounds in each of the housing units and check individual cells and other areas to ensure that all inmates are safely evacuated or otherwise tended to. Id. To ensure that deaf and hard-of-hearing inmates in individual cells are notified of emergencies and evacuated, DOC has adopted policies and procedures to enable the correctional officers on duty in each housing unit to determine which inmates housed there are deaf or hard of hearing, and to require that, in the case of an emergency, those officers go to the individual cells to assist those inmates. Specifically, DOC's booking and admissions policy, 103 DOC 401, provides that if an inmate has been identified as deaf, blind, hearing and/or visually impaired during his or her medical evaluation, a red dot is placed on the lower right corner of the inmate's bed book card, which is used by the officers on duty in the housing units. 103 DOC 401.01(2)(B). This red dot identification process alerts the correctional officers that work in those housing units which inmates have hearing disabilities and therefore which inmates may need assistance during an emergency or evacuation. The 408 Policy expressly requires that "[o]ral announcements and commands, whether through a public address system or other means, shall be communicated to inmates who are deaf, late deafened and hard of hearing, in a manner which can be understood" and that "[t]he institution shall ensure a means of notifying inmates who are deaf, late deafened and hard of hearing, of such things as emergencies, counts, and announcements, whenever and wherever the inmate may be in the institution, either manually, in writing, or otherwise." 103 DOC 408.12(1). And DOC also has implemented policies that require the Superintendent of each DOC facility to develop written fire and emergency evacuation plans that establish a process to

assist inmates that have medical restrictions, including but not limited to those inmates who are deaf or hard of hearing, during emergency evacuations. 103 DOC 401.01(2)(B); 103 DOC 730.04(A). The various DOC facilities have in fact developed written fire and emergency evacuation plans that contain procedures to be followed in notifying and evacuating deaf and hard-of-hearing inmates. See, e.g., DOC_BRIGGS_020091; DOC_BRIGGS_020118; DOC_BRIGGS_020291; and DOC_BRIGGS_020428.

Under the Department of Justice's 2010 ADA Standards for Accessible Design ("2010 Standards"), as a general matter, the fire alarm systems in state and local government facilities are required to have permanently installed audible and visual alarms. See 2010 Standards for Titles II and III Facilities: 2004 ADAAG, Chapter 7, Section 702.1. However, the 2010 Standards also provide that visible alarms are not required in existing facilities except when an existing fire alarm system is upgraded or replaced or a new fire alarm system is installed, and that other types of facility alarm systems (such as for tornado warnings or other emergencies) do not have to comply with the technical criteria for fire alarm systems. Id., Chapter 2, Section 215.1. Given these standards and exceptions, it is my opinion that DOC's current practice of requiring correction officers and other DOC staff to be responsible for evacuating deaf and hard-of-hearing inmates during emergencies is a reasonable means for DOC to communicate emergency notifications to those inmates who might not see the visual alarms that are in the common areas of DOC facilities. If a correctional officer is notified that a deaf or hard-of-hearing inmate is part of his/her caseload and understands, through training, the inmate's communication challenges, it is reasonable to require the correctional officer to be responsible for the safe evacuation of deaf and hard-of-hearing offenders through "direct door to door" or "cell to cell" contact. Here, DOC identifies which inmates are deaf, hard of hearing, or otherwise disabled by including a red dot on their bed book

27

cards. This marking notifies correctional officers newly stationed at a housing unit which inmates are disabled. As Mr. O'Gara testified at his deposition, correctional officers at DOC are assigned to particular shifts and specific posts in each facility. Typically, officers are assigned to those specific shifts and posts for a long time, during which they get to know and develop a rapport with the inmates in their housing units. O'Gara Dep. 324-25. Mr. O'Gara also testified that all correctional officers receive training and are required to know the inmates under their care, and to familiarize themselves with the inmates in their particular housing unit by going through the bed book. O'Gara Dep. 327-28.

During orientation or upon arrival at a new facility, DOC should explain to deaf and hard-of-hearing inmates, through the use of interpreters or other auxiliary aids if necessary, the process that will be used during an emergency evacuation or practice drill, so that the inmate understands the process and that safety is paramount. Additionally, deaf and hard-of-hearing inmates should be informed that the reasons for an evacuation are often not disclosed to any inmate, for purposes of safety and security.

Noting that the plaintiffs have reported being left behind during emergency fire drills, the plaintiffs' experts Dennis Cokely and Richard Lorenzo Ray both opine that relying on correctional officers to alert deaf and hard-of-hearing inmates of an emergency alarm is ineffective and insufficient. Report of Dennis Cokely at 41-42; Report of Richard Lorenzo Ray at 11-12. But Plaintiff Francis McGowan's testimony reflects that in the instance he reported, he actually was evacuated with everyone else during the fire drill. Transcript of Deposition of Francis McGowan ("McGowan Dep.") at 86. He also testified that during an evacuation while he was living in the Assisted Daily Living Unit at MCI-Norfolk, he was properly informed and evacuated, thereby demonstrating that the policy functions in practice as it should. McGowan Dep. 86-87. And while

28

other inmates have testified to being left behind during fire drills, it is not exactly clear from their testimony when those incidents happened. To the extent deaf or hard-of-hearing inmates have been left behind recently during a fire drill, this may indicate that DOC's policy needs to be clearer or that the correctional officers require better training. But it is not unreasonable to rely on correctional officers to notify deaf and hard-of-hearing inmates who are in their individual cells of emergencies and evacuations in the correctional setting, particularly because inmates' movement is controlled by DOC and correctional officers.

Portable fire alarms and wireless notification systems do exist that can be triggered by the sound of audible alarms and then alert individuals with hearing loss of the alarm by providing acoustic, visual and/or tactile notification. One example of such a device is the SafeAwake Fire Alarm Aid with BedShaker. See https://www.harriscomm.com/safeawake-fire-alarm-aid-with-bed-shaker.html. When it detects an activated fire alarm, this device will alert individuals with hearing loss by flashing a bright light, emitting a 520 Hz low frequency alarm that is more effective than high frequency alarms in alerting hard-of-hearing individuals, and also triggering a powerful bed shaker to alert sleeping individuals with hearing loss. It is my opinion that such a device, if it is able to detect the sound of the fire alarm in DOC facilities, is otherwise compatible with DOC's fire alarm system, and is determined to not pose any significant security or control risks to DOC, would be a reasonable accommodation to offer deaf and hard-of-hearing inmates under the ADA for use in their individual cells.

I have not examined whether any particular device would be compatible with DOC's fire alarm system so as to alert deaf or hard-of-hearing inmates in the event of an emergency. But I do believe that systemic compatibility could be an issue depending on the device. As I noted during my site visits, some of DOC's facilities are significantly older buildings. Given the date of their

construction, the fire alarm systems installed in those buildings may not be compatible with more modern portable fire alarm devices. Also, depending on the signal pattern emitted by DOC fire alarm systems, certain notification systems that are triggered by a different sound pattern may not work in DOC facilities. For example, the SafeAwake Fire Alarm Aid device discussed above only works with an alarm system that emits a "T3 alarm pattern"—that is, a pattern of three beeps followed by a pause. It will not work with fire alarm systems that emit a continuous tone pattern with no pauses. See https://www.harriscomm.com/safeawake-fire-alarm-aid-with-bed-shaker.html. So this device would not work if a DOC facility's fire alarm signal emits a continuous tone pattern. Other wireless notification devices can be triggered by a continuous period of sound of a certain duration, and thus would be triggered by a fire alarm with a continuous tone pattern. See https://www.harriscomm.com/clarity-alertmaster-amax-audio-transmitter.html. But to the extent these devices are triggered by any continuous period of sound longer than 12 or 15 seconds, they may not be practical to use in individual cells in a correctional setting if they would also be triggered by the level of activity and noise that can occur in housing units.

In Exhibit E to his expert report, Mr. Ray provided a list of websites allegedly containing information regarding available models of wireless notification systems with shakers that detect audible alarms and alert deaf users with a bright visual flasher and a bed shaker. See Expert Report of Richard Lorenzo Ray at 14, Exhibit E. I attempted to review the models that Mr. Ray said were listed at those websites. However, each web address either returned an error message that the page no longer existed or redirected me to a main webpage and not to any particular device. As a result, I cannot identify what systems Mr. Ray may be referring to, and cannot specifically opine on whether any of them may be appropriate for use in a correctional setting. I will note, however, that Mr. Ray did not address or even acknowledge the variety of compatibility or security issues

30

that could be implicated by the use of any type of device and that may mean that they are not an appropriate auxiliary aid to offer in this context.

### 1. Notification of Non-Emergency Events

DOC must take reasonable steps to ensure that deaf and hard-of-hearing inmates are housed in facilities "with the accessible elements necessary to afford the inmate[s] access to safe, appropriate housing." 28 C.F.R. § 35.152(b)(3). As noted, DOC also must take appropriate steps to ensure that communications with deaf and hard-of-hearing inmates are as effective as communications with hearing inmates. 28 C.F.R. § 35.160(a)(1). Therefore, in addition to emergency notifications, DOC is also required to make reasonable efforts to ensure that deaf and hard-of-hearing inmates are made aware of non-emergency information that is communicated from DOC staff to the general inmate population. DOC recognizes this obligation, as the 408 Policy requires that oral announcements and commands be communicated to deaf and hard-of-hearing inmates in a way that can be understood, whether it be manually, in writing, or otherwise. 103 DOC 408.12(1). This can be adequately accomplished in several different ways that should not impose an undue burden – either financial or administrative – on DOC.

Preliminarily, it should be emphasized that individuals who experience hearing loss, although in certain cases their reading levels may be lower than hearing individuals, do not commonly have cognitive issues that prevent them from learning facility routines or that otherwise prevent them from operating with a degree of independence and self-reliance, even within a correctional environment. For example, Ms. Ward knows that count is at the same time every day, and simply would like to have a written list of the announcements posted somewhere where she can read them. Ward Day 1 Dep. 105, 143. Mr. Skinder also acknowledged that in the prison setting there are set times for movement and count, and that prisoners need to know when those are. Skinder Day 1 Dep. 30-31. Implementing a range of auxiliary aids and services that also

31

**IV.     Summary of Opinions and Conclusions**

Pursuant to the ADA, the DOC must make their services, programs and activities readily accessible and useable by individuals who are deaf or hard of hearing. DOC may properly take into account the special safety and security considerations that are present in a penological institution, and is not required to make fundamental alterations of its programs, services or activities when making an accommodation for an inmate. Because deaf and hard-of-hearing individuals have a wide range of hearing losses, ranging from mild to profound, the DOC must make an individualized assessment as to the appropriate type of assistive device for each deaf and hard-of-hearing inmate.

It is my opinion that, collectively, DOC's policies, procedures, and training materials adequately ensure that deaf and hard-of-hearing inmates are provided with effective access to DOC programs, activities, and services, and effectively establish various processes by which deaf and hard-of-hearing inmates may request and/or receive auxiliary aids and services to enable them to achieve such effective access, while also considering DOC's authority and obligation to account for the specialized safety and security concerns inherent in the management of a penological institution.

DOC's policies and procedures establish processes for assessing a deaf or hard-of-hearing inmate's need for accommodation upon entry to DOC custody, for determining what reasonable accommodations are necessary throughout their incarceration, and tracking their requests for reasonable accommodations. DOC utilizes Institution ADA Coordinators to review, respond to and document requests for reasonable accommodations, and engage in a dialogue with the inmate regarding requests, resulting in a collaborative approach in accordance with ADA requirements. Collectively, these various processes help to ensure that requests for reasonable accommodations are addressed promptly, consistently, and meaningfully.

35

DOC has developed training materials that, in my opinion, adequately address the requirements of the ADA, providing both a general overview of ADA requirements as well as training regarding specific auxiliary aids and the importance of communication and an individualized determination in determining appropriate accommodations. It is my opinion that the trainings should be conducted with all staff, and that the DOC should consider providing additional trainings to enhance DOC staff's understanding of the reasons that a one-size-fits-all approach is not appropriate to adequately address the needs of the deaf and hard-of-hearing inmate population. DOC may consider consolidating the various applicable sections of its separate policies to create a single DOC policy that addresses the various aspects of deaf and hard-of-hearing inmates' experience in DOC custody, in order to enhance the effectiveness of the policies.

The ADA requires that DOC provide auxiliary aids or interpreter services for deaf and hard-of-hearing inmates, but the precise auxiliary aids or services the DOC may need to provide will depend on a variety of circumstances. It is my opinion that, when it is determined that a deaf or hard-of-hearing inmate requires the use a qualified ASL interpreter to have effective communications, a qualified ASL interpreter generally should be available to that inmate for the following programs, services, or events: (1) inmate orientation; (2) institutional assessment and classification hearings involving the inmate; (3) vocational classes; (4) educational programs; (5) rehabilitative programs, including sex offender treatment programs; (6) religious services; (7) medical appointments and mental health services; (8) DOC disciplinary hearings and investigations; and (9) parole hearings. This list is not exhaustive and there may be other circumstances when an ASL interpreter is appropriate, and circumstances in which an ASL interpreter may not be required for a particular individual.

VRI is as effective in providing interpreter services as is an on-site ASL interpreter and, in some circumstances, may be preferable. Because they are equally acceptable, it is my opinion that DOC has the right to choose between either option in deciding how to provide ASL interpreter services to deaf and hard-of-hearing inmates, particularly considering DOC's interests in the safe, secure, and orderly operation of its facilities.

In order to ensure equal telecommunications access, DOC should provide a range of telecommunication auxiliary aid options to deaf and hard and hearing inmates that includes: videophones, VRS, TTY/TDD, telephones with a captioning or text function, and telephones with amplification functions. The appropriateness of providing any particular accommodation must be considered on a case-by-case basis, taking into account the requesting inmate's identified need as well as specific security and penological concerns. In order to make access meaningful, DOC must provide deaf and hard-of-hearing inmates with access to telecommunication auxiliary aids during the same hours that hearing inmates have access to telephones, with consideration for correctional staff's other responsibilities, for twice the allotted time as a call using a convention telephone if there is an intermediary interpreter or text, and at no greater cost than the cost of using a conventional telephone.

In the event of a fire or other emergency, it is my opinion that the visual alarms in DOC's common areas are an adequate and effective way to alert deaf and hard-of-hearing inmates who are in those areas. It is my opinion that DOC's current practice of requiring correctional officers and other DOC staff to be responsible for evacuating deaf and hard-of-hearing inmates during emergencies is a reasonable means for DOC to communicate emergency notifications to those inmates who are deaf or hard of hearing and might not see the visual alarms that are in the common areas of DOC facilities, because inmates' movement is controlled by correctional officers.

Portable fire alarms and other wireless notifications system, if they can detect the sound of the fire alarm in DOC facilities, are otherwise compatible with DOC's fire alarm system, and do not pose any significant security or control risks, are a reasonable accommodation to offer deaf and hard-of-hearing inmates for use in their individual cells.  DOC's use of written notes and a visual communication system, such as a simple white board and or other posted announcements, are reasonable and sufficient means of notifying deaf and hard-of-hearing inmates of non-emergency events.  The use of vibrating watches would also be a reasonable accommodation, and the use of an inmate "buddy system" in conjunction with the other accommodations would facilitate communications.

Date: June 12, 2018

_____
Eileen D. Baker, M.E.D.