**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| LEONARD BRIGGS, GEORGE SKINDER, LOUIS MARKHAM, FRANCIS MCGOWAN, ERIC ROLDAN, ROLANDO S. JIMENEZ, AND JENNIFER WARD, *on behalf of themselves and all others similarly situated*, <br><br> Plaintiffs, <br><br> v. <br><br> MASSACHUSETTS DEPARTMENT OF CORRECTION, *et al.*, <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)  C.A. No. 1:15-cv-40162-RGS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION TO FIND THE MASSACHUSETTS DEPARTMENT OF CORRECTION IN SUBSTANTIAL NON-COMPLIANCE WITH THE NOVEMBER 25, 2019 SETTLEMENT AGREEMENT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................................1

FACTS ..................................................................................................................................2

I.  Procedural History and Settlement Agreement................................................................2

II.  Wellpath Guidelines Establish Prohibited Hearing Loss Thresholds ................................4

III. The Use of Hearing Loss Thresholds to Deny Accommodations Is Inconsistent with
Clinical Standards ........................................................................................................4

IV. DOC's Disability Accommodation Request Assessments and Appeals
Apply the Wellpath Guideline to Determine CapTel and Pager Access ............................5

V.  Implementation of the Wellpath Guidelines Significantly Reduced the Number of
Class Members Approved for CapTel ..............................................................................7

VI. Class Member and Family Experiences Substantiate Defendants' Denial of
Accommodations Despite the Individualized Needs of Class Members ............................8

VII. Settlement Monitor Reports on Use of Wellpath Guidelines to Deny CapTel and
Pagers .........................................................................................................................11

VIII. Dispute Resolution.....................................................................................................12

ARGUMENT .....................................................................................................................13

I.  Defendants Deprive Class Members of Effective Communication by Denying
Access to CapTel Services and Pagers Based on Threshold Levels of Hearing Loss
Alone in Violation of the Agreement..............................................................................13

   A.  Defendants Are Using the Wellpath Guidelines to Categorically Deny
     CapTel and Pagers to Class Members Who Do Not Meet Threshold Levels of
     Hearing Loss as Shown by Their Audiogram ..........................................................14

   B.  Defendants Fail to Give Primary Consideration to Class Members' Choice of
     Accommodations in Violation of the Agreement ..................................................16

   C.  Defendants Have Failed to Demonstrate That Class Members Have Equally
     Effective Means of Accessing Telecommunications and Announcements ..........17

CONCLUSION...................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Statutes**

Americans with Disabilities Act of 1990, 42 U.S.C. § 12100 *et seq.* (1990) ....................... *passim*

G.L. c. 127 § 87A...............................................................................................................12

**Other Authorities**

Fifth Report of the Settlement Monitor (Jan. 26, 2023) ................................................11

## INTRODUCTION

In May 2019, the parties reached a settlement agreement ("Agreement") pursuant to which Defendants agreed to give the class of deaf and hard-of-hearing prisoners in Department of Correction ("DOC") custody equal access to DOC's programs, services, and activities.[1] Among the obligations established by the Agreement, Defendants are required to provide accommodations, including captioned telephones ("CapTels"), which provide live transcripts of telephone conversations, and pagers, which relay announcements from correction officers, to class members who need them. The Agreement requires DOC to perform an individualized assessment of each class member to determine what accommodations are needed. Ex. A, Agreement § IV(D). Although the Agreement requires Defendants give primary consideration to each individual's expressed preferences, they have failed to do so. *Id.*

Instead, Defendants have systematically denied access to CapTels and pagers based solely on threshold levels of hearing loss set by guidelines adopted by its medical provider, Wellpath, without regard to class member's individualized need for accommodations to access DOC telecommunications and non-emergency notification services. As a result, Defendants are violating both the Agreement and federal.

Plaintiffs bring this motion pursuant to Section XVI of the Agreement and ask this Court to find that Defendants are in substantial non-compliance with Section IV(D) of the Agreement.

---

[1] The Court issued a Final Settlement Approval Order on November 25, 2019 in which it found that the terms of the Agreement—including the provisions at issue in this motion related to CapTel devices and pagers—were "fair, reasonable, and adequate." Dkt. No. 222 at ¶ 2.

## FACTS

### I.     Procedural History and Settlement Agreement

On November 24, 2015, Plaintiffs filed a class action alleging that Defendants violated federal law protecting the rights of deaf and hard-of-hearing people in DOC custody by, among other things, failing to provide substantially equal access to telecommunication services and announcements made by correction officers. On May 28, 2019, the parties executed a settlement agreement that resolved most of Plaintiffs' claims, including access to CapTels and pagers.[2] Ex. A. The Court entered final approval of the Agreement on November 25, 2019. Dkt. 222. The presumptive term of the Agreement was extended to November 25, 2023. Dkt. 257.

Under the Agreement, Defendants must provide class members with an array of auxiliary aids and services, including CapTels and pagers, to ensure effective, meaningful, and substantially equal access to DOC programs, services and activities. Ex. A §§ IV(D), VIII(B), IX(B). The Defendants are also required to update DOC's policy governing reasonable accommodations for inmates, 103 DOC 408, to ensure consistency with the Agreement. Ex. A § XI. Defendants agreed to "provide deaf and hard-of-hearing inmates in [DOC] custody with access to telecommunication services and devices that enable Effective Communication with people outside of DOC Facilities that is substantially equal to the access to telecommunication services and devices that DOC provides to inmates without hearing disabilities." Ex. A. § VIII(A). With respect to non-emergency announcements, Defendants agreed to provide "an effective non-auditory alert system [*i.e.*, pagers] that will be used to notify deaf and hard-of-

---

[2] The Settlement Agreement reserved claims regarding the adequacy of DOC's emergency notification systems as well as claims for attorneys' costs and fees. Ex. A § III ¶ 30. The emergency notification claims were tried by the Court in August 2023 and the matter is under advisement.

hearing inmates of prison-wide events (including by not limited to announcements, visitations, and count) and events specific to deaf and hard-of-hearing inmates." Ex. A § IX(B).

Defendants also agreed to give "Primary Consideration" to a person's expressed choice of accommodations "unless DOC can demonstrate (1) that another means of Effective Communication is available or (2) that the means chosen by the inmate would result in a fundamental alteration in the service, program, or activity, in undue financial and administrative burdens, or will result in actual risks or impairment of the safe operation of a DOC Facility or the service, program, or activity . . . ." Ex. A §§ IV(D), III ¶ 27; see 103 DOC 408.07(8). "Effective Communication means communication that is clear and understandable to persons with disabilities." Ex. A § III ¶ 16. Any alternative means of providing Effective Communication must "afford[] deaf and hard-of-hearing inmates an opportunity to participate in and enjoy the benefits of DOC's services . . . in a manner that is substantially equal to the opportunity provided to similarly situated inmates who are neither deaf nor hard-of-hearing." *Id.* In determining whether to grant any accommodations, the Agreement requires DOC to observe Title II program access obligations "to make its programs, services, and activities accessible . . . except in limited circumstances permitted under federal law . . . ," namely, when the accommodation would give rise to a fundamental alteration, undue burden, legitimate safety risk, or direct threat. Ex. A §§ IV(D), XI ¶ 8.

Any decision to deny a class member's preferred auxiliary aid or service, such as CapTel or a pager, must be based on an ***individualized assessment*** and must ***not*** be based on "any set guidelines, protocols, or threshold levels of hearing loss shown on an inmate's audiogram." Ex. A § IV(D). The parties explicitly agreed to this language to avoid DOC's improper pre-suit practice of relying on threshold levels of hearing loss to deny accommodations, like hearing aids,

to people who needed them. *See* Ex. B, Letter from Tatum Pritchard, Pls.' Counsel, to Edward O'Donnell and Mary Murray, Defs.' Counsel (Mar. 6, 2023) at 2.

## II.      **Wellpath Guidelines Establish Prohibited Hearing Loss Thresholds**

DOC contracts with Wellpath to provide medical services, including audiology care and medical accommodations, to people in DOC custody. In January 2022, Wellpath issued Guidelines for the Deaf and Hard of Hearing ("Wellpath Guidelines") "to be utilized as a supplement to assist both medical providers and DOC personnel in ascertaining the appropriateness of assistive devices and reasonable accommodations within a correctional setting." Ex. C, Wellpath Guidelines at 1. The Guidelines establish "Levels of Hearing Deficit" in 6 categories based on hearing threshold levels in decibels alone: "0-25dB – Normal hearing range"; "26-40dB – Mild hearing loss"; "56-70dB – Moderately severe hearing loss"; "71-90dB – Severe hearing loss"; and "90dB and above – Profound hearing loss/deaf." *Id.* at 1-2. The Wellpath Guidelines state that "CapTel and other phone accommodations are generally reserved for the most hard-of-hearing (71 dB and above)" and recommend pagers only for those with "profound" or "severe" hearing loss. *Id.* at 2*.* Therefore, those whose hearing loss is "moderately severe," "moderate," or "mild" do not qualify for CapTel or pagers. *Id.* at 1-2. While the Wellpath Guidelines are self-described as "a general approach," and note that "a more individualized approach . . . should be considered" for those who "appear to fall outside the guidelines" (Wellpath Guidelines at 1-2), they do not require individualized assessments as required by the Agreement.

## III.     <u>The Use of Hearing Loss Thresholds to Deny Accommodations Is Inconsistent with Clinical Standards</u>

The use of threshold levels of hearing loss to deny accommodations is not supported by research or clinical practice, as explained by expert audiologist Dr. Steven Carter. Ex. D, Expert

Decl. of Dr. Steven Carter ¶ 2. Dr. Carter explains that there are many reasons why it is inappropriate to rely on the Wellpath Guidelines to determine eligibility for CapTel. These include: (1) the Wellpath Guidelines are based on the audiogram's Pure Tone Average, which does not reflect that a patient's hearing loss will typically be different at different frequencies, *id.* ¶ 24; (2) speech perception is especially difficult on phones because phones cut off higher frequency sounds, callers hear background sounds through the ear that's not pressed to the phone, and callers cannot read lips or see the facial expressions of the person with whom they are speaking, *id.* ¶ 10-12; (3) significant environmental noise, such as often exists in a prison environment, makes conversations difficult to follow, *id.* ¶ 11; and (4) while hearing aids or volume control buttons may help with telephone comprehension, they are often not useful because of feedback and other issues, *id.* ¶ 37.

In Dr. Carter's professional judgment, it is important to have an in-depth conversation with the patient to evaluate the need for CapTel, but Defendants are instead basing their decisions entirely on the degree of hearing loss shown in the audiogram. *Id.* ¶ 53. Based on his review of the class member declarations, and associated DOC documents, Dr. Carter's professional opinion is that many class members with less than "severe" hearing loss struggle to use the traditional phones and would benefit from CapTel to communicate effectively on the telephone. *Id.*

## IV.   DOC's Disability Accommodation Request Assessments and Appeals Apply the Wellpath Guideline to Determine CapTel and Pager Access

ADA coordinators at each of DOC's prisons are responsible for assessing the needs of disabled people at their facilities, which they do through Disability Accommodation Request Assessments ("DARAs")—assessments of an individual's hearing-related needs "so that the inmate may effectively communicate and receive effective, meaningful, and substantially equal

access to DOC programs, services, and activities." Ex. A § IV(D). A review of these DARAs demonstrates that approval for CapTel and pagers has almost perfectly tracked the thresholds in the Wellpath Guidelines, rather than relying on individualized assessments. For instance, in July and November 2023, Defendants produced 361 DARA forms from people with recognized hearing loss requesting access to CapTel. Ex. E, Decl. of Michael J. Horrell, Esq. ¶ 3. Of the 130 forms indicating CapTel access was approved, 124 indicate the person has profound or severe hearing loss. *Id*. ¶ 5. By contrast, of the 225 forms indicating CapTel was denied, only two indicate the person has profound or severe loss. *Id*. ¶ 6.[3] In virtually every denial of CapTel, the only reason was a failure to meet the threshold level of hearing loss in the Wellpath Guidelines, even though most individuals reported trouble communicating by phone. *See, e.g.*, Ex. F, Decl. of Brian H. Sherman at 9 ("overall determination of level of hearing deficit by medical did not indicate the need for the denied accommodation(s)"); Ex. G, Decl. of Daniel LaPlante at 13 ("does not meet clinical guidelines for this service"); Ex. H, Decl. of John A. Scott at 7 (CapTel is "not medically indicated"). None of the DARA denials refute class members' struggles communicating on the traditional phones. *See, e.g.*, Ex. H at 6-7 (denied CapTel access despite responding "no" to whether he could "effectively communicate on traditional inmate telephones"); Ex. F at 7-8 (same); Ex. G at 7-8 (same); Ex. I, Decl. of Jon Bourassa at 7-8 (same); Ex. J, Decl. of Richard Haskins at 11-12 (same), Ex. K, Decl. of Nicole Chuminski at 6-8 (same).

The DARA forms also make clear that the hearing thresholds in the Wellpath Guidelines determine whether Defendants approve class members' pager requests. For instance, in July and November 2023, Defendants produced 225 DARA forms concerning people with recognized

---

[3] Six forms did not indicate whether access to CapTel was approved or denied. Ex E ¶ 4.

hearing loss requesting access to pagers. Ex. E ¶ 7. Of the 125 who were approved for pagers, 124 had severe or profound hearing loss. *Id.* ¶ 9. By contrast, of the 94 who were denied pagers, only one had severe or profound hearing loss. *Id*. ¶ 10.[4]

Class members who disagree with the DOC's decision can appeal the decision to the Department ADA Coordinator for Inmates. Appeal decisions, however, also hew to the thresholds in the Wellpath Guidelines. Of the 132 appeals for CapTel access from people with recognized hearing loss, 15 were granted and 117 were denied. *Id.* ¶ 13. Of the 15 appeals that were granted, 13 were from people who had severe or profound hearing loss, while all 117 people whose appeals were denied had less than severe loss. *Id.* ¶¶ 14-15. The CapTel appeal denials use an identical boilerplate explanation: "there is currently no clinical indication that your current hearing necessitates the use of a CapTel captioned telephone to effectively utilize a telephone." *See, e.g*., Ex. L, Decl. of Hernan Cruz ¶ 11; Ex. H ¶ 10; Ex. I ¶¶12-23; Ex. M, Decl. of Terrance Montgomery ¶¶ 12-13, Ex. K ¶¶ 12-13. Similarly, all appeals for pagers from people with less than severe or profound loss were denied, while all of those from people with severe or profound loss were approved. Ex. E ¶¶ 18-19.

## V.    Implementation of the Wellpath Guidelines Significantly Reduced the Number of Class Members Approved for CapTel

The total number of class members approved for CapTel dropped dramatically after Defendants began applying the Guidelines around early 2023. *See* Ex. N, Monthly ADA Committee Meeting Minutes, MA Dep't of Corr. (Mar. 22, 2023) at 3 (noting "[a]ll Deaf and Hard of Hearing inmates are in the process of being reassessed . . . April 1st deadline was given for completion of reassessments"). According to DOC records, 318 people in DOC custody were approved to use CapTels in December 2022. Ex. E ¶ 20. By April 25, 2023, that number had

---

[4] Six forms did not indicate whether access to a pager was approved or denied. Ex. E ¶ 8.

dropped to 179, representing a 44% decrease. *See* Ex. O, Email from Edward O'Donnell, Defs.'

Counsel, to Pls.' Counsel (Apr. 25, 2023).[5]

## VI.    Class Member and Family Experiences Substantiate Defendants' Denial of Accommodations Despite the Individualized Needs of Class Members

The experiences of class members—including those who receive other hearing loss-

related accommodations from DOC—vividly illustrate that Defendants have chosen to ignore

individual preferences in favor of threshold hearing levels. Multiple class members attest that

CapTel access has been incredibly helpful in enabling effective communication over the phone.

For example, below are accounts from class members who had their CapTel access revoked by

Defendants because of the Wellpath Guidelines:

- Brian Sherman at NCCI Gardner: "When I first began using CapTel, I realized how much I had been missing in previous conversations. The captions allowed me to be fully engaged instead of constantly missing parts of the conversation") Ex. F ¶ 7;

- Daniel LaPlante at MCI Norfolk: "I relied on the captions and used them to fill in words or sentences I missed, or to ensure that I understood the speaker correctly" Ex. G ¶¶ 8-9;

- John Scott at MCI Concord: "The conversations [with my family] were much smoother and less frustrating" Ex. H ¶ 4;

- Jon Bourassa at the Massachusetts Treatment Center: "The CapTels greatly helped me to communicate with my family and members of my support group" Ex. I ¶ 6;

- Nicole Chuminski at MCI Framingham: "I relied on a combination of the higher volume and captions on the CapTel phones to ensure that I was following the conversation." Ex. K ¶ 7;

- Richard Haskins at the Massachusetts Treatment Center: "Because of my hearing loss, I would read the captions on the CapTel, and would sometimes ask the speaker to pause while I read the captions to ensure that I was following the conversation" Ex. J ¶ 7; and

- Terrance Montgomery at Souza Baranowski Correctional Center: "Access to CapTel . . . allowed me to understand what my loved ones were saying without having to constantly interrupt for clarification." Ex. M ¶ 4.

---

[5] There is no comparable data for the impact of the Guidelines on pager access since DOC delayed systemwide implementation of pagers until 2022.

By contrast, class members attest to the difficulty they experience using DOC's regular

phones, particularly because cell blocks are frequently noisy:

- Brian Sherman: "Although I have previously made phone calls using regular phones, they are not adequate substitutes for the CapTel phone. I frequently ask people to repeat themselves because I cannot hear them." Ex. F ¶ 14;

- Daniel LaPlante: "Since losing access to CapTel, I have had to make more phone calls on the regular phone because I often have to call people back to make sure I have not misunderstood them" Ex. G ¶ 16;

- John Scott: "Although I do make calls on the regular phone when there is no other option, it is very difficult for me to use those phones even with my hearing aids. . . . I often misunderstand what's being said and have to ask the person I'm talking to repeat themselves." Ex. H ¶¶ 10-11;

- Jon Bourassa: "I am still struggling greatly with my hearing, and my ability to communicate with my loved ones . . . has deteriorated significantly now that I use the regular phone." Ex. I ¶ 13;

- Richard Haskins: "Without access to the CapTel phones, I am forced to use the regular phone to speak with my siblings and friends. However, I can barely hear them on the regular phone, and now only make about two calls a month." Ex J ¶ 18; and

- Terrance Montgomery: "I struggle most when trying to talk to my kids who are only five and eight years old. They get frustrated with me because I cannot understand what they are saying." Ex. M ¶ 15.

Family and friends of class members confirm the difficulty class members have

communicating by regular phone:

- Alyssa Contois: "Now that Daniel is no longer allowed to use the CapTel phones, our conversations are often cut short due to Daniel's frustration over not being able to hear what I'm saying." Ex. P, Decl. of Alyssa Contois ¶ 6.

- Heather DiBenedetto: "He constantly asks for clarification, which significantly slows and takes away from the substance of our conversations." Ex. Q, Decl. of Heather DiBenedetto ¶ 4.

- James Casey: "He doesn't call as often because he really struggles to hear me on the regular phone. . . . I have to repeat myself constantly. Even when he doesn't ask me to repeat myself, I can tell that he is struggling to understand what I am saying." Ex. R, Decl. of James Casey ¶¶ 4-5; and

- Karen Sherman: "Since Brian lost access to the CapTel phones, our conversations have exponentially slowed, and we do not cover much ground as he cannot hear on the regular phones." Ex. S, Decl. of Karen Sherman ¶ 3.

After it began to use the Guidelines in late 2022 to conduct a systematic reassessment of class members' accommodations, DOC revoked the CapTel access of virtually everyone who did not meet the threshold level of hearing loss. They did so despite class members informing DOC during the DARAs and appeals how hard it was for them to communicate on the regular phones and their need for CapTels:

- Brian Sherman: "They asked if I had any issue using the regular phones and I told them that I could not effectively communicate with traditional phones, even with hearing aids and a pocket talker. I also explained that I cannot hear properly on the regular phone and must ask the speaker to constantly repeat themselves." Ex. F ¶ 9;

- Daniel LaPlante: "I informed [the ADA coordinator] that I relied on the captions and higher volume on the CapTels to communicate via phone and that I could not effectively use the regular phone.") Ex. G ¶ 12;

- John Scott ("I told the Deputy that the CapTel really helped me and that I couldn't communicate effectively using the regular phone, and that the amplification button didn't help.") Ex. H ¶ 6;

- Jon Bourassa: "I told [the ADA coordinator] that I could not communicate effectively while wearing my hearing aid, that I could not communicate effectively using the regular telephone, and that the amplification button didn't help." Ex I ¶ 10;

- Nicole Chuminski: "[The ADA coordinator] asked if I could use the regular phone. I informed her that I could not, and that I could only hear a speaker on the regular phone when my unit was completely quiet." Ex. K ¶ 9; and

- Richard Haskins: "She asked whether I had a hard time hearing on the regular telephones, and I informed her that I could not hear well using the regular phone and that the amplification button didn't help." Ex. J ¶ 13.

Class members similarly report being denied access to pagers, despite their difficulty hearing announcements:

- Brian Sherman: "I also have trouble hearing announcements over the public announcement system and verbal commands from correctional officers, but have never been offered a pager for notifications." Ex. F ¶ 5;

- John Scott: "I would also like a pager because it is hard to understand announcements and I have missed medical appointments. . . . But my request for a pager was denied." Ex. H ¶ 13; and

- Richard Haskins: DARA decision "did not address my need for a pager for in-person notifications" despite the fact that he "I struggled to hear announcements and orders from prison staff, and I sometimes missed medications because I couldn't hear the call for the medication line" Ex. J ¶¶ 15, 20.

## VII.   Settlement Monitor Reports on Use of Wellpath Guidelines to Deny CapTel and Pagers

The Settlement Monitor, who was appointed pursuant to the Agreement to review

Defendants' compliance through site visits, document reviews, and communication with class

members, has determined that Defendants' practices violate the Agreement and federal law. In

the Settlement Monitor's January 26, 2023 report, she concluded that the "Guidelines make clear

that Wellpath has determined that it will use decibel loss as determinative of the need for

accommodations, notably use of CapTel phones and issuance of pagers." Ex. T, E. Elaine

Gardner, Fifth Report of the Settlement Monitor (Jan. 26, 2023) (excerpted) at 58. In particular,

she found that:

> [P]risoners' previously granted accommodations such as CapTel services are being withdrawn, despite their continued need and expressed preference for these accommodations. These accommodation denials seem to be totally based upon the decibel hearing loss of the prison, without regard to the prisoner's expressed preferences or other factors.

*Id.* at 7. With respect to pagers, the Settlement Monitor reported that she has "received

complaints from prisoners who are not receiving [in-person] notifications, and nonetheless have

been denied pagers" and that "[t]he Department has indicated that it intends to limit distribution

of pagers to only those prisoners with severe to profound hearing loss." *Id.* at 91-92.

Accordingly, the Settlement Monitor concluded: "the Guidelines conflict with the Settlement and

federal law. They are not in keeping with Section IV(D) of the Settlement, which requires

primary consideration to the accommodation preference expressed by the inmate, and precludes

11

decisions based solely on threshold levels of hearing loss" and identified "Compliance with Settlement's Requirements for Determination of Appropriate Hearing-Related Auxiliary Aids and Services" as a major area of noncompliance. *Id.* at 59, 141-42.

## VIII.   <u>Dispute Resolution</u>

Pursuant to the dispute resolution process set out in the Agreement Section XVI, Plaintiffs notified the Defendants in writing on March 6, 2023, that Defendants were in substantial non-compliance with the Agreement because Defendants were relying on the threshold level hearing loss set forth in the Wellpath Guidelines to deny class members access to CapTel and pagers and were ignoring individual preferences. Ex. B.

Defendants responded on April 5, 2023, acknowledging that their assessments for CapTel and pager access were based upon the Wellpath Guidelines, but asserting that "the clinically assessed hearing level of an individual is a significant factor, but not the only factor, in determining the need for the device." Ex. U, Letter from Edward O'Donnell, Defs.' Counsel, to Tatum Pritchard, Pls.' Counsel (Apr. 5, 2023) at 2. Defendants' primary justification for reliance on the Wellpath Guidelines is their assumption, without evidence, that people in custody will not be honest about their need for accommodations.[6] Instead of crediting class members' reported difficulty communicating without CapTels and pagers, Defendants noted that they "may be issued pocked talkers and hearing aids and the conventional inmate telephones have amplification capabilities" as alternative accommodations. *Id.* at 4. On April 23, 2023, Counsel for Plaintiffs and DOC participated in a teleconference but were unable to resolve their disagreements over access to CapTel phones and pagers.

---

[6] Defendants' claim that class members ask for CapTel because the calls are free is undermined by the recent enactment of G.L. c. 127, § 87A, which allows all prisoners to make unlimited free calls.

Pursuant to Section XVI of the Agreement, if the Court finds that Defendants are in substantial noncompliance with the Agreement, it may enter an order consistent with equitable principles to achieve compliance.

## ARGUMENT

I. **Defendants Deprive Class Members of Effective Communication by Denying Access to CapTel Services and Pagers Based on Threshold Levels of Hearing Loss Alone in Violation of the Agreement**

Defendants are in violation of Section IV(D) of the Agreement, which states:

> The Institution ADA Coordinator shall review the deaf or hard-of-hearing inmate's selection and… … in accordance with Section XI (Revisions to Relevant DOC Policies in Accordance with this Agreement), ¶ 8, shall determine which accommodations shall be approved and provided to the deaf or hard-of-hearing inmate. In making this decision, the Institution ADA Coordinator *shall give Primary Consideration to the preference expressed by the inmate* for particular auxiliary aids or services, unless one of the exceptions set forth in Section XI … applies. Any decision to deny an auxiliary aid or service selected by an inmate *must be based on an individualized assessment of the inmate, and not on any set guidelines, protocols, or threshold levels of hearing loss shown on an inmate's audiogram*.

Ex. A § IV(D) (emphasis added).

Primary Consideration requires DOC to "honor a deaf or hard-of-hearing inmate's expressed choice(s) of accommodations . . . unless DOC can demonstrate" that another means of Effective Communication[7] is available, or that the individual's preferred means would result in a fundamental alteration, undue burden, or actual safety risks. Ex. A § III ¶ 27 *see also*, Ex. A § IX ¶ 8 Significantly, DOC is required by the Agreement to report any instance where it has denied

---

[7] Again, the Agreement defines Effective Communication to mean "communication that is clear and understandable to persons with disabilities. . [and] which affords deaf and hard-of-hearing inmates an opportunity to participate in, and enjoy the benefits of, DOC's services, programs, or activities in a manner that is substantially equal to the opportunity provided to similarly situated inmates who are neither deaf nor hard-of-hearing." Agreement, Section III ¶ 16.

CapTel or a pager on the basis of fundamental alteration, undue burden, legitimate safety risks, or direct threat, but has never done so. *See* Ex. A, Appendix A ¶ 37.

Contrary to the Agreement, Defendants have adopted a practice of denying access to CapTel and pagers based solely on threshold levels of hearing loss set by the Wellpath Guidelines. In categorically denying CapTel and pagers to those with less than "severe" hearing loss, Defendants refuse to give Primary Consideration to class members' expressed choice of accommodations. Defendants' proposed alternative accommodations—hearing aids and phones with amplification—also do not give hard-of-hearing individuals access to phones or announcements that is substantially equal to that of individuals without hearing loss as required for Effective Communication.

### A.    Defendants Are Using the Wellpath Guidelines to Categorically Deny CapTel and Pagers to Class Members Who Do Not Meet Threshold Levels of Hearing Loss as Shown by Their Audiogram

The independent Settlement Monitor has found that Defendants are impermissibly utilizing threshold levels of hearing loss as the sole basis for determining CapTel and pager eligibility. Based on her review of documents, site visits, and communications with class members, her most recent report concludes that CapTel and pager "denials seem to be totally based upon the decibel hearing loss of the prison, without regard to the prisoner's expressed preferences or other factors" and that the Guidelines "use decibel loss as determinative of the need for accommodations" which is in "conflict with the Settlement and federal law." Ex. T at 7, 58-59.

Neither Defendants nor Wellpath have produced any evidence that CapTel should be reserved for those with "severe" or "profound" levels of hearing loss. Nor could they, as it is common for providers in the community to recommend CapTel to those with less than "severe" hearing loss. Ex. D ¶¶ 21, 35. Indeed, as the Settlement Monitor points out, "Federal agencies

14

have repeatedly rejected the use of numerical audiological tests to determine whether an individual with hearing loss requires a certain auxiliary aid or accommodation. This is because an individual's mild decibel loss may not reflect a serious neurological inability to discriminate speech, or to react to certain pitched sounds." Ex. T at 59.

DOC's use of threshold cutoffs is apparent from the near-one-to-one relation between the individual's "Level of Hearing Deficit" and Defendants' CapTel and pager denial or approval decisions. Out of 229 DARAs[8] for people with mild, moderate, or moderately severe hearing loss (*i.e.,* class members who presumptively do not qualify under the Wellpath Guidelines), only six were approved. *See* Ex. E ¶¶ 5-6. By contrast, 124 of the 126 DARAs for people with profound or severe hearing loss (*i.e.* those who presumptively qualify under the Guidelines) were approved. *Id*. Approvals for pagers similarly track the Guidelines: Only one out of 94 DARAs for people with mild, moderate, or moderately severe hearing loss was approved, while 124 out of 125 for people with profound or severe hearing loss were approved. *Id.*

This near-categorical deference to the Wellpath Guidelines' thresholds is also reflected in appeals of CapTel and pager denials. Among appeals for CapTel access by people with hearing loss that is mild, moderate, or moderately severe, 117 out of 119 were denied. *Id*. ¶¶ 14-15. By contrast, all 13 appeals from people who meet the threshold were approved for CapTel. *Id.* The appeals for pagers tell the same story: all six appeals from people who had severe or profound hearing loss were approved, while all 27 appeals from people with mild, moderate, or moderately severe hearing loss were denied. *Id*. ¶¶ 18-19.

---

[8] These 229 DARAs represent the set of DARAs from Defendants' two most recent productions in which a clear denial or approval was made.

The Wellpath Guidelines explicitly state that "CapTel and other phone accommodations are generally reserved for the most hard of hearing (71 dB and above)" and that "assistive devices such as . . . pagers . . . may be indicated" only for people with severe and profound hearing loss, making it unsurprising that the denial of accommodations tracks the thresholds. Guidelines at 2. Almost invariably, the explanation in the DARA form for a decision to deny CapTel is that it is "not medically indicated" (Ex. H at 7), "does not meet clinical guidelines for these services" (Ex. G at 13), or some variation of that language. The DARA forms and appeal decisions never discuss or attempt to refute the class members' descriptions of their difficulties communicating on the regular telephones.[9]

### B.  Defendants Fail to Give Primary Consideration to Class Members' Choice of Accommodations in Violation of the Agreement

The Agreement requires Defendants to honor a class member's choice of accommodation unless they can demonstrate that another equally effective accommodation is available or it would result in a fundamental alteration, undue burden, or safety risk. Ex. A §§ IV(D), III ¶ 27. As the Settlement Monitor notes, the Department of Justice has explained that it is important to consult with the individual to determine the most appropriate accommodation because the individual with a disability is most familiar with his or her disability and is in the best position to determine what type of aid or service will be effective. *See* Ex. T at 60, *citing* DOJ Title II Technical Assistance Manual II-7.1100. Dr. Carter makes the same point: it is best practice for clinicians to talk to the patient to evaluate what their actual needs may be. Ex. D ¶ 53.

---

[9] Defendants claim that the Wellpath Guidelines are necessary to give them an objective measurement of whether a person truly needs access to a CapTel or pager, but all class members have been determined through audiologic testing to have at least some degree of hearing loss, and many were determined to need CapTel and pagers before DOC implemented the Guidelines.

Defendants have nonetheless systematically disregarded the express preference of class members for CapTels and pagers as accommodations for their hearing disabilities. The DARA forms produced by Defendants in their July and November 2023 productions indicate 225 out of 361 and 94 out of 225 instances where people with recognized hearing loss requested access to CapTel and pagers, respectively, but were denied. Ex. E ¶¶ 4, 8. Similarly, the appeal decisions show that 117 out of 132 requests for CapTels and 27 out of 33 requests for pagers in appeals by people with recognized hearing loss requested were denied. *Id.* ¶¶ 13, 17. In virtually every case, the Wellpath Guidelines determined the outcome. Class member explanations to Defendants about their difficulty using regular phones and hearing announcements are entirely disregarded at both the DARA and appeal stage. *See, e.g.*, Ex. F ¶¶ 9-10; Ex. G ¶ 12; Ex. H ¶ 6; Ex. I ¶ 10; Ex. K ¶¶ 9, 11; Ex. J ¶ 13; Ex. M ¶ 9. Defendants are failing to honor the expressed preference of the class members for CapTel or pagers except when they qualify for these accommodations under the Guidelines.

### C.    Defendants Have Failed to Demonstrate That Class Members Have Equally Effective Means of Accessing Telecommunications and Announcements

To justify providing an accommodation that does not comport with a class member's expressed choice of accommodation, Defendants bear the burden of demonstrating that another means of Effective Communication is available. Ex. A § III ¶ 27. The alternative means of communication must be "clear and understandable to persons with disabilities . . . ." Ex. A § III ¶ 16.

Defendants cannot meet this burden. Defendants claim that they have provided class members with alternative accommodations that adequately ensure Effective Communication, specifically, traditional telephones with amplification buttons, hearing aids, and pocket talkers. Defendants also claim that even though the Wellpath Guidelines are a significant factor, the

17

DOC ADA Coordinator's decisions on appeal show that CapTel and pager denials are also based on an individualized review of the person's record. There are two flaws in Defendants' reasoning: First, as described above, there is overwhelming data that the Guidelines control the decisions. Second, the claim that decisions are individualized is contradicted by the fact that *every* appeal decision contains identical boilerplate justifying the denial of CapTel and pagers:

> It is not clinically indicated at this time. Additionally, a review of your institutional grievance records indicates that there have been no institutional grievance filed by you indicating your hearing needs are not being met. A review of your institutional disciplinary records indicates that there has been no institutional disciplinary proceedings where your hearing may have been an issue. I have also reviewed your telecommunication use over the last year and have determined that you have appropriately and effectively utilized the traditional amplified/hearing aid compatible telephones made available to you.

*See, e.g.*, Ex. H ¶ 10; Ex. G ¶ 13; Ex. F ¶ 13; Ex. L ¶ 22.

None of Defendants' justifications in the appeal decisions, together or separately, demonstrates that those alternative accommodations are effective for those class members. Many class members reported during their DARAs that they cannot "effectively communicate on traditional inmate telephones with amplified volume controls" and that they cannot "understand announcements made verbally by staff[.]" *See, e.g.*, Ex. F ¶ 7; Ex. J ¶ 10. Many also indicated that they have difficulty communicating on the phone even with hearing aids or pocket talkers. *See, e.g.*, Ex. F ¶ 7; Ex. G ¶ 7; Ex. H ¶ 6; Ex. I ¶ 7; Ex. J ¶ 10; Ex. K ¶¶ 6-7.

Despite class members' assertion that these alternatives are ineffective, the DARA decisions uniformly deny CapTel and pagers solely on grounds that they were not "medically indicated" or the person "does not meet the clinical guidelines for these services," *i.e*, the individual's hearing loss did not meet the threshold level prescribed by the Guidelines. *See, e.g.*, Ex. G ¶ 8; Ex. H ¶ 7. Even though the Wellpath Guidelines recommend "a more individualized approach" may be needed in some circumstances, nothing in any of the decisions suggests that

Defendants considered any information other than the guidelines in determining whether their proposed alternatives provided equally effective communication to class members.

Although Defendants purport to conduct a broader review of the individual class members' records when they decide the appeal, appeal decisions regularly ignore the class members' difficulty using the phone or hearing announcements. Instead, Defendants rely on the fact that the person may have used the regular phones, or have not received hearing-related disciplinary reports or filed grievances, to draw the unwarranted conclusion that their accommodations are sufficient.[10] However, class members use the traditional phones only because the alternative is no phone contact at all with their loved ones, *e.g.*, Ex. J ¶ 18, and they still miss verbal announcements, *e.g.*, Ex. L ¶¶ 2, 9, 17. Many class members struggle to understand conversations on the telephone, or limit the frequency and length of their calls, if not skipping them altogether. *E.g.*, Ex. H ¶ 11 ("I often misunderstand what's being said and have to ask the person I'm talking to repeat themselves."); Ex. K ¶ 14 ("I either wait until my unit of approximately 30 people is empty to use the phone or use an outdoor phone in the evenings to avoid the noise from my unit."); Ex. J ¶ 18 ("I have to ask the people I'm talking with to keep repeating themselves . . . resulting in a lot of frustration . . . and far shorter conversations."); Ex. G ¶ 16 ("Since losing access to CapTel, I have had to make more phone calls . . . because I often have to call people back to make sure I have not misunderstood them."); Ex. H ¶ 12 ("I hardly ever talk to my grandson anymore because it's just too difficult to understand each other."). Indeed, the very accommodations that Defendants claim to be effective alternatives may in some instances make communication by telephone more difficult. Ex. D ¶ 37 ("[U]sing a regular

---

[10] The failure to grieve is irrelevant since when class members have grieved their lack of access to CapTel phones, they have typically been told the issue was addressed by their appeal and cannot be addressed through the grievance process. Ex. H ¶ 11.

phone is often difficult for people with hearing aids in part because there is often acoustic feedback (ringing/squealing) because the phone is picking up its own sound. Also, hearing aids are designed to amplify the very environmental noise that interferes with a person's ability to hear, further complicating speech understanding in noisy environments like prison units"). Furthermore, the volume control on the regular phone can distort the quality of the sound. *See, e.g.*, Ex. H ¶ 10 (the amplification button "messes up voice quality, making it sound almost like a factory loudspeaker").

Class members have a right under the Agreement to Effective Communication that "is clear and understandable" and affords them "an opportunity to participate in, and enjoy the benefits of, DOC services . . . in a manner that is substantially equal" to the experience of individuals without hearing disabilities. Ex. A §§ III ¶ 16, VI(D), XI ¶ 8. As made clear from the declarations of class members and Dr. Carter, Defendants have not provided an effective alternative to CapTel or pagers.

## **CONCLUSION**

In violation of the express provisions of the Agreement and federal law, Defendants have adopted a practice of denying class members access to CapTels and pagers based solely on the threshold levels of hearing loss set forth in the Wellpath Guidelines, refused to give Primary Consideration to class members' expressed choice of accommodations, and failed to demonstrate that alternative accommodations offered are equally as effective. Accordingly, Plaintiffs ask that the Court find Defendants in substantial noncompliance with the requirements of Section IV(D) of the Settlement Agreement and enter an order consistent with equitable principles designed to achieve compliance.

Dated: November 22, 2023          Respectfully submitted,

**Plaintiffs Leonard Briggs, George Skinder, Rolando S. Jimenez, Louis Markham, Francis McGowan, Eric Roldan, and Jennifer Ward,**

By their attorneys,

*/s/ James R. Pingeon*
James R. Pingeon, BBO #541852
PRISONERS' LEGAL SERVICES
50 Federal St., 4th Floor
Boston, MA 02110
(617) 482-2773
jpingeon@plsma.org

*/s/ Tatum A. Pritchard*
Tatum A. Pritchard, BBO #664502
DISABILITY LAW CENTER, INC.
11 Beacon Street, Suite 925
Boston, MA 02108
(617) 723-8455
tpritchard@dlc-ma.org

*/s/ Lisa J. Pirozzolo*
Lisa J. Pirozzolo, BBO #561922
Megan E. Barriger, BBO #687707
Stephanie Lin, BBO #690909
George F. Manley, BBO #703665
Rama Vine, BBO# 699395
Tess Ambrose Foley, BBO #703417
Christina Luo, BBO #705590
Edward W. Hasen, BBO #709251
John F. Saylor, BBO #711611
WILMER CUTLER PICKERING
 HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
Lisa.Pirozzolo@wilmerhale.com
Megan.Barriger@wilmerhale.com
Stephanie.Lin@wilmerhale.com
George.Manley@wilmerhale.com
Rama.Vine@wilmerhale.com
Tess.Foley@wilmerhale.com

Christina.Luo@wilmerhale.com
Ted.Hasen@wilmerhale.com
John.Saylor@wilmerhale.com

/s/ *Kaitlin Banner*
Kaitlin Banner (DC Bar #1000436)
WASHINGTON LAWYER'S COMMITTEE FOR CIVIL
RIGHTS AND URBAN AFFAIRS
700 14th St. N.W., Suite 400
Washington, DC 20005
(202) 319-1000
Kaitlin_Banner@washlaw.org

**CERTIFICATE OF SERVICE**

I, James R. Pingeon, hereby certify that a true and accurate copy of this document and accompanying exhibits was served via ECF to all registered participants as identified on the Notice of Electronic filing and paper copies will be sent to those indicated as nonregistered participants on November 22, 2023.

/s/ *James R. Pingeon*
James R. Pingeon, BBO #541852

22