# Exhibit A

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LEONARD BRIGGS, GEORGE SKINDER, LOUIS MARKHAM, FRANCIS MCGOWAN, ERIC ROLDAN, ROLANDO S. JIMENEZ, AND JENNIFER WARD, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 1:15-cv-40162-GAO-JGD |
| v. | ) ) | |
| MASSACHUSETTS DEPARTMENT OF CORRECTION; CAROL A. MICI[1], COMMISSIONER OF THE MASSACHUSETTS DEPARTMENT OF CORRECTION; JENNIFER A. GAFFNEY*, DEPUTY COMMISSIONER OF CLASSIFICATION, PROGRAMS, AND REENTRY DIVISION; COLETTE M. GOGUEN*, SUPERINTENDENT OF MCI-SHIRLEY; STEVEN SILVA, SUPERINTENDENT OF MCI-NORFOLK; LISA MITCHELL, SUPERINTENDENT OF THE MASSACHUSETTS TREATMENT CENTER; ALLISON HALLET*, SUPERINTENDENT OF MCI-FRAMINGHAM; AND MASSACHUSETTS PARTNERSHIP FOR CORRECTIONAL HEALTHCARE, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## SETTLEMENT AGREEMENT

---

[1] These parties, named in their official capacities, have been substituted as successors in office, under Fed. R. Civ. P. 25(d).

## TABLE OF CONTENTS

I.  PARTIES TO SETTLEMENT AGREEMENT ................................................. 1

II.  PURPOSE OF SETTLEMENT AGREEMENT ............................................ 1

III.  DEFINITIONS ............................................................................................ 1

IV.  IDENTIFICATION AND TRACKING OF DEAF AND HARD-OF-HEARING
     INMATES ................................................................................................... 8

    A.  Identification of Deaf and Hard-of-Hearing Inmates Currently in DOC
         Custody ............................................................................................. 8

    B.  Intake Procedures Regarding Deaf and Hard-of-Hearing Inmates ............................ 9

    C.  Identification of Deaf and Hard-of-Hearing Inmates After Intake ........................... 12

    D.  Initial Assessment to Determine Appropriate Hearing-Related Auxiliary Aids
         and Services .................................................................................... 13

    E.  Deaf and Hard-of-Hearing Inmates' Retention of Approved Hearing-Related
         Auxiliary Aids .................................................................................. 18

    F.  Tracking Deaf and Hard-of-Hearing Inmates in DOC Custody ............................... 19

    G.  Meetings with Institution ADA Coordinators Regarding Accommodations ........... 21

V.  CONTRACT MEDICAL PROVIDER'S CARE, TREATMENT, AND
    ACCOMMODATION OF DEAF AND HARD-OF-HEARING INMATES ................. 22

    A.  Audiologists' or Other Qualified Hearing Specialists' Recommendations ............. 22

    B.  Hearing Screening ........................................................................... 23

    C.  Hearing Aid Batteries ...................................................................... 24

    D.  Hearing Aid Repairs ........................................................................ 24

VI.  QUALIFIED SIGN LANGUAGE INTERPRETERS ................................... 25

    A.  General Policy .................................................................................. 25

    B.  Interpretation of Written Materials ................................................. 29

    C.  Methods for Providing Interpreter Services ................................... 30

        1.  Video Remote Interpreting .................................................. 30

        2.  On-Site Live Qualified Sign Language Interpreters ......................... 31

　　　　3.　　Choice Between On-Site Interpreter Services and VRI ................................. 32

　　D.　Off-site Medical Care ........................................................................................ 32

　　E.　Parole Hearings ................................................................................................. 32

　　F.　Use of Inmates as Interpreters for Deaf or Hard-of-Hearing Inmates ...................... 32

VII.　INSTITUTIONAL WORK ASSIGNMENTS ................................................................. 34

VIII.　TELECOMMUNICATION ........................................................................................... 34

　　A.　General Policy .................................................................................................... 34

　　B.　Telecommunication Services and Devices to Be Provided .................................... 35

　　　　1.　　Videophones & Video Relay Services ......................................................... 35

　　　　2.　　Captioned Telephones ................................................................................ 38

　　　　3.　　Teletypewriters .......................................................................................... 39

　　　　4.　　Amplification Available on Traditional Telephones .................................... 40

　　　　5.　　Hearing Aid Compatible Traditional Telephones ........................................ 40

　　C.　Requesting Approval for and Access to Telecommunication Services and
　　　　Devices .............................................................................................................. 40

　　D.　Monitoring Communications ............................................................................. 42

　　E.　Additional Time for Communication .................................................................. 42

　　F.　Cost for Use of Telecommunication Services and Devices .................................. 42

　　G.　Responsibility for Maintaining Equipment ........................................................ 42

　　H.　Responsibility for Training Staff ....................................................................... 43

IX.　VISUAL AND TACTILE NOTIFICATIONS .................................................................. 43

　　A.　General Policy .................................................................................................... 43

　　B.　Relaying Non-Emergency Information ............................................................... 43

　　　　1.　　Visual or Tactile Notification Systems ....................................................... 44

　　　　2.　　Vibrating Watches ...................................................................................... 45

　　　　3.　　Supplementary Non-Auditory Information Relay Systems ........................... 45

X.    TRAINING ........................................................................................................ 46

    A.    Training Provided to Covered Employees ..................................................... 46

    B.    Supplemental Training Provided to Institution ADA Coordinators................. 47

XI.    REVISIONS TO RELEVANT DOC POLICIES IN ACCORDANCE WITH THIS
    AGREEMENT .................................................................................................. 48

XII.    HOUSING DETERMINATIONS.................................................................... 55

XIII.    MONITORING AND REPORTING.............................................................. 56

    A.    Settlement Monitor ...................................................................................... 56

    B.    DOC Records and Reports ........................................................................... 58

    C.    Settlement Monitor's Reports ...................................................................... 59

XIV.    RELEASE AND SETTLEMENT OF CLAIMS ............................................. 60

XV.    FINAL APPROVAL......................................................................................... 60

XVI.    DISPUTE RESOLUTION AND ENFORCEMENT....................................... 61

XVII.    FUNDING........................................................................................................ 63

XVIII.    NO ADMISSION OF LIABILITY................................................................. 64

XIX.    ATTORNEYS' FEES AND COSTS ............................................................... 64

XX.    MISCELLANEOUS ........................................................................................ 64

    A.    Governing Law ............................................................................................ 64

    B.    Confidentiality............................................................................................. 65

    C.    Entire Agreement ........................................................................................ 65

    D.    Execution .................................................................................................... 65

    E.    Non-Waiver ................................................................................................. 66

    F.    Severability ................................................................................................. 66

    G.    Amendments ............................................................................................... 66

    H.    Term of Agreement ..................................................................................... 66

APPENDIX A .........................................................................................................70

## I.     PARTIES TO SETTLEMENT AGREEMENT

The Parties to this Settlement Agreement ("Agreement") are:

1.      Plaintiffs Leonard Briggs, George Skinder, Louis Markham, Francis McGowan, Eric Roldan, Rolando S. Jimenez, and Jennifer Ward;

2.      Members of any class that is certified in this Action; and

3.      Defendants Massachusetts Department of Correction; Carol A. Mici[2], Commissioner of the Massachusetts Department of Correction; Jennifer A. Gaffney*, Deputy Commissioner of Classification, Programs, and Reentry Division; Colette M. Goguen*, Superintendent of MCI-Shirley; Steven Silva, Superintendent of MCI-Norfolk; Lisa Mitchell, Superintendent of the Massachusetts Treatment Center; Allison Hallet*, Superintendent of MCI-Framingham.

## II.     PURPOSE OF SETTLEMENT AGREEMENT

The Parties acknowledge and agree that this Agreement is intended to be a partial settlement of the Action, resolving all claims in the Action except the Reserved Claims.

## III.     DEFINITIONS

1.      **"408 Policy"** refers to DOC's policy 103 DOC 408, "Reasonable Accommodations for Inmates."[3]

2.      **"Action"** means the above-captioned action.

---

[2] These Parties, named in their official capacities, have been substituted as successors in office, under Fed. R. Civ. P. 25(d).

[3] References to any statutes, regulations, and policies by name or number in this Agreement shall be construed as references to those statutes, regulations, and policies as named or numbered as of the date that this Agreement is executed.

3.      **"ADA"** means the Americans with Disabilities Act, codified at 42 U.S.C. §§ 12101 et seq., as amended by the ADA Amendments Act of 2008 (P.L. 110-325).

4.      **"ASL"** means American Sign Language, a visual language that employs signs made by moving the hands combined with facial expressions and postures of the body with its own unique rules of grammar and syntax used predominantly in the United States and parts of Canada.

5.      **"Auxiliary Aids and Services"** shall refer to equipment, devices, or services that facilitate Effective Communication as well as effective access to DOC programs, services and activities for individuals with hearing-related disabilities. Auxiliary Aids and Services for deaf and hard-of-hearing inmates include, but are not limited to the following: **"**Qualified interpreters on-site or through video remote interpreting (VRI) services; notetakers; real-time computer-aided transcription services; written materials; exchange of written notes; telephone handset amplifiers; assistive listening devices; assistive listening systems; telephones compatible with hearing aids; closed caption decoders; open and closed captioning, including real-time captioning; voice, text, and video-based telecommunications products and systems, including text telephones (TTYs), videophones, and Captioned Telephones, or equally effective telecommunications devices; videotext displays; accessible electronic and information technology; or other effective methods of making aurally delivered information available to individuals who are deaf or hard of hearing." S*ee* 28 C.F.R § 35.104; *see also* 42 U.S.C. § 12103(1)(A).

6.       **"Captioned Telephone"** or **"CapTel"** means a specialized telephone that permits verbal communication in the same manner as a traditional telephone and

automatically connects to a captioning service that transcribes the content of the conversation, which provides captions on the device's built-in screen.

7.    **"Communication Access Realtime Translation"** or **"CART"** means a real-time captioning service that is used by deaf and hard-of-hearing individuals who use English as their first language and/or their language of instruction.

8.    **"Contract Medical Provider"** means any provider of medical, dental, or mental health treatment who is not an employee of DOC and who provides such services through a contractual agreement with DOC.

9.    **"Covered Employees"** means all DOC employees with care and custody functions; DOC Contract Medical Provider employees; DOC contract substance use treatment provider employees; and DOC Education Program principals.

10.   **"Deaf"** denotes individuals who cannot hear or who, as a result of hearing loss, are impaired in processing linguistic information through hearing, with or without amplification.

11.   **"Department ADA Coordinator for Inmates"** means the individual designated by DOC who is responsible for coordinating DOC's compliance with the ADA as it relates to inmates and the provisions of 103 DOC 408.

12.   **"Department Investigation"** means DOC's collection of evidence that supports, fails to support, or refutes an allegation, or provides clarification of what occurred during an incident, including alleged misconduct.

13.   **"Direct Threat"** means a significant risk to the health or safety of the deaf or hard-of-hearing inmate or others that cannot be eliminated by a modification of policies, practices or procedures, or by the provision of Auxiliary Aids and Services as provided in 28 CFR § 35.139.

14.    **"DOC"** shall refer to the Massachusetts Department of Correction, as established by Mass. Gen. Laws c. 27, § 1.

15.    **"DOC Facility"** or **"DOC Facilities"** shall refer to any correctional facility owned, operated, administered or subject to the control of DOC.

16.    **"Effective Communication"** means communication that is clear and understandable to persons with disabilities. For deaf and hard-of hearing inmates, Effective Communication is communication that is substantially as effective as communication with the general inmate population (*see* 28 C.F.R. § 35.160(a)). Effective Communication will, when necessary, include the provision of appropriate Auxiliary Aids and Services, such as Qualified Sign Language Interpreters.  Effective Communication affords deaf and hard-of-hearing inmates an opportunity to participate in, and enjoy the benefits of, DOC's services, programs, or activities in a manner that is substantially equal to the opportunity provided to similarly situated inmates who are neither deaf nor hard-of-hearing.

17.    **"Effective Date"** shall mean the date upon which this Agreement is finally approved and entered by the Court or a motion to finally approve or enter the Agreement is granted, whichever occurs first, as recorded on the Court's docket.

18.    **"Final Approval"** shall refer to the Court's entry of this Agreement as an Order of the Court following a hearing and finding that the Agreement is fair, reasonable an adequate, pursuant to Fed. R. Civ. P. 23(e).

19.    **"Hard-of-Hearing"** denotes individuals who have reduced hearing ability ranging from mild to severe.

20.     **"Inmate"** means a committed offender or such other person as is placed in custody in a state correctional facility in accordance with law, as defined in Mass. Gen. Laws c. 125, § 1.

21.     **"IMS"** means the Inmate Management System, DOC's automated information system that provides processing, storage and retrieval of inmate-related information needed by DOC.

22.     **"Institution ADA Coordinator"** means the individual at a particular DOC Facility responsible for ensuring that facility's compliance with the ADA and 103 DOC 408 for inmates.

23.     **"MCDHH"** means the Massachusetts Commission for the Deaf and Hard of Hearing, as established by Mass. Gen. Laws c. 6, § 192.

24.     **"On-site Medical Appointment"** means a medical appointment that is conducted at a DOC Facility, including a medical appointment conducted by third parties in a DOC Facility.

25.     **"Personalized Program Plan"** means a plan that charts the course of action for the inmate, the Correctional Program Officer, and the service providers on addressing the criminogenic needs of the inmate, progress made, and compliance issues.  The plan begins at intake and is continuously updated based on the inmate's risk, needs assessment, if applicable, and record review including but not limited to any secondary assessment.

26.     **"Plaintiffs' Counsel"** means attorneys-of-record for Plaintiffs in *Briggs, et al. v. Massachusetts Department of Correction, et al.*, Case No. 15-cv-40162-GAO-JGD (D. Mass.), as of the date this Agreement is signed.

27.    **"Primary Consideration"** means that DOC must honor a deaf or hard-of-hearing inmate's expressed choice(s) of accommodations when determining what types of auxiliary aids and/or services are necessary to ensure that the inmate is able to communicate effectively and have effective, meaningful, and substantially equal access to DOC programs, services, and activities, unless DOC can demonstrate (1) that another means of Effective Communication is available or (2) that the means chosen by the inmate would result in a fundamental alteration in the service, program, or activity, in undue financial and administrative burdens, or will result in actual risks or impairment of the safe operation of a DOC Facility or the service, program, or activity in accordance with 28 C.F.R. § 35.130(h).

28.    **"Qualified Hearing Specialist"** means a licensed professional specializing in hearing loss, namely audiologists and physicians who specialize in the diagnosis and treatment of hearing loss (such as otologists and neurologists).

29.    **"Qualified Sign Language Interpreter"** means a person who, via a video remote interpreting ("VRI") service or an on-site appearance, can interpret effectively, accurately, and impartially, both receptively and expressively, using American Sign Language.  *See* 28 C.F.R. § 35.104.  For purposes of this Agreement, a Qualified Sign Language Interpreter is one who holds a current, valid certification and/or who has been screened and approved by one or more of the following organizations:

a.      Registry of Interpreters for the Deaf, Inc., a nationally based professional organization;

b.      National Association of the Deaf; and/or

c.      MCDHH.

The Parties agree that other certifications that are the equivalent of those offered by the above organizations shall be considered valid minimum certification, so long as those certifications are kept current.

30.  **"Reserved Claims"** means claims identified in the Complaint filed in this Action that have not been expressly resolved by this Agreement and that will be resolved through further litigation of this Action.  The following are identified as Reserved Claims:

   a.   Claims regarding the adequacy of DOC's provision of notifications of safety announcements, emergency alerts and alarms, and emergency evacuations to deaf and hard-of-hearing inmates.  Included in such claims are Plaintiffs' claims that: (1) DOC lacks effective visual systems for notifying deaf and hard-of-hearing inmates of emergency alarms and announcements, and (2) DOC has failed to take necessary safety precautions, install equipment, and establish procedures to ensure that deaf and hard-of-hearing inmates are made aware of emergency alarms and announcements.

   b.   Claims for attorneys' fees and costs, including claims for attorneys' fees and costs associated with the claims that have been resolved by this Agreement.

31.  **"Teletypewriter"** or **"TTY"** or **"TDD"** means teletypewriters or telecommunications devices for the deaf, which are devices for text communication over a telephone line designed for use by persons with hearing disabilities.

32.  **"Telecommunication Vendor"** means a company that furnishes, installs, and maintains for DOC Facilities an inmate calling system, which includes instruments

such as telephones, videophones, TTY/TDD devices, and Captioned Telephones, through a contractual agreement.

33.    **"Videophone"** means a telecommunication device with a camera and a screen that allows for visual, real-time communication.

34.    **"Video Relay Service"** or **"VRS"** means a video telecommunication service that allows persons who are deaf or hard-of-hearing to communicate over video telephones and similar technologies with hearing persons in real time, via a sign language interpreter.

35.    **"Video Remote Interpreting"** or **"VRI"** means an interpreting service that uses video conference technology over dedicated lines or wireless technology offering a high-speed, wide-bandwidth video connection that delivers high-quality video images.  *See* 28 C.F.R. § 35.160(d).

## IV.    IDENTIFICATION AND TRACKING OF DEAF AND HARD-OF-HEARING INMATES

### A.    Identification of Deaf and Hard-of-Hearing Inmates Currently in DOC Custody

To ensure that all current deaf and hard-of-hearing inmates known to DOC and its Contract Medical Provider have been identified for the purposes of DOC's provision of appropriate services to its inmate population and the monitoring of this Agreement, DOC shall complete a records audit within three (3) months of the Effective Date. This audit will consist of a search and review of the following: (1) records of all accommodations for current inmates related to hearing loss maintained by the Institution ADA Coordinators and the Department ADA Coordinator for Inmates as of the Effective Date; (2) records of all medical devices related to hearing loss (*e.g.*, hearing aids, pocket talkers, FM systems, etc.) provided by DOC Contract Medical Providers from

July 1, 2016 to the Effective Date; and (3) records of all audiological and otological consultations approved by DOC's Contract Medical Provider from July 1, 2016 to the Effective Date.

In addition to conducting the foregoing records audit, within three (3) months of the Effective Date, DOC shall prominently display in all DOC Facility inmate housing units and medical units a notice informing inmates that they may request a hearing screening consistent with **Section V(B) (Hearing Screening)**.  This notice shall be prepared in both English and Spanish, as well as in any other "regularly encountered language" as defined by DOC's Interpreter Services Policy, 103 DOC 488.  DOC will provide Plaintiffs with a copy of this notice before it is posted. Plaintiffs may provide comments to DOC regarding the notice.  It may be removed after being posted for sixty (60) calendar days.  Inmates who do not have access to the posted notice due to various safety or other restrictions imposed on them shall receive a copy of the notice.

Based on the results of both the records audit and of any hearing screenings requested pursuant to the posted notice, DOC shall prepare a list of deaf and hard-of-hearing inmates who are currently in DOC custody.  The Department ADA Coordinator for Inmates will maintain this list consistent with the requirements of **Section IV(F) (Tracking Deaf and Hard-of-Hearing Inmates in DOC Custody)**.

### B.    Intake Procedures Regarding Deaf and Hard-of-Hearing Inmates

Consistent with the 408 Policy, within twenty-four hours of a new inmate's admission into DOC custody, DOC booking, orientation, or Contract Medical Provider staff shall ask the newly admitted inmate if he or she requires an accommodation for a disability and shall record the inmate's response.  As part of this process, DOC or Contract Medical Provider staff shall ask all newly admitted inmates whether he or she has hearing loss.  For any inmate who self-identifies as deaf or hard-of-hearing, or who DOC or Contract Medical Provider staff believes may have a hearing disability, Contract Medical Provider staff shall ask: (1) whether the inmate has ever used

9

a hearing aid or any other device or service to help him or her hear; (2) whether the inmate has ever used a sign language interpreter; (3) whether the inmate believes he or she would benefit from an accommodation to help him or her hear; and (4) whether the inmate's primary language is ASL. The answers to these questions shall be recorded in a Hearing Accommodation Intake Questionnaire, which will be placed in the inmate's medical record.

DOC staff responsible for intake shall provide all newly admitted inmates with a copy of an "Offender/Inmate Orientation to ADA" form, which will inform them of their rights under the ADA and provide an additional opportunity to request a reasonable accommodation for any disability.  Additionally, to those inmates who self-identify as deaf or hard-of-hearing, or who DOC or Contract Medical Provider staff believes may have a hearing disability requiring accommodation, DOC staff shall provide a copy of: (1) the Inmates with Disabilities Notice of Rights Under the Americans with Disabilities Act; and (2) the 408 Policy.  DOC shall also notify such inmates of all telecommunication services and devices available at DOC Facilities, in accordance with **Section VIII(B) (Telecommunications Services and Devices to be Provided)**. DOC will ensure that all staff handling intake at each facility are trained regarding their responsibility to provide the above information prior to performing intake.

Whenever during the intake process any DOC staff or Contract Medical Provider staff become aware of any inmate who indicates he or she needs or who otherwise has been identified as potentially requiring a reasonable accommodation for his or her hearing disability, that DOC or Contract Medical Provider staff shall notify the inmate's Institution ADA Coordinator as soon as practicable.  If a deaf or hard-of-hearing inmate is unable to effectively read or communicate through written English, the Institution ADA Coordinator shall promptly provide the inmate with those auxiliary aids and/or services that have been identified in accordance with **Section IV(D) (Initial Assessment to Determine Appropriate Hearing-Related Auxiliary Aids and Services)**

to enable the inmate to understand the 408 Policy and the Inmates with Disabilities Notice of Rights Under the Americans with Disabilities Act.  For deaf or hard-of-hearing inmates whose primary language is ASL, DOC shall promptly provide Qualified Sign Language Interpreter services.  The Institution ADA Coordinator shall maintain a monthly written record of all notifications as described above that have been received and all accommodations provided to deaf and hard-of-hearing inmates in keeping with this paragraph.

DOC shall require its Contract Medical Provider to promptly evaluate all newly admitted inmates who are identified as deaf and hard-of-hearing during intake within seventy-two (72) hours of admittance into DOC custody.  Record of these evaluations shall be maintained in the inmates' medical records.  Deaf or hard-of-hearing inmates who have identified their primary language as ASL shall receive Qualified Sign Language Interpretation for the purposes of this initial medical evaluation, in accordance with **Section VI (Qualified Sign Language Interpreters)** and **Section IV(D) (Initial Assessment to Determine Appropriate Hearing-Related Auxiliary Aids and Services)**.

The Institution ADA Coordinator shall ensure that deaf and hard-of-hearing inmates receive such Auxiliary Aids and Services that have been identified in accordance with **Section IV(D) (Initial Assessment to Determine Appropriate Hearing-Related Auxiliary Aids and Services)** to ensure Effective Communication during inmate orientation.  All deaf or hard-of-hearing inmates whose primary language is ASL shall receive Qualified Sign Language Interpretation for the purposes of inmate orientation, interpretation of the Inmate Handbook, and interpretation of the notification regarding the telecommunication services and devices available to deaf and hard-of-hearing inmates at DOC Facilities.  The Institution ADA Coordinator shall make a written record of any accommodations provided to deaf and hard-of hearing inmates for the purposes of orientation in each inmate's ADA Folder.

11

For deaf and hard-of-hearing inmates who can effectively communicate in written English, DOC will prepare, within six (6) months of the Effective Date of this Agreement, a video with closed captioning providing orientation information that is applicable to all facilities.  The video shall be shown at all facilities during every inmate orientation session. Any site-specific information not included in the video shall be provided in writing to deaf and hard-of-hearing inmates who can effectively communicate in written English.

### C.    Identification of Deaf and Hard-of-Hearing Inmates After Intake

At any time during his or her incarceration, a deaf or hard-of-hearing inmate may initiate a request for reasonable accommodation by: (1) making a verbal or written request to any DOC staff member; (2) making a verbal or written request to medical/mental health staff for a medically-related accommodation; or (3) completing a Request for Reasonable Accommodation Form.  If it is determined that a deaf or hard-of-hearing inmate requires auxiliary aids and/or services to enable him or her to effectively request reasonable accommodations or to effectively appeal the denial or modification of a request for reasonable accommodation, the Institution ADA Coordinator shall ensure that DOC provides such auxiliary aids and/or services.

If, at any time during an inmate's incarceration, the inmate informs a DOC staff member that he or she is having hearing difficulties or a DOC staff member observes that an inmate may be having hearing difficulties, the staff member should notify the inmate that: (1) he or she may seek accommodations per the 408 Policy; and (2) he or she may also submit a sick call slip requesting to be seen by the Contract Medical Provider for an evaluation.  DOC will conduct training with staff members to inform them that if they are informed or observe that an inmate may be having hearing difficulties, the proper practice is for them to notify inmates of the options described above.

If, at any time during an inmate's incarceration, an Institution ADA Coordinator is informed by an inmate or a member of DOC staff or observes that an inmate may be having hearing difficulties, he or she shall notify the inmate that: (1) he or she may seek accommodations per the 408 Policy; and (2) he or she may also submit a sick call slip requesting to be seen by the Contract Medical Provider for an evaluation.

DOC's Health Services Division shall ensure that its Contract Medical Provider conducts a hearing screening of any inmate not previously identified as deaf or hard-of-hearing who: (1) initiates a request for reasonable accommodation by reporting a hearing disability; (2) submits a sick call slip or makes a verbal report to medical staff concerning hearing issues; or (3) medical staff identifies as having potential hearing issues.  DOC's Contract Medical Provider shall conduct such hearing screening consistent with **Section V(B) (Hearing Screening)**.

During the periodic physical examinations that must occur per DOC Policy 103 DOC 630.11, the Contract Medical Provider shall ask all inmates whether they have hearing difficulties and examine all inmates for hearing loss.  Contract Medical Provider staff must record any relevant information, including any report or indication of hearing loss, in the inmate's medical record.

**D.   Initial Assessment to Determine Appropriate Hearing-Related Auxiliary Aids and Services**

For every inmate who has been identified as deaf or hard-of-hearing, DOC's Department ADA Coordinator for Inmates or an Institution ADA Coordinator shall coordinate an assessment of the inmate's hearing-related needs so that the inmate may effectively communicate and receive effective, meaningful, and substantially equal access to DOC programs, services and activities during his or her incarceration.  The Department ADA Coordinator for Inmates or Institution ADA Coordinator shall initiate the assessment no later than five (5) days after an inmate has been identified as deaf or hard-of-hearing and shall complete the assessment within thirty (30) days

thereafter, unless additional input about the nature of an inmate's hearing needs has been sought but cannot be obtained within the 30 days. In situations where an assessment has not been completed within 30 days, DOC must ensure that it completes the assessment as soon as is feasible after the 30-day period has expired.

No more than five (5) days after an inmate has been identified as deaf or hard-of-hearing, the Institution ADA Coordinator shall meet with that inmate for the purposes of, among other things, (1) addressing the specific hearing-related accommodations available at DOC, in accordance with the terms of this Agreement, and (2) assessing the inmate's need for such hearing-related accommodations. If the inmate is deaf or hard-of-hearing and his or her primary language is ASL, a Qualified Sign Language Interpreter shall be present at this meeting. If the deaf or hard-of-hearing inmate requires an alternative auxiliary aid or service to effectively participate in the meeting, it shall be provided.

At this meeting, the Institution ADA Coordinator and the deaf or hard-of-hearing inmate shall discuss, with the assistance of the Qualified Sign Language interpreter or other auxiliary aid where necessary, the inmate's areas of hearing-related need (*e.g.*, making phone calls, receiving instructions, participating in programming, etc.) and the inmate's preferred method of communication and of receiving information (*e.g.*, lip-reading, written language, ASL, etc.). The Institution ADA Coordinator shall provide the deaf or hard-of-hearing inmate with a list of hearing-related Auxiliary Aids and Services that have been approved for use in DOC Facilities in appropriate circumstances (*e.g.*, interpreter services, CART, physical devices that have passed a security review). Where necessary, including when the deaf or hard-of-hearing inmate is unfamiliar with any of the listed auxiliary aids or services, the Institution ADA Coordinator shall explain the Auxiliary Aids and Services available to the deaf or hard-of-hearing inmate, including what hearing-related need area they may help address and how. The Institution ADA Coordinator

14

and the deaf or hard-of-hearing inmate may also discuss any other topics that are relevant to the inmate's hearing-related needs, including whether the inmate has previously used other auxiliary aids or services not included on the provided list of available accommodations to enable him or her to effectively communicate or receive information.  The Institution ADA Coordinator shall document the substance discussed at this meeting, including the inmate's preferred form of communication; the documentation will be stored in the inmate's ADA folder.

Based on the information provided, the deaf or hard-of-hearing inmate shall indicate at the meeting which auxiliary aids or services he or she believes are necessary to enable him or her to effectively communicate and participate in any DOC programs, services, and activities for which he or she is eligible.  The Institution ADA Coordinator shall document which Auxiliary Aids and Services the inmate has selected; the documentation will be stored in the inmate's ADA folder. The inmate shall not be required to complete the Request for Reasonable Accommodation form.

The Institution ADA Coordinator shall review the deaf or hard-of-hearing inmate's selection and, within no more than thirty (30) days and in accordance with **Section XI (Revisions to Relevant DOC Policies in Accordance with this Agreement), ¶ 8**, shall determine which accommodations shall be approved and provided to the deaf or hard-of-hearing inmate.  In making this decision, the Institution ADA Coordinator shall give Primary Consideration to the preference expressed by the inmate for particular auxiliary aids or services, unless one of the exceptions set forth in **Section XI (Revisions to Relevant DOC Policies in Accordance with this Agreement), ¶ 8,** applies.  Any decision to deny an auxiliary aid or service selected by an inmate must be based on an individualized assessment of the inmate, and not on any set guidelines, protocols, or threshold levels of hearing loss shown on an inmate's audiogram.  Notwithstanding the foregoing, in accordance with **Section XI (Revisions to Relevant DOC Policies in Accordance with this Agreement), ¶ 2**, for deaf or hard-of-hearing inmates whose primary language is ASL, the

Institution ADA Coordinator shall approve and provide as soon as is feasible auxiliary aids in the form of Qualified Sign Language Interpreter services, the telecommunication services of the inmate's choosing, and the visual and/or tactile notification device (*e.g.*, facility-approved receiver/pager and vibrating watch) of the inmate's choosing.  The Institution ADA Coordinator shall document the approved auxiliary aids or services in the inmate's ADA folder and in IMS.  If the Institution ADA Coordinator denies or modifies any requested auxiliary aid or services, he or she shall document the reasons for such denial or modification in the inmate's ADA folder.  A deaf or hard-of-hearing inmate shall have the opportunity to appeal any such denial or modification to the Department ADA Coordinator for Inmates.  Depending on the needs of the deaf or hard-of-hearing inmate, auxiliary aids and/or services will be made available to allow the inmate effective access to the appellate process.  The Institution ADA Coordinator shall notify the Department ADA Coordinator for Inmates of (1) the inmate's requested accommodations, (2) whether such requested accommodations were granted, denied, or modified, and (3) where a requested accommodation was denied or modified, the reasons therefor.  The Department ADA Coordinator for Inmates shall document this information in the centralized database that he or she maintains.

In accordance with **Section X(B) (Supplemental Training Provided to Institution ADA Coordinators)**, DOC shall coordinate with MCDHH or other community resources to provide Institution ADA Coordinators with supplemental training regarding the Auxiliary Aids and Services available to deaf and hard-of-hearing inmates.  Additionally, DOC shall coordinate with MCDHH or other community resources to prepare approved language that Institution ADA Coordinators should use to explain the Auxiliary Aids and Services available to deaf and hard-of-hearing inmates.

Institution ADA Coordinators who have not yet received the supplemental training may initiate the initial assessment within five (5) days after an inmate has been identified as deaf or

hard-of-hearing if they use this approved language.  However, they may not either complete the initial assessment or issue any decision denying the preferred auxiliary aids or services sought by a deaf or hard-of-hearing inmate unless they (1) receive input from MCDHH or a qualified specialist recommended by MCDHH or (2) consult with an Institution ADA Coordinator from another DOC Facility who has already received the supplemental training or the Department ADA Coordinator for Inmates.

The Institution ADA Coordinator who has received the supplemental training may solicit input and/or assistance from MCDHH, a qualified specialist recommended by MCDHH, DOC's Contract Medical Provider, or other community resources where he or she determines that such input or assistance would be helpful for determining which auxiliary aids or services would be appropriate for a particular deaf or hard-of-hearing inmate.  If the Institution ADA Coordinator determines that input and/or assistance from MCDHH, a qualified specialist recommended by MCDHH, DOC's Contract Medical Provider, or other community resources would be beneficial, the Institution ADA Coordinator shall solicit such input and/or assistance as soon as practicable. Factors that the Institution ADA Coordinator may consider in deciding whether such input and/or assistance would be beneficial include, but are not limited to: (1) whether the deaf or hard-of-hearing inmate is able to identify auxiliary aids and/or services that he or she believes are necessary in order to enable him or her to effectively communicate or to participate in proffered DOC programs, services, activities; (2) whether the Institution ADA Coordinator believes the inmate's expressed preference for a particular accommodation or service should be denied; and (3) whether the deaf or hard-of-hearing inmate requests a hearing-related medical device that must be prescribed or provided by DOC's Contract Medical Provider.  The Institution ADA Coordinator shall also request input or assistance from MCDHH, or a qualified specialist recommended by MCDHH, for profoundly or severely hearing-impaired inmates, unless the inmate declines such

input or assistance in writing.  When an Institution ADA Coordinator requests and receives such input or assistance from MCDHH, documentation of the request(s) and response(s) from MCDHH, including any accommodations recommended by MCDHH, shall be included in the inmate's ADA folder.

Additionally, DOC officials shall request to meet with MCDHH, or a qualified specialist recommended by MCDHH, twice a year to consult with DOC concerning the accommodations provided by DOC to deaf and hard-of-hearing inmates and best practices in the correctional context.  MCDHH may request, and DOC shall provide, with the inmate's written consent, access to documents showing the hearing-related accommodations provided to particular deaf or hard-of-hearing inmates to or at such meetings.

Any deaf or hard-of-hearing inmate who wishes to request accommodations prior to meeting with the Institution ADA Coordinator or request accommodations not documented in the inmate's ADA folder, the centralized database maintained by the Department ADA Coordinator for Inmates, or in IMS may do so at any time in accordance with the Reasonable Accommodation Process.  DOC shall provide such assistance as is necessary to aid a deaf or hard-of-hearing inmate in completing a request for reasonable accommodation.

Additionally, if an inmate arrives in DOC custody with a hearing-related medical device or hearing-related auxiliary aid, he or she shall be permitted to retain such assistive device pending intake assessment by Contract Medical Provider staff, absent security concerns.

### E.    Deaf and Hard-of-Hearing Inmates' Retention of Approved Hearing-Related Auxiliary Aids.

Notwithstanding the provision of any auxiliary aid in accordance with the terms of this Agreement, DOC reserves the right to confiscate any auxiliary aid if the deaf or hard-of-hearing inmate for whom it has been approved intentionally damages and/or destroys said auxiliary aid, or

intentionally misuses or alters said auxiliary aid in order to use it for an unintended purpose. If DOC confiscates an auxiliary aid under such circumstances, DOC shall take other action(s) to nevertheless ensure that the deaf or hard-of-hearing inmate receives effective access to DOC benefits or services.

DOC shall allow all deaf and hard-of-hearing inmates who utilize hearing aids to keep their hearing aids on their person if placed in restrictive housing, absent a legitimate health or security risk specifically related to the inmate's retention of the hearing aid(s). If DOC denies a deaf or hard-of-hearing prisoner access to hearing aids on this basis, the reason for this decision must be documented in the inmate's ADA Folder.

DOC shall ensure that, if a deaf or hard-of-hearing inmate who utilizes hearing aids is placed on a mental health watch, DOC's Contract Medical Provider shall not confiscate his or her hearing aids unless the Contract Medical Provider determines that the inmate's retention of the hearing aids presents a risk to the inmate's health, safety, or security. If the Contract Medical Provider confiscates a deaf or hard-of-hearing inmate's hearing aid(s) in such circumstances, the reason for that decision will be documented in the inmate's medical records.

## F.  Tracking Deaf and Hard-of-Hearing Inmates in DOC Custody

DOC shall employ the following procedures to track inmates in DOC custody who have been identified as deaf or hard-of-hearing, as well as what reasonable accommodations have been requested, approved, denied, and/or modified:

- DOC shall note in IMS whether an inmate is deaf or hard-of-hearing as well as the hearing-related medical restrictions and hearing-related accommodations for which an inmate has been approved. Hearing-related medical restrictions shall also be documented in IMS by Contract Medical Provider staff.

- DOC shall note in IMS whether a deaf inmate's preferred language is ASL and/or that the inmate needs a Qualified Sign Language Interpreter for Effective Communication.

- Each Institution ADA Coordinator shall document deaf and hard-of-hearing inmates' approved reasonable accommodations in a manner that will ensure that the information will follow inmates if they transfer to another DOC Facility. Prior to the transfer, or as soon as possible thereafter, the Institution ADA Coordinator from a transferring facility shall contact the Institution ADA Coordinator at the receiving facility to inform the latter that a deaf or hard-of-hearing inmate who has been granted a reasonable accommodation will be or has recently arrived at his or her facility. Record of this contact between ADA Coordinators shall be maintained in the inmates' ADA folder at the receiving facility.

- A distinguishing mark, *e.g.*, a red dot, shall be placed on the bed book card of the inmate, identifying that they are deaf and/or hard-of-hearing, indicating that they may need assistance in case of an emergency. This distinguishing mark shall follow deaf and hard-of-hearing inmates to all DOC Facility placements.

- Deaf and hard-of-hearing inmates shall be offered an identification card or badge indicating that the nature of their hearing disability that they are able to carry on their person and present to staff and/or other inmates as necessary. Inmates may decline to accept such an identification card or badge.

- Deaf and hard-of-hearing inmates shall be offered an identification sign indicating the nature of their hearing disability that will be placed on their cell door. Inmates may decline to accept such an identification sign.

- The Department ADA Coordinator for Inmates shall maintain a centralized database that: (1) contains information regarding all requests for reasonable accommodation and whether the requests were granted, modified, or denied; and (2) documents which inmates have been identified as deaf or hard-of-hearing and the status of any related requests for reasonable accommodations. This information shall be updated at least monthly.

- Institution ADA Coordinators shall submit a monthly report to the Superintendent and the Department ADA Coordinator for Inmates that contains information regarding: (1) all Requests for Reasonable Accommodation made by deaf and hard-of-hearing inmates, including the accommodations requested, whether the requests were granted, modified, or denied, and the reasons for any modification or denial; and (2) any accommodations approved for deaf and hard-of hearing inmates without submission of a Request for Reasonable Accommodation.

**G.     Meetings with Institution ADA Coordinators Regarding Accommodations**

1.    Meetings between the Institution ADA Coordinator and a deaf or hard-of-hearing inmate whose primary language is ASL to discuss his or her request(s) for accommodations per the 408 Policy (103 DOC 408.07(3) and (5)-(7)) must be scheduled. Notwithstanding the foregoing, the Institution ADA Coordinator may meet with a deaf or hard-of-hearing inmate whose primary language is ASL to discuss accommodations without prior scheduling if qualified ASL interpreter services are available.

2.    The Institution ADA Coordinator shall keep a written record of all scheduled meetings referenced in Paragraph IV(G)(1) above. This record shall include information regarding: (1) the date of the meeting; (2) a summary of the discussion; and (3) any accommodations provided during the meeting, including the name of any interpreter utilized.

21

3.  Whenever pursuant to the 408 Policy (103 DOC 408.07(3) and (5)-(7)) the Institution ADA Coordinator and a deaf or hard-of-hearing inmate whose primary language is not ASL have a discussion about his or her request(s) for accommodations, the Institution ADA Coordinator shall keep a written record of that conversation. This record shall include information regarding: (1) the date of the meeting; (2) a summary of the discussion; and (3) any accommodations provided during the meeting, including the name of any interpreter or CART provider utilized.

## V. CONTRACT MEDICAL PROVIDER'S CARE, TREATMENT, AND ACCOMMODATION OF DEAF AND HARD-OF-HEARING INMATES

### A. Audiologists' or Other Qualified Hearing Specialists' Recommendations

Recognizing that reasonable medical opinions may differ, DOC will ensure that its Contract Medical Provider will follow audiologists' and/or other Qualified Hearing Specialists' recommendations for the care, treatment, and accommodation of deaf and hard-of-hearing inmates, unless the Contract Medical Provider determines, based on an individualized clinical assessment by a medical doctor, that implementation of a recommendation is not medically necessary for care and treatment of the inmate, and is not needed as an accommodation to enable that inmate to communicate and participate in DOC programs, services, and activities as effectively as hearing inmates. The Contract Medical Provider may not deviate from the audiologist's and/or Qualified Hearing Specialist's recommendations based on any administrative policy or practice that dictates a blanket approach to the treatment of deaf or hard-of-hearing inmates, such as the use of threshold levels of hearing loss in an inmate's audiogram.

Where the Contract Medical Provider concludes that any part of the audiologist's or other Qualified Hearing Specialist's recommendations need not be followed, the provider must: (1) document the objective clinical basis for that conclusion in the deaf or hard-of-hearing inmate's

22

medical record; (2) establish an alternative treatment plan that is sufficient to provide the deaf or hard-of-hearing inmate with necessary care, treatment, and/or accommodations; (3) document the alternative treatment plan in the inmate's medical records; and (4) promptly communicate both the conclusion and the alternative treatment plan to the deaf or hard-of-hearing inmate.

A deaf or hard-of-hearing inmate may seek further review of the Contract Medical Provider's conclusion that an audiologist's or other Qualified Hearing Specialist's recommendations need not be followed, in accordance with DOC's and the Contract Medical Provider's policies, by first exhausting the medical grievance and appeal process, and, then, if still dissatisfied, by submitting a Request for Reasonable Accommodation pursuant to the 408 Policy.

**B.      Hearing Screening**

DOC will ensure that its Contract Medical Provider performs clinical assessments of all inmates who complain, verbally or in writing, to the Contract Medical Provider of hearing loss to determine whether they should receive audiological evaluations by an audiologist or other Qualified Hearing Specialists.  If the Contract Medical Provider permits its clinicians to use a "whisper test" as part of these clinical assessments, the Contract Medical Provider must have an established, written procedure by which it must conduct a "whisper test," the Contract Medical Provider clinician must follow this established procedure in administering the "whisper test," and the Contract Medical Provider may not decline to refer an inmate for an audiological assessment based solely on the results of a "whisper test."  The Contract Medical Provider may consult with correctional staff about an inmate's hearing loss but may not decline to refer an inmate for an audiological assessment solely because correctional staff do not confirm that the inmate has hearing difficulties.  If the Contract Medical Provider determines that the inmate should receive an audiological evaluation by a Qualified Hearing Specialist, such evaluation shall be scheduled to occur as soon as possible, but no later than within 60 days of the date that the referral request is

approved.  DOC will not be considered in breach of this provision if any delay in scheduling the audiological evaluation is caused by circumstances outside of DOC's or its Contract Medical Provider's control, including if there is no appointment available within 60 days of the date that the referral request is approved.  However, in situations where there is no appointment available within 60 days of the date that the referral request is approved, DOC must ensure that the audiological evaluation is scheduled as soon as is feasible after the 60-day period has expired.

### C.      Hearing Aid Batteries

DOC, either directly or through its Contract Medical Provider, shall purchase and keep in stock appropriate types of hearing aid batteries and shall provide replacement batteries to inmates who need them as soon as possible, but no later than 24 hours after the inmate requests replacement batteries.  Record of requests for replacement batteries and the provision of replacement batteries shall be maintained in the inmates' medical records.

### D.      Hearing Aid Repairs

DOC will ensure that its Contract Medical Provider arranges for hearing aids to be sent to a hearing aid repair company as soon as possible, but in any event no later than one business day following: (1) an inmate's submission of a "sick slip" requesting repair of his or her hearing aid; or (2) an inmate's in-person request for repair of his or her hearing aid during an appointment with the Contract Medical Provider.  DOC's Contract Medical Provider shall inform the inmate as soon as possible when his or her hearing aid was sent for repair and when it is anticipated that the inmate will receive a working hearing aid.  DOC, either directly or through its Contract Medical Provider, shall maintain written documentation of all hearing aid repairs, including information regarding the vendor used, the date the hearing aid was sent to the vendor, the date the hearing aid was returned to the DOC Facility, and the date the hearing aid was returned to the inmate.  DOC will take appropriate steps to provide the means for Effective Communication with the inmate and

allow the inmate to participate in and benefit from DOC programs, services, or activities during any period in which the inmate is without his or her hearing aid.

## VI.     QUALIFIED SIGN LANGUAGE INTERPRETERS

### A.     General Policy

DOC will provide Qualified Sign Language Interpreters consistent with the procedures set forth in the 408 Policy and as required by relevant law, including the ADA.  When it has been determined, in accordance with the provisions of **Section IV(D) (Initial Assessment to Determine Appropriate Hearing-Related Auxiliary Aids and Services)**, that a deaf or hard-of-hearing inmate needs a sign language interpreter to have communications that are substantially as effective as communications by hearing inmates, DOC shall ensure that Qualified Sign Language Interpreter services are available at the programs, appointments and/or major events listed below without requiring the inmate to submit a request for accommodation pursuant to the 408 Policy:

- Inmate orientation;

- Classification hearings;

- Sex offender treatment programming;

- Medical appointments, evaluations, mental health services, and the bi-weekly mental health rounds for inmates in Restrictive Housing, (but excluding routine medical events like daily insulin shots or trips through the medication line) that occur within DOC Facilities;

- Inner Perimeter Security or other DOC investigations and related questioning (*e.g.*, investigations into Prison Rape Elimination Act allegations);

- Disciplinary proceedings;

- Restrictive Housing proceedings at which the inmate has the opportunity to appear in person;

- Grievance interviews;

- Scheduled meetings with the Institutional ADA Coordinator, Department ADA Coordinator for Inmates, or Contract Medical Provider concerning requests for accommodations;

- Educational and vocational classes in which the inmate is enrolled;

- All programs included on the inmate's Personalized Program Plan in the Need Areas of Substance Abuse, Criminal Thinking, Anger, Cognitive/Behavioral, Academic Education/Vocational, and Sex Offender Treatment;

- Any other program in which the inmate is enrolled for which "earned time" may be awarded, leading to a possible reduction in sentence, or where a liberty interest may be implicated;

- Programs and meetings concerning reentry and discharge planning.

- Religious services; and

- Any specific pre-release DOC program recommended by the Parole Board.

For religious services, programs in the Personalized Program Plan Need Area of Low Risk Alternative that the inmate has accepted, and other programs that an inmate has signed up to attend (as opposed to being enrolled by DOC programming staff), DOC may engage in preliminary discussion(s) with the deaf or hard-of-hearing inmate to establish whether and how frequently the inmate intends to participate. DOC shall provide a Qualified Sign Language Interpreter to facilitate these preliminary discussions. Once it has been determined both that the inmate will attend and how frequently, DOC shall provide the deaf or hard-of-hearing inmate with Qualified Sign Language Interpreter services in accordance with that schedule without requiring that the inmate submit any subsequent requests for reasonable accommodation. The inmate should notify

DOC if his or her anticipated schedule changes, requiring more or less frequent assistance from Qualified Sign Language Interpreters.  With respect to the programs discussed in this paragraph, in the event that the inmate's voluntary attendance, the inmate's preference for an interpreter as opposed to another (or no) auxiliary aid, or the nature of the program changes, DOC may engage in another discussion with the deaf or hard-of-hearing inmate to reassess the provision of Qualified Sign Language Interpreters.

DOC shall also provide Qualified Sign Language Interpreter services in other situations as circumstances may warrant.  Deaf and hard-of-hearing inmates may request Qualified Sign Language Interpretation for any DOC program, service, activity, appointment, or major event by initiating a Request for Reasonable Accommodation pursuant to the 408 Policy.  Nothing in this Agreement is intended to permit DOC to categorically deny or prohibit Qualified Sign Language Interpretation to a deaf or hard-of-hearing inmate for any DOC program, service, activity, appointment, or major event.  All such inmate requests for Qualified Sign Language Interpretation shall be considered and processed in accordance with the 408 Policy.

DOC shall be responsible for scheduling and overseeing the provision of Qualified Sign Language Interpreter services for all of the programs, appointments, and/or major events listed above and as circumstances may warrant.  When circumstances prevent DOC from providing necessary interpreter services for the programs, appointments, and/or major events listed above, DOC must document in writing the reason(s) that such services could not be provided and must take any other action to nevertheless ensure that, to the maximum extent possible, the deaf or hard-of-hearing inmate receives substantially equal access to the benefits or services provided by DOC.

DOC shall provide deaf and hard-of-hearing inmates with the opportunity to participate in the programs, appointments, and/or major events listed above, consistent with the opportunities for participation afforded to similarly situated hearing inmates, subject to the exceptions

recognized in **Section XI (Revisions to Relevant DOC Policies in Accordance with this Agreement), ¶ 8,** of this Agreement. Deaf and hard-of-hearing inmates shall not remain on waiting lists for the above programs, appointments, and/or major events for longer than hearing inmates, due to the fact of their disability.

For programs and services that do not fall within the programs, appointments, and/or major events listed above, and for which DOC permits volunteers to provide or facilitate, DOC will notify the volunteer organization or facilitator, if it is aware, that the program and service will be attended by one or more deaf or hard-of-hearing inmates whose primary language is sign language and encourage the volunteer organization or facilitator to arrange for sign language interpretation and make any other accommodations to facilitate the deaf or hard-of-hearing inmate's effective participation and communication.

Whether a sign language interpreter or other particular auxiliary aid or service is needed is based not only on the particular inmate's method of communication, but also on the nature, length, context, and complexity of the communication. In determining what form of auxiliary aid or service is necessary, DOC shall give Primary Consideration to the request of the deaf or hard-of-hearing inmate. DOC shall not be required to provide a sign language interpreter at any particular program, appointment, and/or event if: (1) the inmate knowingly and voluntarily waives in writing his right to a Qualified Sign Language Interpreter; (2) DOC can demonstrate that another substantially equal and effective means of communication is available; or (3) provision of a Qualified Sign Language Interpreter would not be required under 28 C.F.R. § 35.164. To the extent that provision of a Qualified Sign Language Interpreter would not be required under 28 C.F.R. § 35.164, DOC must provide a written statement of the reasons for reaching that conclusion and must take any other action to nevertheless ensure that, to the maximum extent possible, the deaf or hard-of-hearing inmate receives the benefits or services provided by DOC.

DOC shall not rely on any statements, including written statements, made or obtained without a qualified ASL interpreter from a deaf or hard-of-hearing inmate whose primary language is ASL during an Inner Perimeter Security Investigation, other DOC Investigation, or informal investigative interviews conducted by Inner Perimeter Security, a Superintendent's Special Investigator, or the Internal Affairs Unit for purposes of disciplining said inmate. Nothing in this paragraph shall be interpreted to prevent DOC from responding as it deems appropriate in an emergency or rapidly developing situation, including when DOC must act quickly to prevent harm to the deaf or hard-of-hearing inmate, another inmate, staff, or the general public. In addition, nothing in this paragraph shall be interpreted to prevent DOC from relying on voluntary, unsolicited oral or written statements made by an inmate for the following purposes: (1) to discipline the inmate where the making of the statement itself is the violation, or (2) to initiate an investigation into a possible disciplinary infraction by the inmate.

### B.      Interpretation of Written Materials

Where an inmate indicates that he or she so requires, DOC shall provide Qualified Sign Language Interpreter services to deaf and hard-of-hearing inmates whose primary language is ASL and who are unable to effectively understand written English or Spanish to permit those inmates to understand the content of written materials that DOC provides to all inmates, written communications from DOC to the deaf or hard-of-hearing inmate, and any forms that the inmate may need to complete.

If a deaf or hard-of hearing inmate whose primary language is ASL participates in any program or class, except one that is run by an outside academic institution, that has a written requirement that is to be completed outside of program or class time, *e.g.*, homework, DOC will provide the deaf or hard-of-hearing inmate with a reasonable accommodation for that written requirement. The reasonable accommodation may include providing a Qualified Sign Language

Interpreter to permit the deaf or hard-of-hearing inmate to effectively complete the written requirement, or making an adjustment to the written requirement, *e.g.*, allowing the work to be done in class or not in writing.  However, Qualified Sign Language Interpretation shall not be provided to deaf and hard-of-hearing inmates for use during the Test of Adult Basic Education (TABE) reading and language components so that the resulting scores provide an accurate reflection of the inmate's English language abilities.

### C.     Methods for Providing Interpreter Services

#### 1.     Video Remote Interpreting

Either directly or through its Contract Medical Provider, DOC shall provide access to on-demand video remote interpreting at On-site Medical Appointments (but excluding routine medical events like daily insulin shots or trips through the medication line), unless VRI is not appropriate based on the circumstances or the needs of the deaf or hard-of-hearing inmate.  The provision of VRI for any On-site Medical Appointment shall meet the requirements set forth in 28 C.F.R. § 35.160(d)(1)-(4).

Either directly or through its Contract Medical Provider, DOC will provide VRI for use in unscheduled on-site medical emergencies where the exigencies of the situation permit.  Life-saving medical care will never be delayed because no interpretation services are available.

If remote interpreting services are unavailable or not appropriate in the situation, DOC will work in conjunction with the Contract Medical Provider to secure an in-person sign language interpreter as soon as possible.  The Contract Medical Provider may arrange for the provision of in-person interpreters at On-site Medical Appointments through the MCDHH, pursuant to the Massachusetts state contract for interpreter services that MCDHH manages, or through other available community resources (*e.g.*, Partners Interpreting).

### 2.     On-Site Live Qualified Sign Language Interpreters

DOC shall arrange for Qualified Sign Language Interpreter services and CART services for deaf and hard-of-hearing inmates through MCDHH, pursuant to the Massachusetts state contract for interpreter services that MCDHH manages.  DOC shall consult with its contractual ASL interpreters, or shall contact MCDHH to arrange for Qualified Sign Language Interpreter services and CART services before scheduling meetings or hearings with deaf and hard-of-hearing inmates whose primary language is ASL, and before a deaf or hard-of-hearing inmate whose primary language is ASL begins attending a program in which he or she is enrolled.  DOC has consulted with MCDHH to determine the most efficient methods for scheduling sign language interpreter and CART services and shall utilize those methods when arranging those services for deaf and hard-of-hearing inmates.  Those methods include scheduling with MCDHH sign language interpreter and CART services as soon as reasonably possible after DOC becomes aware of the need for such services from MCDHH and identifying for MCDHH regularly occurring events so that MCDHH can schedule such services well in advance and on a regular basis.  In addition, DOC shall also hire two sign language interpreters on a part-time, contract basis of up to 20 hours per week each to supplement interpreter services provided by MCDHH.  If there is a material change, be it an increase or a decrease, in the number or DOC's assessment of the needs of deaf and hard-of-hearing inmates, DOC will re-evaluate the number and/or frequency of in-person sign language interpreters.  Unforeseen circumstances outside of DOC's control may occasionally prevent it from providing necessary interpreter services or auxiliary aids (*e.g.*, institutional emergencies, institutional lock-downs, severe weather).

### 3.      Choice Between On-Site Interpreter Services and VRI

DOC shall retain discretion to decide whether to provide Qualified Sign Language Interpreter services through on-site interpreters or through VRI, except when VRI is not appropriate based on the deaf or hard-of-hearing inmate's needs or abilities.

### D.      Off-site Medical Care

DOC is not required to provide Qualified Sign Language Interpreter services or other communication access accommodations to deaf or hard-of-hearing inmates when those inmates receive medical care outside of a DOC Facility.  When a deaf or hard-of-hearing inmate who relies on Qualified Sign Language Interpreter services or other auxiliary aids for Effective Communication requires medical care offsite, DOC shall require its Contract Medical Provider to inform all offsite medical providers of that deaf or hard-of-hearing inmate's need for an interpreter or other auxiliary aid as soon as possible.

### E.      Parole Hearings

DOC is not required to provide Qualified Sign Language Interpreter services or other communication access accommodations to deaf or hard-of-hearing inmates at parole hearings because parole hearings are provided by the Massachusetts Parole Board, which is a separate public entity under Massachusetts law, not subject to DOC's jurisdiction.  *See* Mass. G.L. c. 27, § 4.  When a deaf or hard-of-hearing inmate who relies on sign language interpreter services or other auxiliary aids for Effective Communication has a scheduled parole hearing, DOC shall inform the Massachusetts Parole Board of that deaf or hard-of-hearing inmate's need for an interpreter or other auxiliary aid as soon as possible.

### F.      Use of Inmates as Interpreters for Deaf or Hard-of-Hearing Inmates

In accordance with 28 C.F.R. § 35.160(c)(1), DOC shall not require deaf and hard-of-hearing inmates to provide another inmate to interpret for them.  Inmates shall not be used as

interpreters for deaf or hard-of-hearing inmates in any of the areas listed in 103 DOC 488.03(1), except in an emergency situation in which institutional security or the health or safety of an individual, including the deaf or hard-of-hearing inmate, any other inmate, member of DOC or vendor staff, or member of the public, would be threatened if communication with the deaf or hard-of-hearing inmate was delayed until a Qualified Sign Language Interpreter could be provided.  If an inmate interprets for a deaf or hard-of-hearing in such emergency circumstances, DOC shall make available within a reasonable period of time a Qualified Sign Language Interpreter to review with the deaf or hard-of-hearing inmate the discussion conducted with the inmate interpreter.

If an inmate is used as an interpreter in an emergency situation, as described above, a written record shall be made of: (1) the name of the deaf or hard-of-hearing inmate, (2) the name of the inmate interpreting, (3) the name(s) of DOC or vendor staff whose communication required interpretation, (4) the date on which the interpretation occurred, and (5) the reason(s) that an inmate interpreter was used.  If inmate interpretation is provided during a medical or mental health appointment or evaluation on an emergency basis, said written record shall be included in the deaf or hard-of-hearing inmate's medical records.

If an inmate is used as an interpreter during an Inner Perimeter Security or other Department Investigation or for questioning related to such an investigation, all official notes concerning those communications shall be preserved.

A deaf or hard-of-hearing inmate shall never be asked or required to sign a waiver or release of his or her confidential CORI or medical information to an inmate serving as an interpreter.

If another inmate interprets for a deaf or hard-of-hearing inmate on an informal basis, neither the deaf or hard-of-hearing inmate nor the assisting inmate shall be subjected to disciplinary consequences solely because the assisting inmate provided interpretation.

A deaf or hard-of-hearing inmate's informal use of an inmate interpreter in a particular circumstance or use of an inmate interpreter in an emergency situation, as referenced above, shall not constitute or be construed as a general waiver of the deaf or hard-of-hearing inmate's request for a Qualified Sign Language Interpreter or as a general waiver of the deaf or hard-of-hearing inmate's confidentiality rights.

Deaf and hard-of-hearing inmates who request the assistance of another inmate to communicate during events and staff interactions for which DOC does not provide Qualified Sign Language Interpreters may, in DOC's discretion, be assigned inmate companions.

## VII.   INSTITUTIONAL WORK ASSIGNMENTS

DOC shall also provide deaf and hard-of-hearing inmates opportunities for institutional work assignments that are consistent with the opportunities for the same assignments afforded to hearing inmates, subject to the exceptions recognized in **Section XI (Revisions to Relevant DOC Policies in Accordance with this Agreement), ¶ 8**, of this Agreement.  DOC shall retain the discretion to determine that certain work assignments present a Direct Threat of injury or death to the deaf or hard-of-hearing inmate or others and may choose not to provide the deaf or hard-of-hearing inmate a substantially equal opportunity to those work assignments on that basis.  If DOC denies a deaf or hard-of-hearing inmate access to work assignments on this basis, the reason for that decision must be documented in the inmate's ADA Folder.

## VIII.   TELECOMMUNICATION

### A.   General Policy

DOC shall provide deaf and hard-of-hearing inmates in its custody with access to telecommunication services and devices that enable Effective Communication with people outside of DOC Facilities that is substantially equal to the access to telecommunication services and devices that DOC provides to inmates without hearing disabilities.  DOC shall list and describe all

telecommunication services and devices available at a facility during an inmate's orientation at that DOC Facility and in that DOC Facility's inmate handbook.

### B.  Telecommunication Services and Devices to Be Provided

By the dates specified below, DOC, through its Telecommunication Vendor, will make the telecommunication services and devices listed in Items 1 through 5 of **Section VIII(B) (Telecommunication Services and Devices to Be Provided)**, available to facilitate Effective Communication between deaf and hard-of-hearing inmates and individuals outside of DOC Facilities.  If unforeseen and unanticipated delays prohibit the provision of any of these Items by the dates specified, within ten days of DOC's receipt of notice of a delay, DOC will provide a written explanation to Plaintiffs' Counsel as to the source of the delay and a revised estimated timeline for the relevant telecommunication service(s) or device(s).

These telecommunication services and devices shall be made available to deaf and hard-of-hearing inmates in a manner that is consistent with DOC's general policy governing inmate telephone access and use, 103 CMR 482, and other relevant regulations and policies, except where specifically stated otherwise.  To be granted access to particular telecommunication service(s) or device(s), deaf and hard-of-hearing inmates must be approved for such access in accordance with the process set forth in **Section VIII(C) (Requesting Approval for and Access to Telecommunication Services and Devices)**.

### 1.  Videophones & Video Relay Services

DOC will make videophone technology available at each of its facilities to those inmates who have been identified as deaf or hard-of-hearing and whose primary language is sign language. The purpose of the videophones is to enable approved inmates who communicate using sign language to effectively communicate with sign language speakers outside of DOC Facilities

35

through point-to-point video communication and to effectively communicate with hearing individuals outside of DOC Facilities through the use of VRS.

### a.        Stationary Videophones Available at Each Facility

DOC will ensure that at least one stationary videophone available at each DOC Facility with the exception of MCI-Shirley Minimum.  The stationary videophone will be installed in a designated location at each facility, to be determined by each facility.  The stationary videophone shall be available during the same hours, including nights and weekends, that hearing inmates have access to traditional phones, consistent with 103 CMR 482.  Deaf and hard-of-hearing inmates who have been approved to use the stationary videophone must request access to the stationary videophone each time they wish to use it by communicating to their unit correctional officers either in writing, if they are able, or by using the ASL sign for "phone".  DOC personnel shall clearly communicate to each deaf inmate that the ASL sign for "phone" may be used to request access to the stationary videophone.  Unit correctional officers will be trained to understand that an inmate signing in ASL "phone" is requesting access to the videophone.  An approved inmate who requests access to a stationary videophone shall be provided such access as soon as possible and without delay, with the expectation that access will be provided within forty-five (45) minutes and that occasions in which access is not provided within 2 hours shall be the rare exception.  In no event shall an approved inmate have to wait longer than two-and-a-half (2.5) hours, unless access must be prevented or delayed as permitted by 103 CMR 482.  If an inmate's access to a stationary videophone is prevented or delayed, DOC must notify the requesting inmate and provide access as soon as is feasible.  The requirements of 103 DOC 482.07(1) shall apply to access to stationary videophones.  DOC will ensure that there are staff members on each shift at each DOC Facility who know where the stationary videophone is located and the process by which deaf and hard-of-hearing inmates approved to use the videophone may access it.  DOC shall ensure that the location

designated for stationary videophone use at each facility does not result in such frequent or repeated interruptions or interference to approved inmates' access and use that deaf and hard-of-hearing inmates are deprived of Effective Communication with persons outside of DOC Facilities that is substantially equal to the access to telecommunication services and devices that DOC provides to inmates without hearing disabilities.

### b. Mobile Videophones Available in Housing Units

No later than November 30, 2019, DOC shall make at least one mobile videophone available in each housing unit in which an approved deaf or hard-of-hearing inmate is housed in a manner that is consistent with DOC's regulations governing telephone access and use (103 CMR 482). Such mobile videophone technology will be generally available for use during the same hours, including nights and weeks, that hearing inmates have access to traditional telephones. Once a deaf or hard-of-hearing inmate has been approved to use the videophone phone, the approved inmate shall not be required to request access to the mobile videophone in his or her housing unit each time he or she wishes to use it. Instead, an approved inmate's authorization to use the videophones shall be associated with that inmate's PIN number, as defined in the policy numbered 103 CMR 482.05. When, consistent with DOC regulations, telephones are not available for general inmate use, the mobile housing unit videophone shall be stored in a location to be determined by each individual DOC Facility. DOC will ensure that there are staff members on each shift in each housing unit in which an inmate approved to use videophones is housed who know where the mobile videophone is stored and are responsible for making it available in the housing unit for use in accordance with the foregoing. The presence of a mobile videophone on a deaf or hard-of-hearing inmate's unit shall not prevent that inmate from accessing other types of telecommunication service(s) and device(s) that the inmate is approved to use. In addition, in the event that a mobile videophone is not fully functional, deaf and hard-of-hearing inmates approved

for videophone use shall be able to request and access the stationary videophone installed at the inmate's facility.

In order to make mobile videophones available in each housing unit in which an approved inmate is housed in accordance with the foregoing, DOC shall ensure that the necessary infrastructure has been updated or installed in each housing unit to permit use of the mobile videophone. In making any such necessary infrastructure modifications, DOC shall prioritize those housing units in which a deaf or hard-of-hearing inmate whose primary language is ASL currently is housed.

### 2.    Captioned Telephones

DOC will make at least one CapTel device available at each DOC Facility. DOC will provide additional CapTel devices in DOC Facilities when possible based on the location of analog telephone lines and availability of a suitable space for use thereof, as determined by DOC taking into consideration such factors as use of the space by correctional staff, operational needs, security concerns, technical needs and concerns, and the safe use and storage of the device. The portable CapTel device will be stored in a designated location at each facility, to be determined by each facility. The CapTel device shall be available during the same hours, including nights and weekends, that hearing inmates have access to traditional phones, consistent with 103 CMR 482. Deaf and hard-of-hearing inmates who have been approved to use the CapTel device must request access to the CapTel device each time they wish to use it. An approved inmate who requests access to a CapTel device shall be provided as soon as possible and without delay, with the expectation that access will be provided within forty-five (45) minutes, and occasions in which access is not provided within 2 hours shall be the rare exception. In no event shall an approved inmate have to wait longer than two-and-a-half (2.5) hours, unless access must be prevented or delayed as permitted by 103 CMR 482. If an inmate's access to a CapTel device is prevented or delayed,

DOC must notify the requesting inmate and provide access as soon as is feasible.  The requirements of 103 DOC 482.07(1) shall apply to access to CapTel devices.  DOC will ensure that there are staff members on each shift at each DOC Facility who know where the CapTel device(s) is stored and the process by which deaf and hard-of-hearing inmates approved to use the device may access it.  DOC shall ensure that the location designated for CapTel use at each DOC Facility does not result in such frequent or repeated interruptions or interference to approved inmates' access and use that deaf and hard-of-hearing inmates are deprived of Effective Communication with persons outside of DOC Facilities that is substantially equal to the access to telecommunication services and devices that DOC provides to inmates without hearing disabilities.

### 3. Teletypewriters

DOC will ensure that at least one TTY device is available at each DOC Facility.  The portable TTY device will be stored in a designated location at each facility, to be determined by each facility.  The TTY device shall be available during the same hours, including nights and weekends, that hearing inmates have access to traditional phones, consistent with 103 CMR 482.  Deaf and hard-of-hearing inmates who have been approved to use the TTY device must request access to the TTY device each time they wish to use it.  An approved inmate who requests access to a TTY device shall be provided such access as soon as possible and without delay, with the expectation that access will be provided within forty-five (45) minutes, and occasions in which access is not provided within 2 hours shall be the rare exception.  In no event shall an approved inmate have to wait longer than two-and-a-half (2.5) hours, unless access must be prevented or delayed as permitted by 103 CMR 482.  If an inmate's access to a TTY device is prevented or delayed, DOC must notify the requesting inmate and provide access as soon as is feasible.  The requirements of 103 DOC 482.07(1) shall apply to access to TTY devices.  DOC will ensure that there are staff members on each shift at each DOC Facility who know where the TTY device is

stored and the process by which deaf and hard-of-hearing inmates approved to use the device may access it.  DOC shall ensure that the location designated for TTY use at each DOC Facility does not result in such frequent or repeated interruptions or interference to approved inmates' access and use that deaf and hard-of-hearing inmates are deprived of Effective Communication with persons outside of DOC Facilities that is substantially equal to the access to telecommunication services and devices that DOC provides to inmates without hearing disabilities.

### 4. Amplification Available on Traditional Telephones

DOC will ensure that all traditional telephones provided for inmate use include a built-in user-controlled volume button that permits telephone users to amplify call volume.

### 5. Hearing Aid Compatible Traditional Telephones

DOC will ensure that all traditional telephones provided for inmate use include handsets that are hearing aid compatible in accordance with Federal Communications Commission guidelines.

### C. Requesting Approval for and Access to Telecommunication Services and Devices

DOC will provide access to videophone, TTY, and/or CapTel services and devices to those deaf or hard-of-hearing inmates who have requested access thereto and whose requests have been approved, or to deaf or hard-of-hearing inmates who have been otherwise approved, in accordance with the procedures set forth in the 408 Policy.  Deaf and hard-of-hearing inmates may be approved for and receive regular access to more than one of the above telecommunication service(s) or device(s).  DOC shall maintain a record of a deaf or hard-of-hearing inmate's approval to access certain telecommunication service(s) or device(s) in IMS as an open-ended medical restriction, subject to periodic reviews for appropriateness.   In the event of a transfer, approvals for

telecommunication service(s) and device(s) shall follow deaf and hard-of-hearing inmates from facility to facility.

Deaf and hard-of-hearing inmates who have been approved to access videophone, TTY, and/or CapTel services and devices shall not be required to submit a new Request for Reasonable Accommodation each time they wish to access the approved telecommunication service(s) and device(s).  Once approved, deaf and hard-of-hearing inmates shall only require permission to use videophones on a particular occasion in the same limited circumstances in which other inmates require permission to use traditional telephones.  For TTY and/or CapTel devices, once approved, deaf or hard-of-hearing inmates need only to informally notify DOC staff that they wish to access the device in question, and DOC staff shall permit and facilitate timely access thereafter, in keeping with the provisions above.

Inmates who have been identified as deaf or hard-of-hearing, either through self-identification or identification by DOC or its Contract Medical Provider, shall be notified during booking and admission and at inmate orientation of all telecommunication services and devices available at DOC Facilities, so that they are aware of what technologies exist and may submit a Request for Reasonable Accommodation for approval to access the appropriate service(s) or device(s).  A written description of all available telecommunication services and devices shall also be included in each facility's Inmate Orientation Manual.  If an inmate is later identified as deaf or hard-of-hearing while in DOC custody, either through self-identification or identification by DOC or its Contract Medical Provider, the Institutional ADA Coordinator or designee at the facility in which such inmate is housed shall notify the inmate of the telecommunication services and devices available so that the inmate may submit a Request for Reasonable Accommodation for approval to access the appropriate services and devices.

41

### D. Monitoring Communications

All calls placed by inmates, including but not limited to those placed by deaf and hard-of-hearing inmates through videophones, CapTel devices, and TTY machines, will be subject to monitoring, recording, and storage, consistent with 103 CMR 482.

### E. Additional Time for Communication

DOC agrees that it may be necessary to provide deaf and hard-of-hearing inmates with more time to use the services and devices listed in Items 1 through 3 of **Section VIII(B) (Telecommunication Services and Devices to Be Provided)** in order to provide them with equal access to Effective Communication.  DOC therefore will allow deaf and hard-of-hearing inmates who have been approved to use videophones, TTY, and/or CapTel devices twice the amount of time to complete calls using such devices as is afforded to inmates who complete telephone calls using traditional telephones, subject to operational or security concerns or administrative constraints (*e.g.*, institutional emergencies).

### F. Cost for Use of Telecommunication Services and Devices

DOC agrees to make videophone, TTY, and CapTel services and devices available at no cost to deaf and hard-of-hearing inmates who have been approved to use such services and devices.

### G. Responsibility for Maintaining Equipment

DOC, through its Telecommunication Vendor, will ensure that the telecommunication services and devices used to permit communication between deaf and hard-of-hearing inmates and people outside of DOC Facilities are in good working order.  DOC will attempt to resolve complaints about any malfunctioning equipment within one week of receiving that complaint.  To the extent services, equipment, and resources that are outside of DOC's control are involved, DOC agrees to notify the relevant providers or companies of any equipment problems within one week

and, to the extent necessary or possible under the circumstances, work with these third parties to expeditiously resolve the problem(s).

### H.      Responsibility for Training Staff

DOC will ensure that designated DOC employees are adequately trained in the operation of the services and devices listed in Items 1 through 3 of **Section VIII(B) (Telecommunication Services and Devices to Be Provided)**.

## IX.    VISUAL AND TACTILE NOTIFICATIONS

### A.      General Policy

Deaf and hard-of-hearing inmates housed in DOC Facilities should not miss announcements, alarms, or any other auditory information delivered by DOC staff to the general inmate population solely because of their disability.

### B.      Relaying Non-Emergency Information

DOC shall provide an effective non-auditory alert system that will be used to notify deaf and hard-of-hearing inmates of prison-wide events (including by not limited to announcements, visitations, and count) and events specific to deaf and hard-of-hearing inmates.  The non-auditory alert system must be capable of effectively alerting deaf and hard-of-hearing events in real time. As of the Effective Date of this Agreement, DOC intends to employ a non-auditory alert system that relies upon: (1) a visual or tactile notification system, and (2) in-person contact/communication between DOC staff and the deaf or hard-of-hearing inmate.  DOC retains discretion as to which type of non-auditory alerts it shall employ and to change those systems as it deems necessary, including if new technology becomes available or if security concerns (either inmate-specific or institution-level) so require.

1.    **Visual or Tactile Notification Systems**

As of the Effective Date of this Agreement, DOC has identified and beta-tested several visual/tactile notification systems that utilize a transmitter that can be triggered to send a signal to a receiver or pager unit.  Based on this testing, DOC has identified for each of its facilities at least one such system that can function effectively at that facility to alert deaf and hard-of-hearing inmates to announcements and non-emergency events.  The identified systems use a transmitter that can be manually triggered to send a signal to a corresponding receiver or pager unit.  Depending on the system, the corresponding receiver or pager unit may vibrate, emit a flashing light, or display a short, typed message when manually triggered.  When the receiver or pager unit has been activated, the deaf or hard-of-hearing inmate may seek additional information regarding the announcement or non-emergency alert from the DOC staff in the housing unit.  DOC will employ a system that provides both a tactile or light alert and a short, typed message in those facilities where DOC has identified such a system that can function effectively.

DOC staff shall convey any information to the inmate using simple written English, flash cards containing simple pictures and words, or other such means of simple communication to effectively convey to the deaf or hard-of-hearing inmate the substance of the announcement or non-emergency alert.  DOC shall provide Plaintiffs' Counsel with copies of the flash cards that it develops for such purpose.

In accordance with **Section XI (Revisions to Relevant DOC Policies in Accordance with this Agreement), ¶ 2**, DOC shall offer either a receiver or pager unit, depending on what is operational in the inmate's facility to deaf and hard-of-hearing inmates whose primary language is ASL without requiring the inmate to complete the Request for Reasonable Accommodation Form or follow the reasonable accommodation process.  If a deaf or hard-of-hearing inmate whose primary language is ASL selects the receiver or pager unit available at the facility at which he or

44

she is housed, it shall be provided to him or her and a transmitter unit shall be placed in each such inmate's housing unit, which will be operated by DOC correctional staff within that unit.  DOC staff responsible for operating the transmitter shall be properly trained in how to effectively use the technology and in accepted methods of communicating announcements or non-emergency alerts to the deaf or hard-of-hearing inmate.

### 2.    Vibrating Watches

DOC has also identified vibrating watches that a deaf or hard-of-hearing inmate can program to vibrate at certain times.

In accordance with **Section XI (Revisions to Relevant DOC Policies in Accordance with this Agreement), ¶ 2**, DOC shall offer a vibrating watch to deaf and hard-of-hearing inmates whose primary language is ASL without requiring the inmate to complete the Request for Reasonable Accommodation Form or follow the reasonable accommodation process.  If a deaf or hard-of-hearing inmate whose primary language is ASL selects the vibrating watch, it shall be provided to him or her.

### 3.    Supplementary Non-Auditory Information Relay Systems

In addition to the foregoing devices, DOC shall also publish the facility-specific schedule in the inmate handbook that each inmate receives when the inmate is housed in a specific facility and shall promptly post notice of any schedule changes in the housing unit of each deaf or hard-of-hearing inmate whose primary language is ASL.

Furthermore, DOC is in the process of updating the Master Antenna Television systems at each facility.  When installation is complete, DOC shall configure each system such that facility announcements and schedules will be posted and may be viewed on a television tuned to a pre-determined channel.  Deaf and hard-of-hearing inmates who have access to a television may view any facility announcements or schedules by tuning to that channel.

X.    **TRAINING**

A.    **Training Provided to Covered Employees**

DOC shall provide training as described below to Covered Employees.  Subject to collective bargaining requirements, DOC will provide this training to: (1) existing Covered Employees within six (6) months of the Effective Date of this Agreement, and (2) new Covered Employees within three (3) months of the date upon which they begin their employment. Thereafter, Covered Employees shall receive this training no less than once every two (2) years, or as pertinent changes in law require.  DOC will incorporate this training into its regularly scheduled training programs for new and existing employees.  DOC shall retain discretion to determine the manner and/or format in which such training shall be conducted.  DOC shall update training materials to reflect pertinent changes in law.  DOC shall retain discretion to consult with outside parties, including MCDHH, to prepare or present relevant training materials.

DOC shall maintain records regarding each training provided to Covered Employees, including information regarding attendance and/or completion of training for each Covered Employee and copies of the training materials and/or content provided.

The training to be provided to Covered Employees shall include the following topics:

- the importance of Effective Communication and best practices for communicating with deaf and hard-of-hearing inmates in accordance with the ADA's Effective Communication requirements and other applicable standards and federal law;

- the unique needs of and problems encountered by deaf and hard-of-hearing inmates;

- deafness and hearing loss as a culture;

- literacy issues that may impact deaf and hard-of-hearing inmates' ability to communicate;

- methods of identifying a deaf or hard-of-hearing inmate's communication needs;

- the potential limitations of lip-reading and note writing as modes of communication with deaf and hard-of-hearing inmates;

- the potential impact of hearing loss on deaf and hard-of-hearing inmates' interactions with hearing correction officers;

- additional notification obligations that apply to correction officers when deaf or hard-of-hearing inmates are in their care and custody (this training shall only apply to DOC employees with care and custody functions);

- the proper use and role of Qualified Sign Language Interpreters;

- directions for using various Auxiliary Aids and Services that may be provided to enhance deaf and hard-of-hearing inmates' ability to communicate effectively;

- the need for additional time for uses of certain telecommunications devices, such as TTY and CapTel; and

- ADA standards and DOC policies and procedures as they relate to deaf and hard-of-hearing inmates.

This training may be delivered in electronic format to all Covered Employees other than DOC Deputies.

This training shall be delivered by an in-person presenter to all DOC Deputies.

**B.      Supplemental Training Provided to Institution ADA Coordinators**

In addition to the foregoing, DOC shall provide supplemental training as described below to all Institution ADA Coordinators.  DOC will provide this training to: (1) existing Institution ADA Coordinators within three (3) months of the Effective Date of this Agreement, and (2) new Institution ADA Coordinators within three (3) months of the date upon which they assume the position of Institution ADA Coordinator.

The supplemental training to be provided to Institution ADA Coordinators is such training sufficient to enable them to effectively explain the purpose and function of each available auxiliary aid and service to deaf and hard-of-hearing inmates so that deaf and hard-of-hearing inmates may make an informed request for Auxiliary Aids and Services in accordance with **Section IV(D) (Initial Assessment to Determine Appropriate Hearing-Related Auxiliary Aids)**. This supplemental training shall include information regarding: (1) the Auxiliary Aids and Services available to deaf and hard-of-hearing inmates; (2) how such Auxiliary Aids and Services work, by including, to the extent possible, a demonstration of auxiliary aid devices; (3) the hearing-related communication access barrier(s) and/or need area(s) that each available auxiliary aid and service may help to address; (4) how to identify common communication access barriers and need areas for deaf and hard-of-hearing inmates; and (5) best practices for removing communication access barriers and providing reasonable accommodations to deaf and hard-of-hearing inmates.

DOC shall coordinate with MCDHH or other community resources to provide Institution ADA Coordinators with the supplemental training described here. This supplemental training shall be delivered to all Institution ADA Coordinators.

## XI.   REVISIONS TO RELEVANT DOC POLICIES IN ACCORDANCE WITH THIS AGREEMENT

DOC will update its policies, including the 408 Policy, where necessary, for consistency with this Agreement. In particular, DOC shall revise its policies where necessary in accordance with the following:

1.   Relevant provisions of the 408 Policy, and other DOC policies as necessary, shall clarify that, when an inmate has been identified as deaf or hard-of-hearing at any time during his or her incarceration, including at intake or by DOC's Contract Medical Provider, in accordance with **Section IV(D) (Initial Assessment to Determine Appropriate Hearing-**

**Related Auxiliary Aids and Services)**, an assessment shall be made of the inmate's hearing-related needs so that he or she may effectively communicate and receive effective, meaningful, and substantially equal access to DOC programs, services and activities during his or her incarceration.

2.   Relevant provisions of the 408 Policy, and other DOC policies as necessary, shall clarify that, as set out in this Agreement and unless declined by the inmate,  DOC shall provide deaf and hard-of-hearing inmates whose primary language is ASL with auxiliary aids in the form of: (1) Qualified Sign Language Interpreters at the events listed in **Section VI(A) (General Policy)**; (2)  telecommunications services (*i.e.* videophones, TTY, and/or CapTel); and (3) visual and/or tactile notification devices (*e.g.,* vibrating pagers),  without requiring the inmate to complete the Request for Reasonable Accommodation Form (103 DOC 408, Attachment A) or follow the reasonable accommodation process.  DOC will provide such accommodations as soon as is feasible after identifying a deaf or hard-of-hearing inmate whose primary language is ASL.

3.   Relevant provisions of the 408 Policy, and other DOC policies as necessary, shall clarify that DOC will provide appropriate auxiliary aids and/or services including, without limitation, Qualified Sign Language Interpretation and writing assistance, to deaf and hard-of-hearing inmates who cannot effectively complete DOC's reasonable accommodation process without such accommodations due to communication access issues.  Depending on the needs of the deaf or hard-of-hearing inmate, auxiliary aids and/or services will be made available at all stages of DOC's reasonable accommodation process, including to assist the inmate in: (1) completing the request form (103 DOC 408, Attachment A); (2) effectively communicating with the Institution ADA Coordinator; (3) effectively communicating with Contract Medical Provider staff conducting an evaluation related to a medically prescribed

accommodation; (4) reading and fully understanding the content of a decision concerning a requested accommodation; and/or (5) completing the appeal form (103 DOC 408, Attachment B).  Deaf and hard-of-hearing inmates who, by reason of their hearing disability, cannot effectively complete DOC's reasonable accommodation process, shall not be required to submit a written request or complete DOC's reasonable accommodation process in order to receive the assistance specified in (1) through (5) of this paragraph.

4.     Relevant provisions of the 408 Policy, and other DOC policies as necessary, shall clarify that, among other factors, including those listed in 28 C.F.R. § 35.160(b)(2), DOC shall give Primary Consideration, as that term is defined in **Section III (Definitions), ¶ 27,** to deaf and hard-of-hearing inmates' requested accommodations when determining what types of auxiliary aids and/or services are necessary to ensure that they are able to communicate effectively and have effective, meaningful, and substantially equal access to DOC programs, services, and activities.

5.     Relevant provisions of the 408 Policy, and other DOC policies as necessary, shall clarify that DOC, either directly or through its Contract Medical Provider, shall provide to a deaf or hard-of-hearing inmate those auxiliary aids and/or services that have been approved as reasonable accommodations to facilitate his or her Effective Communication and/or participation in DOC programs, services, and activities.  If the inmate's hearing impairment has been identified as a clinical condition that is not expected to resolve or improve with time, DOC, either directly or through its Contract Medical Provider, shall designate such auxiliary aids and/or services as open-ended medical restrictions.  The designation of an approved auxiliary aid and/or service as an open-ended medical restriction shall be subject to periodic review for appropriateness, including when and if the deaf or hard-of-hearing inmate transfers to another facility.  The open-ended medical restriction shall remain active

during periodic reviews for appropriateness and shall not be discontinued or modified unless and until the affected inmate is notified and given the opportunity to discuss the discontinuation or modification with the Institution ADA Coordinator.  Any decision to discontinue or modify an existing open-ended medical restriction, including the reasons justifying the discontinuation or modification in keeping with **Section XI (Revisions to Relevant DOC Policies in Accordance with this Agreement), ¶ 9**, must be documented in writing.

6. In accordance with **Section VI (Qualified Sign Language Interpreters)**, relevant provisions of the 408 Policy, and other DOC policies as necessary, shall clarify that, if a deaf or hard-of-hearing inmate submits a Request for Reasonable Accommodation requesting access to Qualified Sign Language Interpreters for particular programs, appointments, or events and that request is approved, DOC will ensure that Qualified Sign Language Interpreter services are available for all the programs, appointments, and/or major events listed in **Section VI(A) (General Policy)** without requiring subsequent Requests for Reasonable Accommodation to receive interpreter services.

7. Relevant provisions of the 408 Policy, and other DOC policies as necessary, shall clarify that DOC shall not assess the cost of approved accommodations to the disabled inmate, in accordance with 28 C.F.R. § 35.130(f).

8. Relevant provisions of the 408 Policy (which includes those sections numbered 103 DOC 408.01, 408.07, and 408.11), and other DOC policies as necessary, shall clarify that the exceptions to DOC's obligation to make its programs, services, and activities accessible to disabled inmates (including deaf and hard-of-hearing inmates) are limited to those which are permitted under federal law, as well as any limitations or requirements incorporated

therein, including 28 C.F.R. §§ 35.130(h), 35.139(a)-(b), 35.150(a)(3).  These exceptions

include that DOC need not provide accommodations in the following circumstances:

(a)  If the accommodation will result in a fundamental alteration in the nature of a

program, activity, or service or in undue financial or administrative burdens.  The

decision that an accommodation would result in a fundamental alteration or in

undue financial or administrative burdens must be made by the Commissioner or

his or her designee after considering all resources currently available for use in the

funding and operation of DOC's programs and services, and must be accompanied

by a written statement of reasons documenting that conclusion, in accordance with

28 C.F.R. §§ 35.150(a)(3) and 35.164;

(b)  If the accommodation will result in actual risks or impairment of the safe operation

of a DOC program, activity, or service, in accordance with 28 C.F.R. § 35.130(h);

or

(c)  If the inmate seeking to participate in or benefit from the DOC program, activity,

or service, poses a Direct Threat to the health or safety of the inmate or others.  To

determine whether an inmate poses a Direct Threat, DOC must make an

individualized assessment, based on reasonable judgment that relies on current

medical knowledge or on the best available objective evidence, to ascertain: the

nature, duration, and severity of the risk; the probability that the potential injury

will actually occur; and whether reasonable modifications of policies, practices, or

procedures or the provision of auxiliary aids or services will mitigate the risk, in

accordance with 28 CFR § 35.139(b).

9.  Relevant provisions of the 408 Policy (which may include those subsections numbered

103  DOC 408.05 and 408.07), and other DOC policies as necessary, shall clarify that the

Commissioner or a designee shall document DOC's basis for modifying or denying any requested accommodation. The Institution ADA Coordinator shall: (1) store this documentation in a designated Inmate ADA folder that shall follow the inmate if he or she transfers to another DOC Facility; and (2) shall give the inmate a hard copy of this documentation along with written notification of the decision modifying or denying the requested accommodation and notice of the inmate's right to appeal within no more than three (3) days after the decision is rendered.

10. Relevant provisions of the 408 Policy (which may include those subsections numbered 103 DOC 408.01, 408.05, and 408.07), and other DOC policies as necessary, shall clarify that, if DOC is not required to provide the inmate's requested accommodation under federal law, including for those reasons listed in **Section XI (Revisions to Relevant DOC Policies in Accordance with this Agreement), ¶ 8**, DOC will: (1) determine what alternative reasonable accommodation(s) can be provided to ensure that the deaf or hard-of-hearing inmate receives effective, meaningful, and substantially equal access to DOC programs, services, and activities; and (2) will provide the deaf or hard-of-hearing inmate with such alternative reasonable accommodation(s).

11. Relevant provisions of the 408 Policy, and other DOC policies as necessary, shall clarify that a determination by medical staff not to prescribe a medical order or medical accommodation to a deaf or hard-of-hearing inmate shall not preclude the Institution ADA Coordinator or Department ADA Coordinator from approving other accommodations that are necessary for the inmate's Effective Communication or effective, meaningful, and substantially equal access to DOC programs, services, and activities.

12. Relevant provisions of the 408 Policy and/or other DOC policies as necessary, shall clarify that DOC will provide appropriate auxiliary aids and/or services including, without

limitation, Qualified Sign Language Interpretation and writing assistance, to deaf and hard-of-hearing inmates who need accommodation(s) to effectively complete DOC's grievance process, in keeping with 103 CMR 491.07(1).  Depending on the needs of the deaf or hard-of-hearing inmate, auxiliary aids and/or services will be made available at all stages of DOC's grievance process.  A deaf or hard-of hearing inmate who is unable to initiate a grievance process in writing as a result of his or her hearing impairment may inform a Correctional Program Officer or the Institution ADA Coordinator that he or she requires assistance to initiate or complete the grievance process.  Deaf and hard-of-hearing inmates who, by reason of their hearing disability, cannot effectively complete DOC's grievance process, shall not be required to submit a written request or complete DOC's reasonable accommodation process in order to receive the assistance specified this paragraph.

13.    Relevant provisions of the 408 Policy, and other DOC policies as necessary, shall clarify that DOC will provide to deaf and hard-of-hearing inmates appropriate auxiliary aids and/or services, including, without limitation, Qualified Sign Language Interpretation and writing assistance, to ensure that they have effective access to Staff Access periods that is substantially equal to the access available to hearing inmates at the same DOC Facility; or, alternatively, that deaf and hard-of-hearing inmates have effective access to DOC staff who are available during Staff Access periods in a separate meeting at least as frequently as hearing inmates have access to such staff during Staff Access periods at the same DOC Facility.  Deaf and hard-of-hearing inmates who, by reason of their hearing disability, cannot effectively access DOC's Staff Access period, shall not be required to submit a written request or complete DOC's reasonable accommodation process in order to receive the assistance specified above.  However, where a deaf or hard-of-hearing inmate requires an auxiliary aid or services the use of which must be scheduled in advance (*e.g.*, Qualified

Sign Language Interpreters, CART services, etc.), DOC may engage in preliminary discussion(s) with the deaf or hard-of-hearing inmate to establish whether and how frequently the inmate intends to attend Staff Access periods. The inmate will be asked to notify DOC if his or her intent to attend changes. If the inmate does not attend Staff Access periods with the frequency he or she had previously indicated, DOC may have further discussion(s) with the inmates regarding attendance at Staff Access periods.

## XII. HOUSING DETERMINATIONS

At a deaf or hard-of-hearing inmate's annual classification hearing, DOC shall inquire whether the inmate would prefer to be housed in a correctional facility that already houses another deaf or hard-of-hearing inmate. If an inmate indicates such a preference, DOC will consider the inmate's request at the classification hearing. DOC shall document the inmate's request in the inmate's classification report. If an inmate has made such a request and has been placed at a facility at which there are other deaf and hard-of-hearing inmates, the DOC staff responsible for making housing determinations at that facility will consider the inmate's request in determining his or her housing unit placement after any orientation period. Additionally, once a deaf or hard-of-hearing inmate has been placed at a facility, he or she may request to be housed with other deaf or hard-of-hearing inmates at that facility at any time by submitting a request to the facility Superintendent. DOC shall document the deaf or hard-of-hearing inmate's request to the facility Superintendent and the facility Superintendent's response thereto in IMS.

Such facility and housing placements would be in the sole discretion of the DOC and would be considered only after DOC has taken into account the various factors upon which it relies in making facility and housing placement decisions, including, but not limited to: classification status; individual programming needs; medical, mental health and sex offender treatment needs; the need for reasonable accommodations; and conflicts between and among the inmate population

(*e.g.*, enemy situations, STG affiliations, protective custody situations, etc.).  Nothing in this section shall be interpreted to limit DOC's discretion to classify or house inmates in whatever correctional facility or housing unit it deems appropriate in keeping with the requirements of state and federal law.  However, DOC will not place a deaf or hard-of-hearing inmate in a DOC Facility, housing unit, or cell in which it is unable to provide reasonable accommodations that ensure that the deaf or hard-of-hearing inmate is afforded access to DOC's programs, services, and activities that is substantially equal to the access afforded to hearing inmates placed in the same DOC Facility, housing unit, cell, or status.  Additionally, regardless of the DOC Facility in which a deaf or hard-of-hearing inmate is housed, said inmate retains all rights required by this Agreement and state and federal law.

## XIII.   MONITORING AND REPORTING

### A.      Settlement Monitor

1.     The Parties will consult to identify a Settlement Monitor that is reasonably acceptable to both parties.  The Settlement Monitor will serve to assess DOC's compliance with the terms of the Agreement.  If the Parties cannot timely agree upon the selection of a Settlement Monitor, each Party shall submit name(s) of proposed monitor(s), along with a summary of their qualifications, from which the Court may select the Settlement Monitor.

2.     It is contemplated that Plaintiffs will pay for the fees and costs incurred by the Settlement Monitor and any consultants he or she retains out of any attorneys' fees paid by the Commonwealth of Massachusetts as part of this litigation.  To the extent any award of attorneys' fees is insufficient to cover the fees and costs incurred by the Settlement Monitor and any consultants he or she retains, Plaintiffs reserve the right to seek such fees and costs from the Court.  DOC will not pay fees and costs incurred by the Settlement Monitor or any consultants he or she retains unless so ordered by the Court.

3.      The Settlement Monitor shall have access to all DOC Facilities that house deaf or hard-of-hearing inmates, with reasonable notice, to conduct monitoring visits in order to assess DOC's compliance with this Agreement. There shall be no more than three monitoring visits in each year that the Agreement is in effect.  These visits may take up to three consecutive days each, and the Settlement Monitor may visit as many facilities as is practicable during each visit.

4.      During each monitoring visit, the Settlement Monitor shall have access to meet with and interview personnel whose duties pertain to the provision of accommodations and services to deaf or hard-of-hearing inmates.  The Settlement Monitor may ask DOC, through its in-house counsel, to provide timely written responses to questions she may pose related to the implementation of this Agreement.

5.      During each monitoring visit, the Settlement Monitor shall have a reasonable opportunity to conduct confidential interviews of deaf or hard-of-hearing inmates, or groups of such inmates (if a group setting does not present a safety or security concern), with the inmate or inmates' written consent obtained on the date of the interview or in advance thereof, to assess whether they are receiving the accommodations and other services called for by the Agreement.

6.      DOC shall designate one or more representatives with whom the Settlement Monitor shall conduct an in person or telephonic "exit interview." The Settlement Monitor shall conduct the exit interview before the conclusion of each monitoring visit and at a time mutually convenient to the Settlement Monitor and DOC.  Unless otherwise stated by the Settlement Monitor, any opinions or observations shared with DOC representatives during such exit interview shall be deemed to be preliminary and subject to revision.

7.      In addition to in-person interviews during monitoring visits, the Settlement Monitor may receive calls and correspondence from deaf or hard-of-hearing inmates, provided that deaf and hard-of-hearing inmates may only call the Settlement Monitor during regular hours when inmates have access to phones, consistent with 103 CMR 482. Such communications shall be treated as confidential and will be protected from discovery by DOC.

**B.      DOC Records and Reports**

1.      Three times per year during the course of this Agreement, at intervals to be agreed upon by the parties, DOC will provide the Settlement Monitor and Plaintiffs' Counsel with data and documents collected by the DOC and its Contract Medical Provider to track DOC's compliance with the Agreement. This data will cover each DOC Facility that houses a deaf or hard-of-hearing inmate. The data and documents to be provided are set forth in Appendix A attached to this Agreement. Material and information provided in one report need not be repeated in subsequent reports; only new or updated information since the date of the last report must be provided.

2.      The Settlement Monitor shall have access to any other relevant records or documents to assess compliance with this Agreement, except documents protected by attorney-client or work product privileges or any applicable protective order entered by the Court. If these documents are requested in conjunction with a monitoring visit, the DOC will provide these documents to the extent feasible within ten (10) days prior to the visit.

3.      During the monitoring visits, the Settlement Monitor shall have reasonable access to current inmate records (subject to the inmate's written consent), including inmate ADA folders, six-part files, and medical records. If the Settlement Monitor requests copies of any inmate's ADA folder or other records, the DOC shall provide copies within thirty (30)

business days of the request.  Within thirty (30) days of the Effective Date, the parties shall agree to a procedure to ensure access to and the confidentiality of inmate records.

4.      DOC shall also conduct an annual audit of its policies, practices and procedures to assess compliance with the terms of the Agreement and the ADA.  The first such audit shall be completed within one (1) year of the Effective Date.  At minimum, this audit shall address the issues described in the Settlement Monitor's inspection checklist described in **Section XII(C) (Settlement Monitor's Reports), ¶ 2**.

**C.      Settlement Monitor's Reports**

1.      The Settlement Monitor shall prepare bi-annual written reports on DOC's efforts to meet the terms of this Agreement, and may also include additional advice, suggestions or proposals in the nature of quality assurance or quality improvement as she deems appropriate.  The Settlement Monitor shall make her written report available to the DOC within thirty (30) days from the completion of her monitoring visit and the delivery by DOC of any documents requested by the Settlement Monitor at the monitoring visit, whichever is later, unless the time for submission is extended by agreement of the parties.  Although DOC will give full consideration to advice, suggestions, and proposals offered by the Settlement Monitor, all decisions concerning the provision of accommodations and services to deaf and hard-of-hearing inmates will be made by DOC in accordance with the terms of this Agreement and statutory and other legal responsibilities.  If the Settlement Monitor reports that DOC has not met the terms of any provision or provisions of this Agreement, she shall make recommendations as to actions she believes to be necessary to meet the terms of the provision(s). If DOC does not accept any recommendations made by the Settlement Monitor, it will explain its reasons to the Settlement Monitor and Plaintiffs' Counsel.

2.      Six (6) months from the Effective Date, the Settlement Monitor shall develop an inspection

checklist that canvasses all of the issues subject to the Agreement, and shall circulate it to

Plaintiffs and DOC.  The inspection checklist should serve as an aid for DOC to use as a

self-audit instrument.

## XIV.   RELEASE AND SETTLEMENT OF CLAIMS

In consideration of the representations, promises, and agreements set forth herein, the

sufficiency of which is hereby acknowledged, the individual Plaintiffs and members of any class

that is certified in this Action, on behalf of themselves, their assignees, heirs, executors, family

members, beneficiaries, administrators, successors in interest, and anyone acting, or claiming to

act, on their behalf, hereby release and forever discharge the Commonwealth, the Executive Office

of Public Safety and Security, DOC, and their current and former employees from any and all

claims and causes of action arising out of the matters described in the Complaint filed in this

Action, except for the Reserved Claims, through the term of the Agreement.

Nothing in this Agreement shall constitute a waiver by any individual class member other

than the named Plaintiffs of any individual claim against DOC or against any individual defendant

in a court of competent jurisdiction for monetary damages.

## XV.   FINAL APPROVAL

For purpose of this Agreement and its Final Approval by the Court, the Parties agree to

stipulate that this Action shall be maintained as a class action under Fed. R. Civ. P. 23, with the

class  defined as all individuals who are currently in DOC custody or in the future are placed in

DOC custody, and who are currently or in the future become deaf or hard-of-hearing.

This Agreement shall be subject to the Final Approval of the Court.  The Parties shall

cooperate in presenting this Agreement to the Court for Final Approval and/or at any hearing under

Fed. R. Civ. P. 23(e).  If the Court grants Final Approval, the Parties stipulate that this Agreement

shall not be construed as a consent decree or its equivalent.  If the Court does not grant Final

Approval, this Agreement shall be null and void and of no force and effect, and nothing herein

shall be deemed to prejudice the position of any Party with respect to the Action or otherwise, and

neither the existence of this Agreement, nor any of its terms or provisions, nor any of the

negotiations or proceedings connected with it, shall be admissible in evidence, referred to for any

purpose in the Action or in any other litigation or proceeding, or construed as an admission,

presumption, or concession by DOC of any liability or the truth of any of the allegations of the

Action.

## XVI.   DISPUTE RESOLUTION AND ENFORCEMENT

This Agreement may be enforced only by the Parties hereto.  Nothing contained in this

Agreement is intended to or shall be construed to evidence an intention to confer any rights or

remedies upon any persons other than the Parties hereto.  The Court shall be the sole forum for the

enforcement of this Agreement.

If Plaintiffs believe that DOC is not in substantial compliance, *i.e.*, is in substantial non-

compliance, with any provision of this Agreement, Plaintiffs, through Plaintiffs' Counsel, shall

provide DOC, in writing, notice of the specific reasons why it believes that DOC is not in

substantial compliance with such provision or provisions, referencing the specific provision or

provisions.  Plaintiffs may not allege that DOC is not in substantial compliance based on minor or

isolated delays in compliance.  Plaintiffs may also not allege that DOC is not in substantial

compliance without evidence of a pattern of non-compliance with regard to the particular provision

or provisions.  To the extent that Plaintiffs rely on observations or opinions of the Settlement

Monitor to support an allegation that DOC is not in substantial compliance, Plaintiffs shall refer

to the Settlement Monitor's written reports or to portions thereof that support Plaintiffs' belief.  To

the extent that Plaintiffs rely upon documents provided by DOC to support an allegation that DOC

is in not in substantial compliance, Plaintiffs shall make reference to the specific documentation that supports Plaintiffs' belief.

DOC shall have the opportunity to consult the Settlement Monitor with respect to Plaintiffs' allegations that DOC is not in substantial compliance with any provision or provisions. Any such consultation must be in writing and shared with Plaintiffs' Counsel. DOC shall provide Plaintiffs' Counsel with a written response to the notification of alleged substantial non-compliance within thirty (30) days of receipt. DOC's response shall contain a description of the steps it took to investigate the issues addressed in Plaintiffs' notice, the results of the investigation, and, where DOC proposes corrective action, a specific plan for addressing the described issues. If no corrective action is proposed by reason of the unavailability of appropriated funds, the lack of receipt of appropriated funds, legal considerations, or for other reasons, DOC's response shall specifically state those reasons as well as any statutes, regulations, evidence, or technical bases upon which it is relying in reaching such conclusion.

Plaintiffs will advise DOC of its acceptance or rejection of DOC's response within seven (7) business days of its receipt. Either DOC or Plaintiffs, in any of the written submissions pursuant to this section, may request a meeting to discuss and attempt to resolve any matter addressed in the written submissions. DOC and Plaintiffs shall meet within fourteen (14) business days of receipt of a request to meet, unless a later meeting is agreed to by the Parties.

If DOC and Plaintiffs are not successful in their efforts to resolve the issue, they may jointly or independently seek relief from the Court to effect substantial compliance with the Agreement, but not through a petition for contempt.

If the Court finds that DOC is not in substantial compliance, *i.e.*, is in substantial non-compliance, with a provision or provisions of the Agreement, it may enter an order consistent with equitable principles, but not an order of contempt, that is designed to achieve compliance.

If Plaintiffs contend that DOC has not complied with an order entered under the immediately preceding paragraph, they may, after reasonable notice to DOC, move for further relief from the Court to obtain compliance with the Court's prior order.  In ruling on such motion, the Court may apply equitable principles and may use any appropriate equitable or remedial power available to it.

The Parties shall not seek termination of or otherwise challenge this Agreement or any order approving this Agreement during the time that the Court retains jurisdiction.  Nothing in this paragraph shall limit the Parties' rights to challenge or appeal any finding as to whether DOC is not in substantial compliance, *i.e.*, is in substantial non-compliance, or any consequent order entered by the Court.

## XVII.  FUNDING

The Parties acknowledge that full implementation of this Agreement may be subject to the availability and receipt of appropriated funds.

DOC agrees to make all possible good faith efforts to seek all necessary funding to implement fully the terms of this Agreement.  In the event that DOC alleges that it is unable to fulfill any of its obligations under this Agreement because of inadequate appropriations by the Legislature or a lack of receipt of appropriated funds, the Parties shall meet and confer, and if necessary, consult the court.

In the event that the Parties remain unable to agree, Plaintiffs' Counsel reserve all rights to seek remedial orders from the Court to effect substantial compliance with this Agreement under the Dispute Resolution and Enforcement procedures in **Section XVI (Dispute Resolution and Enforcement)** of this Agreement, and DOC reserves all rights to respond to any such requested relief.

## XVIII. NO ADMISSION OF LIABILITY

Nothing in this agreement shall be construed in any way as an admission, presumption, or concession by DOC or any defendant of any liability or wrongdoing whatsoever.  DOC specifically disclaims any liability or wrongdoing whatsoever on the part of itself, its agents, and its employees.

This Agreement may not be relied upon as precedent in any future claim.

## XIX.   ATTORNEYS' FEES AND COSTS

The Parties agree to negotiate in good faith Plaintiffs' Counsel's claim to reasonable attorneys' fees and costs.  If such negotiations are unsuccessful, Plaintiffs' Counsel reserve all rights to seek reasonable attorneys' fees and costs, including fees and costs associated with those claims resolved by this Agreement, and DOC reserves all rights to oppose any such petition for fees and costs.

Notwithstanding anything herein, the Parties agree that the Court's failure to approve any fee award sought by Plaintiffs' Counsel shall not be grounds for terminating this Agreement.

Plaintiffs' Counsel reserve all rights to seek reasonable attorneys' fees and costs for successful enforcement of this Agreement after Final Approval, and DOC reserves all rights to oppose any such petition for fees and costs.

## XX.   MISCELLANEOUS

### A.   Governing Law

This Agreement shall be deemed to be made and entered into in the Commonwealth of Massachusetts and shall in all respects be interpreted, enforced, and governed under the laws of said Commonwealth and the laws of the United States.

**B.      Confidentiality**

No part of this Agreement is or will be considered confidential by the Parties.   This Agreement will be made available by request under the Massachusetts Public Records Law, Mass. Gen. Laws c. 66, § 10, or Freedom of Information Act, 5 U.S.C. § 552.

**C.      Entire Agreement**

This Agreement constitutes the entire agreement of the Parties and, except for any Protective Order entered by the Court, supersedes all prior agreements, representations, negotiations, and undertakings in this litigation not set forth or incorporated herein.

Each Party represents and acknowledges that each Party is and has been represented by its own counsel.   Each Party further represents and acknowledges that, in executing this Agreement, no Party relies or has relied upon any representations or statements made by any other Party or its counsel other than the promises and representations set forth in this Agreement.   No other statement, promise, or agreement, either written or oral, made by any Party or agents of any Party this is not contained in this written Agreement, will be enforceable.

This Agreement is the result of an arm's-length negotiation.   Since all Parties contributed substantially, materially, and cooperatively in drafting this Agreement, it shall not be more strictly construed against one Party than as against any other.

**D.      Execution**

This Agreement may be executed in counterpart originals, all of which, when so executed and taken together, shall be deemed an original and all of which shall constitute one and the same instrument.   Each counterpart may be delivered by email (as a PDF attachment) or facsimile, and an email or facsimile signature shall have the same force and effect as an original signature.

### E.  Non-Waiver

Failure by Plaintiffs to seek enforcement of this Agreement pursuant to its terms with respect to any instance or provision will not be construed as a waiver to such enforcement with regard to other instances or provisions.

### F.  Severability

Should any part, term, or provision of this Agreement be declared or be determined by any Court to be illegal, invalid, or otherwise unenforceable, the validity of the remaining parts, terms, or provisions shall not be affected thereby and said illegal, invalid, or other unenforceable part, term, or provision shall be deemed not to be part of this Agreement, unless the Court declines to approve this Agreement.  However, if the severance of any illegal, invalid, or otherwise unenforceable part, term, or provision materially alters the rights or obligations of the parties hereunder, the Parties will attempt, through reasonable, good fair negotiations, to agree upon such other amendments to this Agreement as may be necessary to restore the Parties as closely as possible to the relative rights and obligations initially intended by them hereunder.

### G.  Amendments

Except as otherwise stated, this Agreement shall only be amended, revoked, changed, or modified through a written agreement executed by all Parties and approved by the Court.  No waiver of any provision of this Agreement will be valid unless it is in writing and signed by the Party against whom such waiver is charged and approved by the Court.

### H.  Term of Agreement

The term of this Agreement shall commence upon the date of Final Approval by this Court and shall extend for three (3) years from said date of Final Approval.  The Court's jurisdiction shall terminate at the end of the three (3) year settlement period with respect to any provision or provisions of this Agreement for which there is no outstanding determination, or pending claim,

that DOC is not in substantial compliance, *i.e.*, is in substantial non-compliance.  If the Court determines that there has been substantial non-compliance by DOC with a provision or provisions of this Agreement at any time during the three (3) year period of this Agreement, the Court's jurisdiction with respect to such provision or provisions relating thereto shall continue for the remainder of the three (3) year period or for an additional period to be ordered by the Court of not more than two (2) years from the date of the Court's finding that DOC is not in substantial compliance.

Subject to the provisions set forth in this section and in **Section XVI (Dispute Resolution and Enforcement)**, this Agreement shall expire at the end of three (3) years from the date of Final Approval by the Court and the Action shall then be dismissed with prejudice.

However, DOC will continue to provide all accommodations required under law, including under the U.S. Constitution, the ADA, Section 504 of the Rehabilitation Act, and Massachusetts law, along with any other applicable federal and state laws, regardless of any term limit applicable to this Agreement.

Signed:

_____
MASSACHUSETTS DEPARTMENT OF CORRECTION
Commissioner Carol A. Mici

_____
Date

_____
DOC Defendants' Counsel
OFFICE OF THE ATTORNEY GENERAL MAURA HEALEY
Kirk G. Hanson
Anna Rachel Dray-Siegel
Assistant Attorneys General
Government Bureau

_____
Date

_____
DOC Defendants' Counsel
MASSACHUSETTS DEPARTMENT OF CORRECTION LEGAL DIVISION
Timothy M. Pomarole

_____
Date

Signed:

_____

MASSACHUSETTS DEPARTMENT OF CORRECTION
Commissioner Carol A. Mici

_____

Date

_____

DOC Defendants' Counsel
OFFICE OF THE ATTORNEY GENERAL MAURA HEALEY
Kirk G. Hanson
Anna Rachel Dray-Siegel
Assistant Attorneys General
Government Bureau

____May 28, 2019_____

Date

_____

DOC Defendants' Counsel
MASSACHUSETTS DEPARTMENT OF CORRECTION LEGAL DIVISION
Timothy M. Pomarole

____May 28, 2019_____

Date

68

Signed:

Plaintiffs' Counsel
WILMER CUTLER PICKERING HALE AND DORR LLP
Lisa J. Pirozzolo
Lindsay Kosan
Alexandra B. Lavin

**5 | 28 | 19**
Date

Plaintiffs' Counsel
PRISONERS' LEGAL SERVICES
James R. Pingeon

**5 / 28 / 2019**
Date

Plaintiffs' Counsel
DISABILITY LAW CENTER, INC.
Tatum A. Pritchard

**5/28/2019**
Date

Plaintiffs' Counsel
WASHINGTON LAWYERS' COMMITTEE FOR
CIVIL RIGHTS & URBAN AFFAIRS
Philip Fornaci

**5/28/2019**
Date

69

## APPENDIX A

In accordance with the provisions of **Section XIII(B) (DOC Records and Reports), ¶ 1**, DOC shall provide the Settlement Monitor and Plaintiffs' Counsel with the data and documents set forth below as required by the corresponding Agreement Provisions, noted below:

      **A.**    **In accordance with Section IV (Identification and Tracking of Deaf and Hard-of-Hearing Inmates)**

1.    All DOC and institutional policies and procedures that implement this Agreement, including Orientation manuals, handbooks, and forms provided to inmates. (Also in accordance with **Section XI (Revisions to Relevant DOC Policies in Accordance with this Agreement**)).

2.    The records audit described in **Section IV(A) (Identification of Deaf and Hard-of-Hearing Inmates Currently in DOC Custody)** of this Agreement.

3.    A list of all deaf and hard-of-hearing inmates in DOC custody and the facility and unit where each such inmate is housed.

4.    A copy of the IMS entry for each deaf and hard-of-hearing inmate identifying: (1) the severity of the inmate's hearing disorder; (2) any of the inmate's hearing-related medical restrictions; and (3) the hearing-related reasonable accommodations that have been approved for that inmate.

5.    The monthly records that **Section IV(F) (Tracking Deaf and Hard-of-Hearing Inmates in DOC Custody)** of this Agreement requires each Institution ADA Coordinator to prepare, showing all notifications and accommodations provided under that Section.

6.    The annual self-evaluations and compliance plans completed by each DOC institution Superintendent required, per the 408 Policy (103 DOC 408.03).

7.    All audits conducted by DOC of its medical provider to ensure compliance with the requirements of this Agreement, including the requirement that the medical provider examine inmates for hearing loss as part of the periodic physical. (Also in accordance with **Section V (Contract Medical Provider's Care, Treatment, and Accommodation of Deaf and Hard-of-Hearing Inmates**)).

8.    A monthly list of all deaf and hard-of-hearing inmates who have been transferred, including the date of the transfer, and the name of the sending and receiving facility.

9.    A list of all inmates for whom a distinguishing mark has been placed on his or her bed book card, identifying that they are deaf and/or hard-of-hearing, indicating that they may need assistance in case of an emergency.

10.    A list of all deaf or hard-of-hearing inmates provided an identification badge or card indicating the nature of their hearing disability, and a list of all deaf or hard-of-hearing inmates who have declined the badge or card.

11.     A list of all deaf or hard-of-hearing inmates offered an identification sign on their cell door indicating the nature of their hearing disability, and a list of all deaf or hard-of-hearing inmates who have declined the sign.

12.     Monthly reports showing all updates to the Centralized Database documenting: (1) all hearing-related Requests for Reasonable Accommodation(s) made by deaf and hard-of-hearing inmates and whether the requests were granted, modified, or denied; and (2) the list of inmates who have been identified as deaf or hard-of-hearing and the status of any hearing-related requests for accommodation(s).

13.     The monthly reports submitted to the Superintendent and Department ADA Coordinator for Inmates by each Institution ADA Coordinator that contain information regarding: (1) all hearing-related Requests for Reasonable Accommodation(s) made by deaf and hard-of-hearing inmates, including the nature of the hearing-related accommodations requested, whether the requests were granted, modified, or denied, and the reasons for any modification or denial; and (2) any hearing-related accommodations approved for deaf and hard-of hearing inmates without submission of a Request for Reasonable Accommodation.

14.     A list showing the names and contact information of the Institution ADA Coordinators for each DOC Facility and the Department's ADA Coordinator for Inmates.

15.     A description of facts showing DOC's compliance with the accommodation assessment provisions in **Section IV(D) (Initial Assessment to Determine Appropriate Hearing-Related Auxiliary Aids)** of the Agreement that shall include documentation of: (1) any conversation with the deaf or hard-of-hearing inmate; (2) an explanation of the reason(s) if the deaf or hard-of-hearing inmate's preferred accommodations were not approved; (3) documentation of any consultations with medical staff or outside consultants, such as MCDHH, and the names of the individuals consulted; (4) the recommendations of any outside consultants; and (5) whether the recommendations of outside consultants were approved, and, if not, an explanation of the reason(s) for why the recommendations were denied and what alternative accommodations have been provided to the inmate.

16.     The written records of any scheduled meetings between the Institution ADA Coordinator and a deaf or hard-of hearing inmate to discuss Requests for Reasonable Accommodations, as referenced in **Section IV(G) (Meetings with Institution ADA Coordinators Regarding Accommodations)** of the Agreement.

**B.      In accordance with Section V (Contract Medical Provider's Care, Treatment, and Accommodation of Deaf and Hard-of-Hearing Inmates)**

17.     The minutes from all Monthly ADA Committee Meetings and from all Bi-Monthly Deputy Meetings in which accommodations are discussed.  The minutes from the Bi-Monthly Deputy Meetings shall be redacted to reflect only those portions of the minutes related to the discussion of hearing-related accommodations.

18.     Monthly data showing: (1) all hearing screenings requested and conducted by DOC's Contract Medical Provider, and, where a screening was requested and not conducted, a description of the reasons for the denial; (2) a list of all inmates who were recommended

71

for an audiological consultation, and, where the consultation was not approved by the Contract Medical Provider's Utilization Management, a summary of the reasons for the denial; (3) information concerning all audiological and otological consultations, including any recommendations by the audiologist or otologist for hearing aids or other medical devices; (4) the date when the hearing aid or other device was provided; and (5) if the recommendation of the audiologist or otologist was not approved, a description of the reasons for the denial.  (Also in accordance with **Section IV (Identification and Tracking of Deaf and Hard-of-Hearing Inmates)**).

19.  All guidelines or protocols used by DOC's Contract Medical Provider to determine whether to order an audiological or otological consultation or to approve an audiologist's or otologist's recommendation for hearing aids or other medical device(s).

20.  Documentation showing each instance in which DOC's Contract Medical Provider provided an ASL interpreter, VRI, CART, or any other communication device to deaf and hard-of-hearing inmates during a medical or mental health appointment or session, including the name of the inmate, the date of the service, and the nature of the accommodation.

**C.     In accordance with Section VI (Qualified Sign Language Interpreters)**

21.  All notifications to volunteer organizations or facilitators that a given program or service may be attended by a deaf or hard-of-hearing inmate and any response, including whether a hearing-related accommodation was offered.

22.  Monthly records showing: (1) the identity of all Qualified Sign Language Interpreters employed by DOC; (2) a log of the Qualified Sign Language Interpreters' schedules, showing the date and locations in which they provided services; (3) the program or activity for which such services were provided; and (4) the name of the inmate who received interpretation.

23.  Records showing all DOC requests for Qualified Sign Language Interpreters or CART services made to MCDHH, including: (1) the date of the request; (2) the response; (3) the date the service was provided; and (4) all invoices submitted by the interpreter.

24.  Monthly records showing each instance in which an inmate received an ASL interpreter or CART services, including: (1) the name of the inmate for whom the service was provided; (2) the date the service was provided; (3) the reason it was provided; and (4) the name of the interpreter.

25.  Monthly records reflecting: (1) all educational and vocational programs in which deaf inmates who rely upon sign language as their primary means of communication are enrolled; (2) whether the deaf inmate has been provided a Qualified Sign Language Interpreter during the program; and (3) if so, the name of the interpreter.  If a Qualified Sign Language Interpreter was not provided, DOC shall document the reason(s) therefor, including the written statements required by **Section VI(A) (General Policy)** of the Agreement, documenting the reason(s) whenever circumstances prevented DOC from providing necessary interpreter services.

72

26.     Any written waivers showing that a deaf or hard-of-hearing inmate has declined Qualified Sign Language Interpreter services.

27.     The written records documenting the use of an inmate as a non-Qualified Sign Language Interpreter for a deaf or hard-of-hearing inmate in an emergency situation.

   **D.     In accordance with Section VIII (Telecommunication)**

28.     A description of facts showing DOC's provision of access to TTY, CapTel, VRI, and videophone services as required by this Agreement, and data showing their use at each DOC Facility.

29.     A list of: (1) all deaf and hard-of-hearing inmates who have requested permission to use a videophone, CapTel phone, or TTY device; (2) whether their request(s) were approved or denied; and (3) to the extent their request(s) were denied, the reason for the denial.

30.     For each DOC Facility, the name of each deaf or hard-of-hearing inmate authorized to use videophones, CapTel phones, or TTY devices.

31.     The location of the stationary videophone in each DOC Facility, the date it was installed, and a log showing its usage.

32.     The location of each mobile videophone in each DOC Facility; the location of all mobile videophone jacks in each DOC Facility and the date of installation; and a log showing the mobile videophone's usage.

33.     The location where each CapTel phone is stored in each DOC Facility and a log showing its usage.

34.     The location where each TTY device is stored in each DOC Facility and a log showing its usage.

   **E.     In accordance with IX (Visual and Tactile Notifications)**

35.     A report describing any visual/tactile non-emergency notification system(s) that DOC has implemented and the date of implementation.

   **F.     In accordance with X (Training)**

36.     Records regarding each training required by this Agreement, including information regarding attendance and/or completion of the training for each Covered Employee and copies of the training materials and/or content provided.

   **G.     In accordance with XI (Revisions to Relevant DOC Policies in Accordance with this Agreement)**

37.     All hearing-related Requests for Reasonable Accommodation(s) that were denied because the requests were not required under 28 CFR § 35.164, including DOC's written statements of the reasons for reaching that conclusion.

73

H.      **In accordance with XIII (Monitoring and Reporting)**

38.     DOC's annual audit that addresses its compliance with the provisions of this Agreement.

39.     All deaf or hard-of-hearing inmates' grievances and grievance appeals, including medical grievances, alleging facts that would violate the Agreement if true, and all responses, including a description of the resolution of the grievance.

40.     The records of any disciplinary proceedings involving a deaf or hard-of-hearing inmate where the inmate's hearing may have been at issue, including, but not limited to, all disciplinary proceedings concerning a deaf or hard-of-hearing inmate missing count, missing an announced appointment, being out of place, or not responding to orders or announcements.

41.     A description of any time a deaf or hard-of-hearing inmate was denied an opportunity to participate in an inmate work program as a result of his or her hearing loss.