Exhibit D

## EXPERT DECLARATION OF DR. STEVEN CARTER

*Summary of Engagement and Opinion*

1.     I have been requested to render an opinion evaluating whether 1) the Wellpath Guidelines for the Deaf and Hard of Hearing ("Wellpath Guidelines") used by the Massachusetts Department of Correction ("DOC") to help determine whether deaf or hard-of-hearing prisoners may access captioned phones ("CapTel") are an appropriate method of determining which prisoners need access to this service, and 2) whether the DOC's implementation of the Wellpath Guidelines inappropriately prevents prisoners with hearing disabilities who may need CapTel from communicating as effectively by phone as individuals who do not have hearing disabilities.

2.     Specifically, within this opinion, I will explain why the DOC's practice of categorically denying CapTel access to those with less than severe hearing loss is both out of line with clinical practice and an inappropriate way to determine whether they need CapTel for phone communication.

3.     In drafting this opinion, I have reviewed the Wellpath Guidelines for the Deaf and Hard-of-Hearing, declarations of class members Brian Sherman, Daniel LaPlante, Hernan Cruz, John Scott, Jon Bourassa, Nicole Chuminski, Richard Haskins and Terrance Montgomery, their audiology records (where available), DOC's assessments of their hearing accommodations needs, their appeals of DOC's denials of their requests for accommodations, and DOC's decisions on those appeals. I have also reviewed declarations submitted by their friends and family.

4.     I am not being compensated and am providing this opinion on a volunteer basis.

*Professional Background and Qualifications*

5.      I currently hold the title of Adjunct Assistant Professor at Oregon Health and Science University in Portland, Oregon.

6.      In addition, I hold the title of Educational Audiologist at Tucker Maxon School in Portland, Oregon. Tucker Maxon provides a multitude of services for Deaf and hard-of-hearing preschool and elementary services. In both positions, I provide diagnostic testing for individuals (mainly pediatrics) with hearing loss and fit appropriate amplification options (hearing aids, cochlear implants, etc). As part of my clinical practice, I regularly consider whether patients require assisted listening technology, including CapTel.

7.      I earned my undergraduate degree from Arizona State University in Biomedical Sciences, a master's degree in Education from Northern Arizona University, and a doctorate in Audiology from Vanderbilt University. For the last 10 years, Vanderbilt has ranked number one in Best Audiology Programs according to US News & World Report.

*Use of Regular Phones Versus Captioned Phones for Individuals with Hearing Loss*

8.      Traditional telephones can be difficult for individuals with varying degrees of hearing loss for a variety of reasons:

9.      Due to hearing loss, any form of communication, including sound from telephones, is softer and therefore less intelligible.

10.      Bandwidth limitations also result in a reduction in voice quality, which results in a limited frequency range. While the frequency spectrum of a human voice can range from 50 Hz to 8000 Hz, traditional telephones use a range of only 300 Hz to 3400 Hz. This results in certain parts of speech (mainly high frequencies) being compressed or cut out through transmission.

High frequency sounds significantly benefit a person's ability to perceive and understand speech (Monson et al, 2014), especially in the presence of background noise (Plyler et al, 2007).

11.     On traditional phones, a hard-of-hearing user is only able to listen through one ear. In quiet environments, this would not impact speech understanding. However, when background noise is present, the user's other ear will process sounds from the environment around them, interfering with their ability to understand the caller. It is common for individuals using a regular phone to struggle in the presence of background noise as there is only one ear available to hear the conversation and it is common for environmental background noises to reach or exceed levels of a regular telephone. This is exacerbated in prison environments like the DOC, where phones are often located in prison dayrooms, where dozens of conversations may be happening all at once.

12.     Unlike face-to-face communication, there are no visual cues on regular phones to aid speech understanding. Many individuals with hearing loss rely on visual cues to provide clarification. Cues such as eye contact, shifts in gaze, speech reading, contextual cues, and facial expression have been shown to improve the accuracy of consonant recognition in words (Lansing, 2009).

13.     A rudimentary form of captioned phones called Teletypewriters or "TTY" was first introduced via the Public Switch Telephone Network in 1964. With advancements in technology, captioned phones were able to provide people with hearing loss the ability to participate in conversation over the phone. CapTel is a captioned phone company which was first established in 2003. CapTel phones allow users with any amount of hearing ability to read a captioned display of what the other party is saying in real time. Users can read these captions to

provide clarification while speaking back to the other party, allowing for a convenient and natural telephone conversation for individuals with hearing loss.

14.     The declarations submitted by incarcerated class members and their family members demonstrate their difficulties with the regular phone and the benefits of the CapTel.

*The DOC's Application of Threshold Hearing Cutoffs for CapTel Use*

15.     The DOC currently relies on a clinical guideline created by Wellpath, its healthcare contractor, to help determine whether deaf or hard-of-hearing individuals in the DOC should have access to CapTel.

16.     The Wellpath Guidelines lay out levels of hearing deficit that are similar to categories used in the clinical setting: Normal hearing range (0-25 dB), mild hearing loss (26-40 dB), moderate hearing loss (41-55 dB), moderately severe hearing loss (56-70 dB), severe hearing loss (71-90 dB) and profound hearing loss (90 dB and above).

17.     However, the Wellpath Guidelines state that "CapTel and other phone accommodations are generally reserved for the most hard of hearing (71 dB and above)," an opinion which has no support in the medical literature or clinical practice. In my experience, CapTel can often be a helpful or even essential tool for people with lesser degrees of hearing loss.

18.     Based on a review of the documents provided by Plaintiffs, it is my understanding that the DOC relies on the Wellpath Guidelines to deny CapTel access to virtually all hard-of-hearing individuals with hearing loss that is not rated as "severe" or "profound." DOC has also used the Guidelines to revoke CapTel access to individuals who had previously been approved for CapTel use and who had greatly benefitted from it.

19.     It is my understanding that DOC staff complete Disability Accommodations Resource Assessments ("DARA") with hard-of-hearing individuals to determine what accommodations, including CapTel, they should be granted. The DARA asks several questions about the effect of their hearing loss, including whether they can use the traditional phones effectively.

20.     The DARAs demonstrate that DOC staff rely almost exclusively on the 71 dB threshold in the Wellpath Guidelines as a cutoff for CapTel use, without first considering the nuances of the prisoner's hearing loss, including which frequencies they can and cannot hear, and without having a conversation about whether they are unable to effectively use regular phones, due to factors such as environmental noise and use of hearing aids. Such conversations are considered essential in the clinical setting to determine whether deaf or hard of hearing patients require CapTel services.

21.     As a result, both the Wellpath Guidelines and the DOC's implementation of the 71 dB cutoff for CapTel use are out of line with standard clinical practices and fail to effectively consider patients' actual need for CapTel phones as a reasonable accommodation for their disability.

22.     It is my understanding based on a review of the class member declarations that the CapTel devices are louder at their highest volume than the traditional phones and that they have more variable volume settings. Higher and more variable volume settings are a feature common to all CapTel phones.

*The Wellpath Recommendations for Determination of Hearing Loss Category Are Not in Line with Research and Clinical Practice*

23.     Wellpath's hearing loss categories appear to be determined based on Pure Tone Average ("PTA"), which is the average of frequencies of 500, 1000, and 2000 Hz. PTA is

commonly used to determine speech outcomes as it is correlated with speech reception in a no-noise environment (Kim et al, 2016).

24.     In contrast, in ordinary clinical practice, we would not categorize a patient's hearing loss (or make recommendations for accommodations like CapTel) based on PTA alone. One reason is that levels of hearing loss tend to differ at different frequencies. As a result, in clinic, we typically test all frequencies along the speech spectrum (usually 250-8000 Hz), instead of using only a PTA. For example, a patient who has a 30 dB threshold at 500 Hz and 75 dB thresholds at 1000 and 2000 Hz would be categorized as having a mild sloping to severe hearing loss. This patient's PTA (average of these three frequencies) would be 60 dB (moderately-severe hearing loss). Thus, they would be ineligible for CapTel under the Wellpath Guidelines even though a majority of their hearing loss falls within that qualifying severe range.

25.     As mentioned, sloping and rising hearing losses (i.e. hearing losses that have different severities at different thresholds) are often not successfully categorized by PTA alone. Sloping hearing losses (worsening in the higher frequencies) are the most common type of hearing losses due to aging and other factors.

26.     In addition, using PTA to determine eligibility for services requires the individual to be seen for a hearing evaluation at least annually. In clinical settings, an audiologist would not provide recommendations for accommodations based on an audiogram from over a year ago, as the DOC regularly does. Hearing can often change suddenly, and those changes can easily lead to a change in the categorization of the hearing loss. Research has shown that PTA performance in a noisy environment does not correlate with PTA or speech reception in quiet (Killion & Niquette, 2000). Performance will often be worse when there is background noise and will vary based on many factors such as level of background noise (Meyer et al, 2013), familiarity of

conversation partner (Nygaard & Pisoni, 1998), and hearing loss at high frequencies (Hornsby et al, 2011).

27.     This is important to mention because prisoners, including those in the DOC, are typically having conversations in particularly noisy settings like dayrooms. In clinical settings, if an audiologist were addressing a patient's difficulty with phones, the first thing we would ensure is that they have a quiet environment in which to have a conversation, which is often impossible for prisoners. Many individuals in the community use phones in a quiet space in their home. Unfortunately, individuals in prison are not offered that option, making PTA a less relevant tool, as it does not encompass an inmate's true listening environment.

28.     Finally, the Wellpath Guidelines do not recommend speech testing, which is an important part of the clinical test battery that assesses ability to hear and repeat back words. Speech testing is especially necessary when determining access to services like CapTel that are used specifically for speech. For example, when working with patients with difficulty hearing background noise, a clinician might administer a speech test that integrates background noise (Wilson et al, 2007) to allow a clinician to more appropriately determine a patient's ability to hear in noise.

29.     The Wellpath Guidelines do not recommend speech testing, and the DARAs also do not appear to consider the impact of certain types of hearing losses on prisoners' ability to understand speech. The lack of these important inputs makes it especially necessary for the DOC to engage in a conversation with prisoner about their individual challenges and needs, which they do not appear to do.

30.     Ultimately, a threshold cutoff alone does not provide adequate information to appropriately decide accommodations for inmates that may benefit from these services.

*There is No Support for Limiting CapTel Use to Those with Severe to Profound Hearing Losses*

31.     Wellpath does not provide any support in its clinical guidelines for a threshold cutoff for CapTel use, and in fact, there is no support in the literature for limiting CapTel use to those with severe to profound hearing losses.

32.     While difficulty in hearing on the telephone is linearly related to degree of hearing loss, significant numbers of people with mild and moderate hearing loss report great difficulty communicating on the phone and for whom clinicians will recommend CapTel services. Neither the Wellpath Guidelines nor the process by which the DOC is determining who should have access to CapTel consider the nuances in the types of hearing losses within the mild to moderately-severe hearing loss range, including the impact of frequencies.

33.     To outline access to speech, an image of the "speech banana" is shown below. This encompasses where a variety of speech sounds are on average located within the frequency and intensity range for average conversational speech. The x axis shows frequency (from left right goes low to high frequency) and the y axis shows intensity (from top to bottom goes softer to louder).



34.     You will notice here that the speech sounds listed encompass a frequency range of 250-5000 Hz and an intensity range of 20-55 dB HL. Those of us with normal hearing sensitivity have access to all speech sounds. However, individuals with any level of hearing loss (even mild) will easily miss parts of speech, such as words containing "f," "th," and "s."

35.     Pictured below are various audiograms (depictions of hearing loss) that demonstrate different types of hearing losses that might exist. Speech sounds that are below the black line should be audible to the patient, and those above the black line would be considered inaudible. It is worth noting that only the patient on the bottom right ("corner audiogram") has a PTA of greater than 71 dB and would thus be eligible for CapTel under the Wellpath Guidelines. However, patients with the other types of audiogram results would have significant difficulty understanding speech and might well benefit from CapTel.



36.     A majority of patients, including those who DOC might categorize as having mild to moderate hearing loss, fall into the "sloping audiogram" category, meaning they have some audibility of speech sounds in the lower frequencies but miss many high-frequency sounds, making them perform worse on speech perception tasks (Hornsby et al, 2011).

*Addressing those with Hearing Aids*

37.     Properly fit hearing aids can make a significant difference in a hard-of-hearing individual's ability to hear over the telephone. However, using a regular phone is often difficult for people with hearing aids in part because there is often acoustic feedback (ringing/squealing)

because the phone is picking up its own sound. Also, hearing aids are designed to amplify the very environmental noise that interferes with a person's ability to hear, further complicating speech understanding in noisy environments like prison units.

38.     The Wellpath Guidelines state that for those with less severe hearing losses, "some hearing aids supplied by [Lemuel Shattuck Hospital] have an 'autophone' option that is enabled so that individuals can use a regular phone as long as DOC phones are able to connect to amplification devices (most standard phones are)." However, based on my review of the class member declarations, none of the declarants who use hearing aids are able to connect their hearing aids to the phones.

*Other Reasons Given by DOC for Denying CapTel*

39.     There is no evidence that the facility ADA Coordinators took into consideration any of the substantial evidence from individuals about their need for CapTel services. In my clinical practice, it would be my responsibility as a clinician to not only consider the patient's audiogram results, but also to inquire into factors such as whether the patient can hold conversations over the regular phone, whether they rely on captions, or other real-life inputs that should be considered when determining whether CapTel is necessary for effective phone communication.

40.     Instead, the DARA typically notes that the person's request for CapTel will not be granted because it is not "clinically indicated." In other words, because the person does not qualify under the Wellpath Guidelines.

41.     Similarly, the DOC's appeal denials fail to consider the actual needs of the individual prisoner but instead relies on blanket assumptions about their hearing capabilities that have no support in the literature or factual evidence.

42.     For example, each appeal I have reviewed first states that CapTel is not "clinically indicated" according to Wellpath, and then goes on to say that a review of the prisoner's telecommunication use shows that they have "appropriately and effectively used the traditional amplified/hearing aid compatible telephones made available for your use." *See, e.g.*, Declaration of Nicole Chuminski, pp. 13; Declaration of Jon Bourassa, pp. 13. However, the fact that prisoners have no choice but to use the regular phones if they have been denied access to CapTel services does not mean they have effectively used those phones. The declarants report having to time their calls when other prisoners are gone and the unit is quiet; having difficulty understanding the conversation and often having to ask the person they are conversing with to repeat themselves or speak louder and more slowly; making fewer and shorter calls; calling fewer people than they would like, and other difficulties indicating that their ability to use the phone effectively is not equal to that of people who do not have a hearing disability.

*Case Examples*

43.     I have reviewed the declarations of eight class members who were denied use of CapTel services. The following examples highlight how the DOC's application of the Wellpath Guidelines fail to provide adequate accommodations to hard of hearing inmates who would greatly benefit from CapTel. In all cases, the declarants were denied CapTel because it was not "clinically indicated."

44.     **Nicole Chuminski** has been diagnosed with "mild" hearing loss. She relies in part on lip reading and hearing aids in both ears to follow conversation. In 2022, she was granted access to CapTel by DOC staff as a reasonable accommodation. In February of 2023, DOC staff administered a DARA during which Ms. Chuminski explained that she could not use the regular phone effectively due to her hearing loss and that she could only hear a speaker on the regular

phone when her unit is completely quiet. However, DOC denied her access on the basis that her level of hearing loss "does not indicate a need for CapTel," and her appeal was denied on the basis that there is no clinical indication that CapTel is necessary. Even individuals with mild hearing loss can experience difficulty using regular phones, especially where there is significant environmental noise. While hearing aids might help make the regular phones more accessible, Ms. Chuminski reports that she is unable to connect her hearing aid to the regular phones. She found CapTel beneficial for communication both due to the higher volume and captions. The revocation of her access because she had less than severe hearing loss failed to account for the fact the CapTel provided effective access to phone communication while the regular phone cannot.

45.    **Brian Sherman** has been diagnosed with "moderately severe" hearing loss and has relied on hearing aids since before his incarceration in 2010. He was given new hearing aids in early 2023 after his previous ones failed, but reports that they sometimes amplify all environmental noise, which hinders his ability to hear. He states that that his hearing aids cannot be paired with the regular phones and that they only amplify the background noise, making it even harder for him to hear. The phones are also located close to one another in noisy environments, which means that he strains to hear over people on the phone next to him and sound from his unit. It is apparent that Mr. Sherman's hearing loss, paired with the noise of the unit and his inability to use his hearing aids on calls, makes it extremely difficult for him to communicate over the phone. He notes that he often seeks clarification from the speaker, which would be much less of a problem on the CapTel due to the captioning. Like the other declarants, Mr. Sherman informed DOC staff of his inability to use the regular phones, but was nevertheless denied because CapTel was "not clinically indicated."

46.     **Richard Haskins** has been diagnosed with "mild to moderately" severe hearing loss. He relies on hearing aids for communication and often struggles to hear announcements by DOC staff, which has resulted in him missing calls for the medication line. Mr. Haskins relied on the captions and higher volume on the CapTel phones. When he had access to CapTels, he would regularly call his friends and family, many of whom were also helping him prepare for reentry. In 2017, his hearing aids broke, but he did not receive a new set until July of 2023. Although he now has hearing aids, he is unable to connect them to the phones at his facility. Mr. Haskins is 69 years old and it appears that his hearing loss has worsened steadily over time. He also experiences a loud ringing in his ears (tinnitus). Despite his inability to use the regular phone, DOC revoked his access to CapTel in 2023 on the basis that his level of hearing loss did not qualify him for CapTel use. His declaration indicates that he previously benefitted greatly from CapTel and that he requires captioning to follow conversations. His inability to communicate over the phone also appears to be harming his mental health. Assistive listening devices like CapTel were designed to reduce the social isolation that many deaf or hard-of-hearing people experience. It is noteworthy that, during his July 2023 audiology visit, his provider explicitly recommended use of CapTel phone if he continued to have trouble on the regular phone.

47.     **Hernan Cruz** has been diagnosed with "mild" hearing loss and uses hearing aids. He was diagnosed with hearing loss in 2021 and was initially approved for CapTel following this diagnosis. DOC revoked Mr. Cruz's access to CapTel phones in 2023 based on the level of his hearing loss. He reports difficulty with the regular phones, especially due to the background noise of the unit. He has significant difficulty hearing his family members over the phone even when they speak loudly, and the phone is on its highest volume setting. Mr. Cruz states that he often waits until his unit is empty and has had to miss programming or work (and work extra

shifts) because he can only make calls during the day when his unit is quiet. He also notes that

the regular phones do not have an audio jack for headphones, which might block environmental

noise. When Mr. Cruz had access to CapTel, it was much easier for him to communicate because

the CapTel phones were located in a quiet part of the facility and he could read the captions to

follow the speaker. The confluence of Mr. Cruz's hearing loss, inability to use hearing aids or

headphones on the regular phone, and his high noise environment indicate that he will not be

able to effectively communicate over the phone without access to CapTel.

48.     **Daniel LaPlante** has been diagnosed with "moderate" hearing loss and relies on

lip-reading and hearing aids for communication. He was initially approved for CapTel in around

2021 and found that the captions allowed him to fill in words or sentences he had missed during

phone conversations, which allowed him to be more fully engaged in conversations. He reports

that the sound on the CapTel phones was both louder and clearer, which meant that he did not

have to ask his friends and family to repeat themselves as much. In 2023, DOC revoked his

access to CapTel because he did not "meet clinical guidelines" for this service even though he

explained during his assessment that he could not effectively use the regular phone. He appealed,

again explaining that the DOC failed to consider his preferences and needs, but DOC affirmed

the denial. Mr. LaPlante cannot properly communicate over the regular phone because the

conversations and activities in his unit drown out the sound of the speaker. Although he has

hearing aids, he has never been able to pair them with regular phones, and they generally amplify

the noise from the unit, not the speaker. Mr. LaPlante reports that conversations on the regular

phone cause frustration for both him and his loved ones, which has made him feel less connected

to them. His situation demonstrates that the DOC cannot determine which assistive listening

devices are necessary for any given patient using a threshold cutoff. The DOC did not consider

Mr. LaPlante's actual inability to hear over the regular phone or how CapTel has been beneficial to him in the past. It is standard practice for audiologists to ask questions about the context in which they would be making calls when determining whether CapTel is necessary, which the DOC failed to do here.

49.    **Jon Bourassa** has been diagnosed with "moderate" hearing loss and uses hearing aids in both ears. He reports that his hearing loss has worsened over the years. For several years, he relied on CapTel to speak with his family and friends, including his daughters and his friend. As part of his required programming, he is expected to form and stay connected to a support group in the community that will support his treatment and eventual reentry. He states that he relied heavily on captions and the higher volume on the CapTels. In 2023, the DOC revoked Mr. Bourassa's access to CapTel on the basis that there is no clinical indication that he requires CapTel to effectively communicate. Now that he uses the regular phones, he cannot hear over the noise of the dayroom in which the phones are located. As a result, he waits until others in his unit leave for outdoor recreation time. His inability to hear properly over the phone makes it difficult for him to verbalize and express himself, so he makes fewer and shorter calls. He no longer has as much contact with his daughters because they have found it frustrating to communicate with him when he cannot hear them. As noted above, CapTel is one of many assistive devices that were created for deaf or hard-of-hearing individuals to give them access to the telecommunications that are available to hearing people. A threshold cutoff for CapTel use is inappropriate because it does not consider the ways in which CapTel can alleviate the difficulties that patients like Mr. Bourassa experience on the regular phone, especially in high-noise conditions, without hearing aids that be used with the phone.

50. **Terrance Montgomery** has "moderately-severe" hearing loss. He uses hearing aids and was given access to CapTel in 2021. In 2023, DOC revoked his access to CapTel on the basis that his level of hearing loss did not meet clinical requirements even though he explained during his assessment that he cannot use the regular phones and that he relies on the captions on the CapTel to follow conversations. Mr. Montgomery reports that he struggles with the regular phones because the background noise makes it difficult for him to hear. He often asks people to repeat themselves during conversations. He has young children (ages 5 and 8) who he has an especially difficult time hearing (likely due to the high frequency nature of their voices). He reports that when he was using CapTel, the captions would allow him to understand without having to ask people to repeat themselves.

51. **John Scott** is a 63-year-old man who was diagnosed with moderate hearing loss and uses hearing aids. He reports that he is "hopeless" without his hearing aids. Without his hearing aids, sounds are muffled and it is very difficult to understand what people are saying.  He was approved for CapTel use in early 2021; however, DOC revoked his access in 2023 because it was not "medically indicated." When he submitted an appeal, it was denied because his level of hearing loss did not qualify him for CapTel use. Mr. Scott reports that: "CapTel was extremely beneficial to me in communicating with my family. If I couldn't understand something, I would just look at the captions and it would become clear. The conversations were much smoother and less frustrating, allowing us to talk more easily about a variety of topics. This definitely helped with the overall quality of our relationships." Mr. Scott also explains that the phone blocks the microphone on his hearing aids, and that turning up the volume results in a whistling sound. The amplification on the regular phone also reduces voice quality so that it sounds like a "factory loudspeaker." The phones on his block are also close together. In

combination with his hearing loss, the loud environmental noise makes it almost impossible to hear his loved ones. He states that he now restricts his telephone calls to Sundays or times when his unit is quiet; however, this often means he misses important family members as they are not able to pick up at those He does not speak to his children or grandson as much because it too difficult to hold a conversation.

*Conclusion*

52.     In my professional opinion, the DOC is denying CapTel services based solely on threshold levels of hearing loss set forth in the Wellpath Guidelines, inappropriately restricting CapTel services to those with severe or profound hearing loss. Threshold cutoffs are not supported by research or clinical practice and should not be the basis for the denial of essential accommodations or services. The use of threshold cutoffs does not address the many complexities of hearing loss and the increased difficulty of speech perception over the telephone, especially in an environment with significant background noise.

53.     Based on my review of the class member Declarations and the associated DOC documents, there is substantial evidence that many hard-of-hearing individuals in DOC custody with mild or moderate hearing loss have struggled significantly to use traditional telephones and would greatly benefit from access to CapTel. In my professional judgment, it is important to have an in-depth conversation with the patient to evaluate the need for CapTel. Although even the Wellpath Guidelines suggest that DOC should conduct such conversations, the Declarations and DOC documents suggest the DARA reviews are perfunctory, with the decision based entirely on the degree of hearing loss shown by the audiogram. As a result of its reliance on the Guidelines, DOC is denying individuals with a hearing disability the accommodations they need

to have substantially equal access to the telephone services it provides to prisoners who do not have hearing loss.

*References:*

Hornsby, Benjamin WY, Earl E. Johnson, and Erin Picou. "Effects of degree and configuration of hearing loss on the contribution of high-and low-frequency speech information to bilateral speech understanding." Ear and hearing 32.5 (2011): 543.

Killion, Mead C., and Patricia A. Niquette. "What can the pure-tone audiogram tell us about a patient's SNR loss?." The Hearing Journal 53.3 (2000): 46-48.

Kim, Jeong Min, et al. "The best-matched pure tone average and speech recognition threshold for different audiometric configurations." Korean Journal of Otorhinolaryngology-Head and Neck Surgery 59.10 (2016): 725-729.

Lansing CR. Visual speech perception in spoken language understanding. Adult Audiologic Rehabilitation. San Diego: Plural Publishing (2009):Chapter 11.

Meyer, Julien, Laure Dentel, and Fanny Meunier. "Speech recognition in natural background noise." PloS One 8.11 (2013): e79279.

Nygaard, Lynne C., and David B. Pisoni. "Talker-specific learning in speech perception." Perception & Psychophysics 60.3 (1998): 355-376.

Monson, Brian B., et al. "The perceptual significance of high-frequency energy in the human voice." Frontiers in Psychology 5 (2014): 587.

Plyler, Patrick N., et al. "Contribution of high-frequency information to the acceptance of background noise in listeners with normal and impaired hearing." American Journal of Audiology 16.2 (2007):149-56.

Wilson, Richard H., Rachel A. McArdle, and Sherri L. Smith. "An evaluation of the BKB-SIN, HINT, QuickSIN, and WIN materials on listeners with normal hearing and listeners with hearing loss." Journal of Speech, Language, and Hearing Research, 50 (2007): 844-56.

# STEVEN CARTER, AU.D, CCC-A

sccarter99@gmail.com • c: 602-499-2899

## Education

| **Doctor of Audiology** | ***Graduation Date: May 2019*** |
|---|---|
| Vanderbilt University | Cumulative GPA: 3.91 |
| Specialty Track: Vestibular Sciences | |
| **Master of Education** | ***Graduation Date: July 2015*** |
| Northern Arizona University | Cumulative GPA: 4.00 |
| **Bachelor of Science: Biological Sciences (Animal Physiology and Behavior)** | ***Graduation Date: May 2013*** |
| **Bachelor of Science: Psychology** | |
| Barrett, the Honors College, Arizona State University | Cumulative GPA: 3.67 |
| Magna Cum Laude, Dean's List, President's Scholar | |

## Clinical Experience

| **Educational Audiologist, Tucker Maxon School (Portland, OR)** | **August 2022 – Present** |
|---|---|

- Primary audiologist for all D/HH preschool and elementary students, as well as infants and toddlers in EI program
- Perform hearing evaluations, fitting/management of various devices (hearing aids, cochlear implants, BAHAs), classroom equipment management (FM/DM systems), and IEP/IFSP documentation/meetings
- Operate as a pediatric private practice for newborn hearing screenings, diagnostic Auditory Brainstem Response (ABR) testing, hearing evaluations, and fitting/management of hearing devices

| **Adjunct Asst. Professor, OHSU Child Development and Rehabilitation Center (Portland, OR)** | **January 2020 – Present** |
|---|---|

- Part-time coverage-based position within Dorenbecher Children's Hospital
- Perform hearing evaluations through a variety of specialized clinics (Autism, Down Syndrome, Craniofacial, etc)
- Occasional device troubleshooting and follow-up care

| **Clinical Audiologist, Oregon Hearing Solutions (Sherwood, OR)** | **August 2019 – Present** |
|---|---|

- Perform compensation and pension (C&P) evaluations for Veterans applying for services related to hearing loss
- Occasional hearing aid and accessory troubleshooting and follow-up care

| **Educational Audiologist, Willamette Education Service District (Salem & McMinnville, OR)** | **August 2019 – July 2022** |
|---|---|

- Manage a caseload of ~100 Deaf/Hard-of-Hearing students within Marion and Yamhill counties
- Provide Early Intervention (EI) and Early Childhood Special Education (ECSE) services to ~20 infants/toddlers
- Perform hearing evaluations, fitting/management of various devices (hearing aids, BAHAs), classroom equipment management (FM/DM systems), and IEP/IFSP documentation/meetings

| **LEND Audiology Fellow, Oregon Health and Sciences University (Portland, OR)** | **August 2018 – July 2019** |
|---|---|

- 6 months with Children's Hospital: pediatric hearing evaluations, ABR testing (sedated and natural sleep), BAHA fitting and follow-up, newborn hearing screenings
- 6 months with Otolaryngology department: adult and pediatric hearing evaluations, cochlear implant evaluations and programming, hearing aid fitting and follow-up, vestibular evaluations
- LEND Fellowship: interdisciplinary collaboration, weekly lectures, various research and community projects

| **Audiology Student, Vanderbilt Bill Wilkerson Center (Nashville, TN)** | **August 2015 – May 2018** |
|---|---|

- Various clinical rotations within pediatrics and adults, including hearing evaluations, hearing aid/BAHA fitting and follow-up, cochlear implant evaluation and programming, and vestibular evaluations

## Professional Participation

### Presentations

- "School Based Services: ESDs, Practice Areas, and the Medical Model" – Oregon LEND, Portland OR (April 2020, 2021, 2022, 2023)
- "How to Interpret an Audiogram" – Oregon Early Intervention (EI) Meeting (April 2022)
- "FM Equipment Basics and Troubleshooting" – WESD All-Staff Meeting (March 2021)
- "Clinical Applications for Wideband Acoustic Immittance" – Audiology Grand Rounds, OHSU, Portland OR (September 2018)
- "Audiologic and Vestibular Considerations for Children with EVA" – TAASLP Conference, Knoxville TN (November 2017)
- "Sound Localization Under Virtual Reality" – Vanderbilt University, Nashville TN (August 2017)
- "Vestibular Findings in Children with Enlarged Vestibular Aqueduct" – Mayo Clinic, Scottsdale AZ (May 2017)

### Posters

- "Case Study of Pediatric Cochlear Implant Patients with Single-Sided Deafness" – ACIA Conference, Miami FL (July 2019)
- "Audit of NBHS Results: How Can We Improve Accuracy in Electronic Reporting?" – EHDI Conference, Chicago IL (March 2019)
- "Wideband Acoustic Immittance in Children with Enlarged Vestibular Aqueduct" – AAS Conference, Scottsdale AZ (February 2019)
- "Assessment of Spatial Hearing Using Virtual Reality" – AAA Conference, Nashville TN (April 2018)
- "Sound Localization Under Virtual Reality" – AAS Conference, Scottsdale AZ (February 2018)

Signed under pains and penalties of perjury.

Dated: November 18, 2023

_____
Dr. Steven Carter