Exhibit T

# Fifth Report

# of the Settlement Monitor

January 26. 2023

*Briggs, et al. v. Massachusetts Department of Corrections, et al.*

C.A. No. 1:15-cv-40162-GAO-JGD

E. Elaine Gardner
Settlement Monitor
Elaine.Gardner.esq@gmail.com
(202) 681-2559

I.  EXECUTIVE SUMMARY                                                                                        6

II.  ANALYSIS OF DOC 2022 PRODUCTIONS                                                                        8

    A.  DOC and institutional policies and procedures (Item 01)                                          8

        1.  DOC Policies                                                                              8

        2.  Policies of Individual Institutions (Item 01 of 2022 Productions)                          9

            a)  Boston Pre-Release Center (BPRC)                                                    9

            b)  Bridgewater State Hospital (BSH)                                                    10

            c)  Lemuel Shattuck Hospital (LSH)                                                       11

            d)  MCI Cedar Junction (MCI-CJ)                                                          13

            e)  MCI Concord (MCI-CON)                                                                15

            f)  MCI Framingham (MCI-FRAM)                                                            16

            g)  MCI Norfolk                                                                          17

            h)  MCI Shirley (MCI-SHI)                                                                19

            i)  Massachusetts Treatment Center (MTC)                                                 22

            j)  North Central Correctional Institution (NCCI)                                        23

            k)  Northeastern Correctional Center (NECC)                                              24

            l)  Old Colony Correctional Center (OCCC)                                                24

            m)  Pondville Correctional Center                                                        25

            n)  Souza Baranowski Correctional Center (SBCC)                                          25

            o)  South Middlesex Correctional Center (SMCC)                                           26

    B.  Information on Deaf and Hard-of-Hearing Prisoners in DOC Custody (Item 02)                      27

    C.  A List of All Deaf and Hard-of-Hearing Inmates in DOC Custody and the Facility
        Where Each is Housed (Item 03)                                                           27

    D.  IMS Files for Each Deaf and Hard-of-Hearing Inmate (Item 4)                                    28

    E.  Institutional ADA Coordinators' Monthly Records (Item 5)                                      29

    F.  Self Evaluation and Compliance Plans for Each Institution (Item 6)                            33

        1.  Boston Pre-Release Center (BPRC)                                                        34

        2.  Bridgewater State Hospital (BSH)                                                         34

3.   Lemuel Shattuck Hospital (LSH)                                     35

4.   Massachusetts Treatment Center (MATC)                             36

5.   MASAC @ Plymouth (MASAC)                                          37

6.   MCI-Cedar Junction (MCI-CJ)                                       37

7.   MCI-Concord (MCI-CON)                                             37

8.   MCI-Framingham (MCI-FRAM)                                         38

9.   MCI-Norfolk (MCI-NOR)                                             38

10.  MCI-Shirley (MCI-SHI)                                             39

11.  North Central Correctional Center (NCCC)                          39

12.  Northeastern Correctional Center  (NECC)                          39

13.  Old Colony Correctional Center (OCCC)                             40

14.  Pondville Correctional Center (POND)                              40

15.  Souza Baranowski Correctional Center                              41

G.   Audits by DOC of its Medical Provider  (Item 7)                   41

H.   List of Prisoners Transferred, and Prisoners Granted or Denied Accommodations
     Relating to Their Hearing Loss (Items 8 - 13)                     42

I.   List of ADA Coordinators (Item 14)                               42

J.   Written Records of Individual Assessment Meetings to Request Reasonable
     Accommodations (Item 15)                                          42

K.   Written Records of Other Scheduled Meetings to Request Reasonable Accommodations
     (Item 16)                                                         46

L.   Minutes of ADA Meetings (Item 17)                                 47

M.   Monthly Data on Wellpath Hearing Screenings and Results (Item 18)  56

N.   Wellpath Guidelines to Determine Whether to Approve an Order for an Audiological
     Consult or its Recommendation for Hearing Aids or Other Devices  (Item 19)  58

O.   Wellpath Interpreter Provision (Item 20)                         61

P.   Notifications to Volunteer Organizations (Item 21)               62

Q.   DOC Provision of Sign Language Interpreter Services (Item 22-24)  63

R.   Sign Language Users Program Participation (Items 25-27)          63

| | | | |
|---|---|---|---|
| S. | Access to Telephone Services  (Items 28-34) | | 64 |
| T. | Visual/Tactile Non-Emergency Notification Systems  (Item 35) | | 89 |
| U. | Trainings (Item 36) | | 93 |
| V. | Denials of Accommodations (Item 37) | | 94 |
| W. | Annual Audit (Item 38) | | 94 |
| X. | Grievances and Appeals (Item 39) | | 95 |
| Y. | Disciplinary Proceedings (Item 40) | | 103 |
| Z. | Denial of Opportunity for Inmate Work Programs | | 117 |
| III. | DECEMBER 2022 MONITORING ASSESSMENT VISITS | | 118 |
| A. | Overview of Monitoring Assessment Visits | | 118 |
| B. | MCI Norfolk | | 119 |
| | 1. | CapTel Wait Times and Protocols as Non-Compliant with Settlement | 119 |
| | 2. | New Reasonable Accommodations Assessment Reliance on the Prisoner's Audiometric Pure Tone Average and Decibel Loss | 121 |
| | 3. | Timely Provision of Effective Hearing Aids | 122 |
| | 4. | Other Concerns | 123 |
| C. | MCI Shirley | | 123 |
| | 1. | CapTel Wait Times and Protocols as Non-Compliant with Settlement | 123 |
| | 2. | New Reasonable Accommodations Assessment Reliance on the Prisoner's Audiometric Pure Tone Average and Decibel Loss | 125 |
| | 3. | Timely Provision of Effective Hearing Aids | 126 |
| D. | NCCI | | 127 |
| | 1. | CapTel Wait Times and Protocols as Non-Compliant with Settlement | 127 |
| | 2. | New Reasonable Accommodations Assessment Reliance on the Prisoner's Audiometric Pure Tone Average and Decibel Loss | 127 |
| | 3. | Timely Provision of Effective Hearing Aids | 128 |
| | 4. | Other Concerns | 129 |
| E. | MCI Concord | | 130 |
| | 1. | CapTel Wait Times and Protocols as Non-Compliant with Settlement | 130 |

2. New Reasonable Accommodations Assessment Reliance on the Prisoner's Audiometric Pure Tone Average and Decibel Loss ............ 132

3. Timely Provision of Effective Hearing Aids ............ 132

4. Other Concerns ............ 133

F. MCI Framingham ............ 133

1. CapTel Wait Times and Protocols as Non-Compliant with Settlement ............ 133

2. New Reasonable Accommodations Assessment Reliance on the Prisoner's Audiometric Pure Tone Average and Decibel Loss ............ 134

3. Timely Provision of Effective Hearing Aids ............ 134

4. Other Concerns ............ 135

F. Exit Interview ............ 135

IV. PRISONER REPORTS OF COMPLIANCE CONCERNS ............ 139

A. Telecommunication Concerns ............ 139

B. Hearing Aid Assessment and Provision ............ 140

C. Visual and Tactile Notices ............ 140

V. SUMMARY AND CONCLUSION ............ 141

A. Compliance with Settlement's Requirements for Determination of Appropriate Hearing-Related Auxiliary Aids and Services. ............ 141

B. Compliance with Telecommunication Requirements of Settlement Agreement ............ 142

B. Compliance with Notification Requirements of Settlement Agreement ............ 143

C. Compliance with Contract Medical Provider Requirements of Settlement Agreement ............ 144

D. Consistency of Institutional Policies with Related Department Policies ............ 145

E. Conclusion ............ 145

APPENDIX A:  FIFTH MONITOR REPORT RECOMMENDATIONS ............ 147

APPENDIX B:  NORFOLK 2022 SITE VISIT COMPLIANCE CHECKLIST ............ 149

APPENDIX C:  SHIRLEY 2022 SITE VISIT COMPLIANCE CHECKLIST ............ 157

APPENDIX D:  NCCI 2022 SITE VISIT COMPLIANCE CHECKLIST ............ 165

APPENDIX E:  MCI CONCORD 2022 SITE VISIT COMPLIANCE CHECK LIST ............ 173

APPENDIX F:  MCI FRAMINGHAM 2022 SITE VISIT COMPLIANCE CHECK LIST ............ 181

## I.   EXECUTIVE SUMMARY

Pursuant to the Settlement Agreement in Briggs et al. v. Massachusetts Department of Corrections, et al., this is the Fifth Report of the Settlement Monitor to the parties concerning the status of compliance with the Settlement Agreement.  The Settlement Agreement governs how the Massachusetts Department of Corrections ("Department" or DOC) deals with prisoners who are deaf or hard-of-hearing.  Section XIII(C) of the Settlement Agreement requires that the Settlement Monitor issue bi-annual written reports on DOC's efforts to meet the terms of this Agreement, which may include additional advice, suggestions or proposals as the Monitor deems appropriate. The Settlement requires these reports be issued in conjunction with the Settlement Monitor's visits to DOC facilities, specifically within thirty days from the completion of such visits and associated delivery by DOC of any documents requested by the Monitor at the visit.

This Fifth Report covers the twelve months since the Fourth Report of the Settlement Monitor (Fourth Report) was issued on January 21, 2022.  It is based on three document productions by DOC (March, August and November 2022, Fifth, Sixth and Seventh Productions), evaluations made during monitoring assessment visits to five DOC institutions in December, 2022, and direct reports of compliance concerns from individual prisoners.  In addition, the Report reflects clarifications and comments made by the parties to a Review Draft of the Report.  The Monitor intends this Report to serve three primary goals: 1) assess, measure, and determine progress toward partial and substantial compliance with all provisions of the Settlement Agreement; 2) assess compliance progress relative to the earlier Reports and their Recommendations; and 3) as a tool to assist DOC officials in developing action plans to systematically develop, prioritize, implement, and evaluate policies, procedures, and administrative and operational changes and improvements that ensure consistent substantial compliance with the Agreement and the provision of compliant care and custody of prisoners incarcerated at DOC facilities.

The Department has made some improvements in another difficult year.  Provision of hearing aids and vibrating watches continue to help many prisoners participate more fully in the

life of their institutions, although some prisoners continue to experience serious difficulties and delays in securing operable hearing aids.  The availability of accessible telephone devices could serve to be of great assistance to prisoners' ability to stay in touch with their families and friends, especially in another year of restrictions on visitations.  However, as noted below, access to CapTel devices in most institutions falls far short of other prisoners' telephone access.[1]  The Department's two staff sign language interpreters continued to make its programs more readily available to those prisoners who use sign language, but now that one has resigned the vacancy is felt deeply by sign language dependent prisoners.  Rollout of pager systems has been very well received by the prisoners who have been granted this accommodation, although some concerns have been expressed.[2]

A very serious recent concern has arisen recently, with the pager rollout.  The Department of Corrections (Department) has begun Prisoners have been reassessed for the need for reasonable accommodations, including the pager system.  In many cases, in addition to being found ineligible for the accommodation of a pager, these prisoners' previously granted accommodations such as CapTel services are being withdrawn, despite their continued need and expressed preference for those accommodations.  These accommodation denials seem to be totally based upon the decibel hearing loss of the prisoner, without regard to the prisoner's expressed preferences or other factors.

Significant areas require improvement, therefore, in order to meet the requirements of the Settlement.  First, access to CapTel devices is insufficient, due to the relatively small number of the devices compared to the number of approved users in these institutions, the lack of any systematic and fair means of ensuring access to all of these users, and audio quality issues of the devices themselves.  Second, delays remain in assessment for, provision and repair of  hearing

---

[1] This is particularly true in those institutions that impose waiting list or appointment requirements for the use of CapTel devices. *See* below, and Fourth Monitor Report, Recommendation 1.  The practice of locking the cages securing the CapTel device while the prisoner is using the phone also impairs equivalency of access, as the prisoner is unable to redial dropped calls or place a second call without an officer's assistance.  *See* below at Section II.S and Recommendation 10.

[2] Prisoners who have been issued pagers have criticized officer inconsistency in issuing alerts, as well as burdensome securement requirements placed on pager users by some institutions.  These pager issues are discussed below, and in Comments of Plaintiffs' Counsel to the Monitor's draft Fifth Report (Plaintiffs' Fifth Report Comments).

aids.  Finally, while the roll out of pagers for prisoners with hearing loss in some institutions has improved the issues of inaccessible non-emergency announcements for some, serious issues have arisen in the Department's implementation of this accommodation and subsequent accommodation denials.[3]

Throughout the following discussions of the Department's production, the monitoring assessment visits of five institutions, and concerns expressed by individual prisoners, these and other concerns will be examined, and recommendations extended to assist the Department of approaching a more complete compliance with the Settlement terms.

## II.  ANALYSIS OF DOC 2022 PRODUCTIONS

On March 4, August 11, and November 1, 2022, DOC produced files and documents responsive to its production obligations under Section XIII.B and Appendix A of the Settlement Agreement  (5th, 6th and 7th Productions).  Below are the Monitor's comments and appraisals of the information and documents provided in these 2022 Productions.

### A.     DOC and institutional policies and procedures (Item 01)

#### 1.  DOC Policies

No Department-wide policies or procedures were produced in any of the 2022 Productions.  The Department's cover letter to its March 2022 production (March 2022 Cover Letter) states that the 103 DOC 408, Reasonable Accommodations Policy and the 103 DOC 401 Booking and Admissions Policy were presently being revised and would be provided when finalized.

The Monitor has recommended revisions to DOC Policies which have not been implemented.  The Fourth Report recommended revision to the Department's DOC 482 Standard Operating Procedure (482 SOP).  The Fourth Report recognized that a number of institutions had adopted a reservation system for use of the CapTel devices that resulted in limitations to

---

[3] The Department's recent Disability Accommodation Resource Assessments of class members, to determine whether they meet the requirements of the new Wellpath Guidelines for the Deaf and Hard of Hearing for issuance of accommodations, has resulted  in revocation of accommodations for many class members.  The use of these audiometric Guidelines by the Department without consideration of other factors, including the expressed preference of the individual with a disability, can result in violations of the Settlement and federal law.  *See* below at Section II.N.

Pages Omitted

### N.    Wellpath Guidelines to Determine Whether to Approve an Order for an Audiological Consult or its Recommendation for Hearing Aids or Other Devices  (Item 19)

In response to this Item in the March 2022 Production, the Department states, in its Production Cover Letter, that it has no new documents to provide on this Item.  No information is provided as to any actions taken on **Recommendation 9 of the Monitor's Third Report**. That Recommendation urged that Wellpath provide an opportunity for each individual for whom Wellpath provides an Audicus hearing aid to meet with a trained Wellpath medical provider to discuss the use and care of the hearing aid(s), and provide the individual with a copy of the Audicus Guide for a Successful Hearing Aid Experience at that meeting. *See* **Recommendation 9 of the Monitor's Third Report**.

Also unanswered was the Monitor's question regarding specific Wellpath guidelines for the use of speech discrimination testing in its decisions to prescribe hearing aids.  *See* **Recommendation 10 of the Monitor's Third Report**.

The August 2022 Production responsive to this Item provides a document entitled "Wellpath Guidelines for the Deaf and Hard of Hearing," which notes a revision date of January 26, 2022.  The document outlines Wellpath's guidelines for its site-based hearing loss testing, including use of the Audicus platform following a medical exam and whisper test.  It notes that some prisoners can be referred to the LSH Audiology Clinic, but does not provide guidelines as to which prisoners will be referred to that clinic.

The most salient section of these Guidelines, however, is their discussion of Levels of Hearing Deficit and Treatment Considerations regarding the issuance of reasonable accommodations, discussed above. The Guidelines make clear that Wellpath has determined that it will use decibel loss as determinative of the need for accommodations, notably use of CapTel phones and issuance of pagers.  The Guidelines limit recommendation for pagers to those with severe (71-90 dB) to profound (90 dB and greater) hearing loss.  Recommendation for CapTel phone use is limited to the same individuals with severe to profound loss.

These Guidelines are troubling and unclear.   First, no indication is made as to whether the recommendations refer to individuals with bilateral hearing loss at the recommended level, or who have such a loss in only one ear.  In addition, the guidelines do not indicate whether the recommendations refer to corrected or uncorrected hearing loss.

More importantly, however, the Guidelines conflict with the Settlement and federal law. They are not in keeping with Section IV.D of the Settlement, which requires primary consideration to the accommodation preference expressed by the inmate, and precludes decisions based solely on threshold levels of hearing loss.

They also conflict with the Americans with Disabilities Act guidelines established by the U.S. Department of Justice.  Federal agencies have repeatedly rejected the use of numerical audiological tests to determine whether an individual with hearing loss requires a certain auxiliary aid or accommodation.  This is because an individual's mild decibel loss may not reflect a serious neurological inability to discriminate speech, or to react to certain pitched sounds.  These Wellpath guidelines seem to indicate that decibel loss alone will determine an individual's need to use captioned telephone services or pagers.  However, as the FCC has noted, in respect to use of captioned telephones:

> . . . the extent to which an individual's hearing loss affects that person's ability to understand telephonic speech —and, therefore, necessitates the use of IP CTS to communicate by phone—can depend on a number of factors, including the individual's specific decibel levels of hearing loss <u>as affected by different sound frequencies, environmental and background noises, and device distortion</u>.  This suggests that <u>an effective assessment of an individual's need for IP CTS should be based on a more specific evaluation than a generalized hearing test or a previously recorded audiogram</u>.[21]

Moreover as discussed above, entities with obligations under the Americans with Disabilities Act Title II regulations, such as the Department, are required to give primary consideration to the choice of aid or service requested by the person who has a communication

---

[21] *MISUSE OF INTERNET PROTOCOL (IP) CAPTIONED TELEPHONE SERVICE; TELECOMMUNICATIONS RELAY SERVICES AND SPEECH-TO-SPEECH SERVICES FOR INDIVIDUALS WITH HEARING AND SPEECH DISABILITIES,* 33 FCC RCD 5800 (9) (2018) <u>at 188</u> (emphasis added, footnotes omitted).

disability.[22]  The state or local government must honor the person's choice, unless it can demonstrate that another equally effective means of communication is available, or that the use of the means chosen would result in a fundamental alteration or in an undue burden.[23]  The Department of Justice explains that it is important to consult with the individual to determine the most appropriate auxiliary aid or service, because the individual with a disability is most familiar with his or her disability and is in the best position to determine what type of aid or service will be effective.[24]  To ensure that appropriate accommodations are provided to individuals with disabilities in the Department's institutions, therefore, the Monitor urges adoption of its **Recommendation 1 to this Report**, above.

The November 2022 Production for this Item consisted of a document entitled, "Wellpath Deaf/HOH Site Guidelines" DOC_Briggs_AppendixA_07-001980.  The guidelines for each Wellpath site include:

- Availability of pocket talkers while hearing aids are pending;

- Requests for hearing tests should be screened by nurse and then referred for HEENT exam and whisper test;

- If recommended, refer to Audicus or LSH Audiology;

- Designated staff trained on Audicus testing, which should be completed in less than 7 days;

- Best practice to have designated medical provider meet with patients to issue hearing devices;

- Education should be provided to patient being issued hearing aids and documented;

- Staff should be familiar with all repair services: Audicus, LSH and list of repair providers previously distributed;

---

[22] 28 C.F.R. Part 35.160(b)(2).

[23] *See* Title II Technical Assistance Manual II-7.1100.

[24] *Id.*

- Designated staff to track testing and issuance of hearing aids;

- Do not take amplification device from patient unless it is replaced with hearing aids or compelling reason is documented.

## O.    Wellpath Interpreter Provision (Item 20)

The Department's March 2022 Production at Item 20 has provided information on Wellpath's provision of  VRI sign language interpreters to prisoners.  The information on VRI provision notes four assignments during October and November, 2021.

The August 2022 Production response to Item 20 is a February 28, 2022 invoice on which the only un-redacted item is a February 17 Virtual VRI invoice for "community interpreting" for Louis Markham by interpreter Ryan.  It is unclear from the invoice whether this reflects the provision of virtual or on-site interpreter services.

The November 2022 Production response is a document entitled VRI ASL Interpretation Appointment from May - August 31, DOC_Briggs_AppendixA_07-001981.  It lists eight appointments for Video Remote ASL interpreting.  No on-site interpreter services are noted.

The issue of provision of on-site ASL interpreter services for provision of medical services in some situations has arisen during the course of this year, and remains to be clearly resolved.  *See* Letter of Compliance Concerns from Tatum Pritchard to Timothy Pomarole *et al.*, September 2, 2022, at 10-11.  It bears noting that the Department bears the ultimate responsibility, as an ADA Title II entity, to ensure that effective communication is provided. The U.S. Department of Justice has made clear that Title II entities have an obligation to ensure effective communication, and cannot limit provision of sign language interpretation to video remote interpreting in situations where it does not result in the requisite effective communication.  Its states:

> VRI will not be effective in all circumstances. For example, it will not be effective if the person who needs the interpreter has difficulty seeing the screen (either because of vision loss or

Pages Omitted

- MASAC: the CapTel was moved to the security office
- MCI-CON has four CapTels that have either been returned for replacement or are offline awaiting replacement, in BAU, HSU, L-2 and J-7 Visiting (Left).  This leaves only three operational CapTels in J-1, SAU, and J-7 Visiting (Right).
- MCI-NOR reports six operational CapTels: five in OIC First Floor and one in RHU Non-Contact Visiting Area.  It reports two others are broken and have been returned.
- MTC now has eight, rather than the previous 9, active CapTels.  There is now an active CapTel in Charlie 2.  But there is no longer an active CapTel in Charlie 1 or Delta 1.
- NCCI no longer has a CapTel in F-2, but has added one in BAU.  Also the CapTel located in B-1 is "with maintenance".
- OCCC has moved one of its four CapTels from Newmans to BAU.
- PONDVILLE has moved one of its two CapTels from Classification to outside the Shift Commander's office.
- SBCC has increased its number of CapTels from 7 to 10.  It has removed CapTels from SRHU, L-2 and N-2, but now has CapTels in J-2, STP/SBAU, P-1, HSU, H-1 and K-1.

It is concerning that the number of CapTel devices has not increased proportionately to the number of approved CapTel users, and has in fact decreased in several of the institutions.

## T.   Visual/Tactile Non-Emergency Notification Systems  (Item 35)

Item 35 requires a report describing any visual/tactile non-emergency notification system(s) that DO has implemented and the date of implementation.  The Production Cover Letter refers to responsive documents in the Item 35 file folder and the post orders contained in the Item 01 file folder.

**Vibrating Watches**   In response to the production requirements of Settlement Appendix A, Item 35, in its March 2022 Production the Department has produced a database of 489 inmates in each Institution who have been given vibrating watches.  In the August 2022 Production, the Department produced a database of the same number of inmates, presumably the same database as provided in March.  As changes and additional watches certainly were

distributed since that time, this production would appear to be non-responsive. The November 2022 Production provided a table in PDF format of approximately 575 prisoners.[29]

Minutes from the ADA Committee Meetings provided in the August 2022 Production indicate that prisoners are suspected of breaking the watches.  The April 2022 minutes announce a new policy that, if a watch is broken or not working, an incident report needs to be created along with a photograph of the broken watch.  If the watch was broken intentionally a D-Report will be issued.  The policy, however, has not been produced.  The November 2022 Production ADA Committee Meeting notes indicate, however, that in fact the earlier watches were of a lower quality, and that new watches (TICCI 8) were more resilient. (July 13, 2022 Minutes).  The Department had 250 of these watches, according to the most recent production (August 24, 2022 Minutes).

Given the fact that the older watches were admittedly of a lower quality, it is concerning that the policy discussed in the April 2022 minutes requires an incident report and presumably an investigation as to whether an inoperative watch was broken intentionally.  Unless there is proof of intentional destruction, this policy could lead to unwarranted disciplinary action, which in turn could deter prisoners from accepting this important accommodation.

> **Recommendation 12.  Review the Department policy referred to in the ADA Committee Meeting April 2022 minutes relating to replacement of vibrating watches, and revise the policy to ensure that disciplinary tickets for intentional breakage of vibrating watches are not issued without clear proof of such intentional action.  Produce the original and revised policies with the next scheduled production.**

**In-Person Notification Post Orders**   As noted above, at Section II.A.2 of this Report, the Institutions have adopted Post Orders that require that any oral announcements be made in person to inmates who have been identified as Deaf or Hard-of-Hearing, and that it is the

---

[29] The Production from a year earlier, November 2021, in Item 35 indicated that 438 watches had been distributed as of the date of that production.

responsibility of the Unit Officers to provide in person pertinent information to the deaf or hard-of-hearing inmate for information on orally announced events including Chow Time, Movement, Count, Medication, Lock In, and Appointments.  The new Post Orders also require that Unit Officers make a notation in the proper IMS log upon completion of notification.

The Monitor did not see many such notations in the produced IMS materials in the earlier 2022 Document Productions, but the November 2022 Production did provide this information for some institutions.  As noted in the Fourth Report, Correctional Officers at the Monitor institutional visits in November 2021 appeared to be uninformed of the Post Order Addendum.

Moreover, prisoners continue to express frustration at the lack of in-person notifications. Recently, the Monitor received complaints from prisoners who are not receiving these notifications, and nonetheless have been denied pagers.  A prisoner at MCI Norfolk complained in November 2022 that he does not know when movement or chow or other announcements are made because he is on the third floor, and the announcements are not loud enough for him to hear and no officer comes to alert him.  An OCCC prisoner complained in November 2022 that when his cell door is closed he cannot hear any announcements.   He states that he never hears bed call and misses count if it is not held at the usual time.  The August 2022 production of grievances reported that in March, 2022, prisoner Franklin ABERNATHY in Pondville received a disciplinary report for not standing count when he was not informed and did not hear the announcement.  This report was deemed non-grievable and referred to the Superintendent. Other concerns regarding this issue were raised during the Monitor Visit interviews of prisoners, below.

Another concern regarding in-person notifications has been expressed due to the new Post Orders requiring these notifications.  In July 2022, a prisoner at MCI Concord expressed concern that due to the new order, correctional officers told him that they want to move him and all other class members to one area, to reduce the number of areas they need to walk to for in-person notifications.  He refused, because he wanted to stay at his current hall, but was concerned he would receive disciplinary action due to his refusal.

Ensuring that correctional officers understand their obligation to provide an in-person alert to deaf and heard-of-hearing prisoners personally of broadcasted or other oral

announcements will continue to be of critical importance even after the roll-out of a pager system. The Department has indicated that it intends to limit distribution of pagers to only those prisoners with severe to profound hearing loss.  That the Department is in fact implementing this intent has been borne out by reports from prisoners in various institutions who, despite significant hearing loss, have been denied pager equipment.

Given the consistent complaints of failures of correctional staff to notify inmates of announcements and activities, and the delay and deficiencies of successful implementation of the pager system, it is critical to ensure distribution of the September Post Order throughout staff in all the Department's institutions.  Moreover, to ensure compliance with the September Post Order on in-person notifications, the Monitor urges the Department to provide the training on this Order as recommended in the **Fourth Report, Recommendation 14:**

> **Fourth Report Recommendation 14.  Immediately develop and implement a training program for all correctional officers and substitute officers to ensure that they understand fully their obligation under the September 2021 Post Order and the Settlement to alert deaf and hard-of-hearing prisoners personally of any and all notices which are broadcast via the loudspeaker, alert sounds, or informally by oral announcement.  Ensure that training emphasizes that this obligation currently requires an officer to provide an individual, face-to-face notice to the prisoner, which obligation is not satisfied by reliance on other prisoners to provide this notice.**

**Pager/Receiver System**

The August and November 2022 Production cover letters state that "the DOC has sought the clinical guidance of its Contract Medical Provider to determine which hard-of-hearing inmates may require a pager in order to receive timely notification of announcements," and refer

to the Item 19 file folder for updated clinical guidelines relating to hearing-related accommodations.

As discussed above at II.N of this Report, the Wellpath clinical guidelines for provision of pagers to prisoners with hearing loss do not comport with the Settlement or the ADA Title II requirements for effective communication. The sole reliance on decibel loss, without consideration of the prisoner's distance from the announcement, individual circumstances, or history of missing announcements, does not meet the Department's obligations. Moreover, the guidelines are unclear as to whether or not they refer to assisted or unassisted decibel level, or unilateral or bilateral loss. Finally, as discussed above, the complete disregard for the personal preference of the individual with disabilities does not accord with either the ADA or the Settlement. *See* **Recommendations 1 and 5, above.**

## U.    Trainings (Item 36)

Item 36 requires that records regarding each training required by the Agreement be produced. The March 2022 Production, in the folder for this Item, produces four certificates of training completions for Lynn Lareau and Sarah Larsen in topics relating to Settlement compliance.

The August and November 2022 Productions provide tables of individuals who have completed the "Americans with Disabilities (ADA) in Corrections" training during the relevant months of 2022. The August 2022 Production also provides four certificates of training for Stacey Butkowski in "103 DOC 408 Reasonable Accommodations for Inmates," "Standard Operating Procedure for Deaf and Hard of Hearing 103 DOC 408," "ADA Training regarding Deaf, Late Deafeneed, and Hard of Hearing People and Briggs Settlement Agreement," and "Request Interpreter/Transliterator for Deaf, Deaf-Blind, Late Deafened, and Hard of Hearing Individuals." The November 2022 Production provides four certificates of ADA and disability related training for Deanna Acquafresca, and three such certificates for Tammy Duarte and James Proctor.

Pages Omitted

# V.     SUMMARY AND CONCLUSION

While DOC has again made notable progress in compliance with the Settlement Agreement during an historically challenging period, major areas of noncompliance remain.  The principal compliance concerns are noted below.

## A.  Compliance with Settlement's Requirements for Determination of Appropriate Hearing-Related Auxiliary Aids and Services.

The Settlement, at Section IV.D, requires the Department to identify and determine hearing-related auxiliary aids and services that must be provided to each class member in order to ensure inmate may "effectively communicate and receive effective, meaningful, and substantially equal access to DOC programs, services and activities during his or her incarceration."  Section IV.D states that, in making this determination, "the Institution ADA Coordinator shall give Primary Consideration to the preference expressed by the inmate for particular auxiliary aids or services, unless one of the exceptions set forth in Section XI (Revisions to Relevant DOC Policies in Accordance with this Agreement), ¶ 8, applies." Settlement Agreement at IV.D (emphasis added).[33]  Section IV.D goes on to require that "[a]ny decision to deny an auxiliary aid or service selected by an inmate must be based on an individualized assessment of the inmate, and not on any set guidelines, protocols, or threshold levels of hearing loss shown on an inmate's audiogram."  Settlement Agreement at IV.D (emphasis added).

As noted above, the Department has begun a reassessment of class members to determine each member's level of hearing loss, in conjunction with Wellpath's new Reasonable Accommodation Policy.  In a meeting at NCCI with Ms. Pratt, HSA, she stated that the section of the new Disability Accommodation Resources Assessment on Level of Hearing (page two) was completed by the Gardner Medical Director, Jesse Hammond, by referring to the PTA (Pure Tone Average) score on the Audicus test results for each prisoner.  It appears that prisoners'

---

[33] The exceptions noted in Section XI are fundamental alteration in the nature of a program, undue financial or administrative burdens, or actual risks or impairment of safe operation of a DOC program.

eligibility to receive important auxiliary aids and services, including CapTel telephone eligibility and the issuance of pagers, is primarily based upon the prisoner's level of hearing loss, without regard to the expressed preference of that prisoner.  Many prisoners have contacted the Monitor with concerns about the recent removal of previously granted accommodations, including CapTel services, and the refusal to grant them pagers despite their expressed preference and need for these devices.  This sole reliance on hearing loss levels is in direct violation of the Settlement and, as explained above, also in violation of the ADA's Title II Regulation.  Moreover, it is not based on the real needs of prisoners with hearing loss, and will result in a serious failure to accommodate them.

      **Recommendation.  *See* Recommendation 1 and Recommendation 5 above.**

## B.   Compliance with Telecommunication Requirements of Settlement Agreement

The Settlement Agreement at Section VIII provides that deaf and hard-of-hearing prisoners in DOC custody shall be provided with access to the services and devices that enable effective communication with people outside of DOC facilities that is substantially equivalent to the access provided to other prisoners.  DOC remains in serious noncompliance with this provision.

DOC has had ample notice of the urgent and long-standing need for additional CapTel devices at several institutions.  Nonetheless, it is reported by prisoners at these facilities that there have been no additional devices installed, and that noncompliance with the availability provisions of the Settlement Agreement continues.  In addition, substantially equivalent telephone access cannot be provided if accessible devices are housed far from the units in which deaf or hard-of-hearing prisoners reside.

In addition, the appointment protocols established by individual institutions to attempt to regulate access to the limited number of CapTel devices throw up substantial barriers to telephone access for individuals with hearing disabilities that the general population prisoners do

not experience.  Among other inequities, the commonly long delay before an appointment is available on its face violates the Settlement's provision for prompt access to telephone services.

Finally, the continued locking of CapTel devices while they are being used creates difficult inequities in the access to telephone services for users.  The Securus transition has obviated many of the security or operational needs for locking the devices, as now these phones have the same restrictions on calls placed and the same monitoring capabilities as others.  The Department expresses concern that if the devices are not locked, "the inmates making such calls would have access to the prior inmate caller's captions and personal identification number, which presents numerous security and operational issues."  Nonetheless, the CapTel users experience serious inequality in their telephone service.  They cannot redial dropped calls, place another call, or easily navigate the controls of the device.   As the practice of locking the phones creates such an inequity in the telephone experience for the users of these devices as compared to general population telephone users, policy and practice changes should be explored to remove the locking requirement.  These changes could include a new policy requiring officers to erase captions before a new user approaches the device.

> **Recommendation:  *See* Recommendation 10, above;**
> **Fourth Report, Recommendation 1.**

## B.   Compliance with Notification Requirements of Settlement Agreement

The Settlement Agreement requires, at Section IX, provision of visual or tactile notification systems, vibrating watches and supplemental non-auditory information relay systems for deaf and hard-of-hearing DOC prisoners.

<u>Visual or Tactile Notification Systems (Pagers)</u>:   DOC has initiated distribution of pagers to alert prisoners of non-scheduled institutional and personal announcements and calls. However, as noted above, many prisoners who need these auxiliary aids have been denied them based upon a sole reliance on their level of hearing loss, without regard to the prisoners' expressed preference, their individual situation and location within the facility, or their history of

missing announcements, among other important factors.  This is a serious concern, as prisoners interviewed repeatedly reported that correctional officers do not come to their cells to ensure they hear announcements.  Despite recent Post Orders, prisoners complain of officers' failing to make in-person announcement, and prisoners therefore missing medication calls, chow calls and other announcements due to their inability to hear announcements. Thus, they feel an urgent need for the pager devices.

In addition, even where a pager has been issued, prisoners complain that some officers do not consistently issue alerts via the pager system.  Training and more rigid adherence to policy is required in order to ensure compliance with the Settlement Agreement.

> **Recommendation:  *See* Recommendations 1 and 5, above; Fourth Report Recommendation 13.**

Moreover, the Settlement Agreement states that DOC will update its Master Antenna Television system in each facility, and configure it so that facility announcements and schedules will be posted visually on a predetermined channel.   The Monitor has not received updates on implementation of this supplemental non-auditory information relay system, and refers to **Recommendation 23 of the Second Monitor Report**.

## C.   Compliance with Contract Medical Provider Requirements of Settlement Agreement

The Settlement Agreement at Section V provides for prompt clinical and audiological hearing assessments of all prisoners who complain of, or who are identified with, hearing loss. Section V.B of the Settlement requires an evaluation no later than within 60 days of the date that the referral request is approved.  Nonetheless, as noted elsewhere in this Report, prisoners at many facilities are facing extensive delays in the provision of hearing aid assessments and equipment, and in some cases express concern with the adequacy of the assessments or equipment they receive.

At every institution visited, and in many of the compliance calls from prisoners, prisoners complained of hearing aid assessments that were unprofessional, overly delayed, or the results of which were never conveyed to them.  Requirements for the hearing screenings and assessments,

as set forth in the Settlement at Section V.A and B, including referrals for audiological assessments, must be more carefully obeyed.

Prisoners also complained of hearing aid device issues, from necessary repairs and replacements that were not promptly addressed, to necessary instructional information that was unavailable.  The Settlement, at Section V.D,  requires that the Medical Provider arrange for hearing aids to be sent to a repair company no later than one business day following a repair request.  Nonetheless, prisoners routinely complain that requests for repair are not responded to, or that the repairs take much too long, leaving them without hearing aids in the interim.

**Recommendation:**  *See* **Fourth Report, Recommendation 18.**

## D.   Consistency of Institutional Policies with Related Department Policies

While DOC has completed its review and revisions of Policy 408, "Reasonable Accommodations for Prisoners," Policy 401, " Booking and Admissions"  and Policy 428 "Telecommunications," as well as related forms and training materials, changes to institutional policies and documents contingent upon these revised policies have not always been made, or do not accurately reflect the Department's documents.  The revision of these institutional policies and documents is critical to ensure that staff have accurate information on the DOC's legal obligations.

**Recommendation:**  *See* **Fourth Report, Recommendation 2.**

## E.   Conclusion

The Massachusetts Department of Corrections has made important improvements in ensuring effective communication for its prisoners who are deaf or hard-of-hearing. Identification and tracking of these prisoners has been improved, and advances have also been seen in provision of auxiliary aids and services, as well as accommodations, such as vibrating watches, to ensure the ability of these prisoners to access auditory information in the institutions. In some respects, concerns have been quickly addressed when raised by the Monitor.

Framingham's introduction of the "No Noise Phone" as an accommodation for hard-of-hearing prisoners is an excellent concept, worthy of replication in other institutions.  The Monitor acknowledges and appreciates these actions.

In addition, it is understood that these past two years have raised unique and unprecedented challenges for DOC.  Steps taken to minimize the impact of COVID 19 on DOC institutions has rendered complete compliance with some of the terms of the Settlement Agreement difficult.  These substantial complexities are recognized, and the Monitor makes allowance for them.[34]  It is the Monitor's understanding that the parties have agreed to extend the monitoring provisions of the Settlement Agreement for a year in recognition of the current compliance difficulties.

Nonetheless, the significant and important shortcomings in DOC's compliance with the Settlement Agreement identified in this Report should be remediable at this time.  It is hoped that this Fifth Report and its Recommendations can serve to assist DOC in its otherwise commendable efforts to comply with the Settlement Agreement and achieve greater accessibility for its prisoners with hearing loss.

---

[34] As noted above, the changes wrought by the COVID 19 crisis have also impacted the Monitor's ability to assess Settlement compliance in a number of areas, most importantly program accessibility.

Pages Omitted