UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 15-cv-40162-RGS


LEONARD BRIGGS, GEORGE SKINDER,
LOUIS MARKHAM, FRANCIS McGOWAN,
ERIC ROLDAN, ROLANDO S. JIMENEZ,
and JENNIFER WARD, on behalf of themselves
and others similarly situated,

v.

MASSACHUSETTS DEPARTMENT
OF CORRECTION, et al.

_____

FINDINGS OF FACT, RULINGS OF LAW,
AND ORDER AFTER A BENCH TRIAL

January 17, 2024

STEARNS, D.J.

On August 20, 2021, U.S. District Judge George O'Toole certified the
plaintiff class in this case as "[a]ll individuals who are currently in
Massachusetts Department of Correction (DOC) custody or in the future are
placed in DOC custody, and who are currently or in the future become deaf
or hard-of-hearing."[1] Dkt # 257 at 2-3.   In April of 2023, the court randomly

---

[1] This case was originally assigned to Judge O'Toole when filed in
November of 2015.  Judge O'Toole certified the plaintiff class on August 20,
2021.

assigned the case to this session of the court after Judge O'Toole recused himself from any further involvement. At counsels' request, and with the assistance of Department of Correction personnel, on July 25, 2023, the court visited residential units at Massachusetts Correctional Institution (MCI)-Norfolk where most of the remaining class members are housed. These included the Critical Care Unit; Unit 4-2 (the court viewed plaintiff Rolando Jimenez's personal cell); Unit 8-2; Unit 3-3 (where plaintiff Harmon Sparks resides); and Unit 2-3 (the court viewed plaintiff Westley Cain's cell). In each unit, the court inspected the prison's current bed books, illuminated exits, and smoke alarms; and noted the inmate hard-of-hearing indicators (ear posters on cell doors and/or red dots on bed book inserts).[2]

A six-day bench trial was convened on August 7, 2023. The claims tried before the court involved the DOC's emergency notification system, and whether the emergency procedures comport with the requirements of the Eighth or Fourteenth Amendments to the United States Constitution or the Americans with Disabilities Act (ADA). Eight class members testified at the trial with the assistance of lipreading, Spanish and sign language interpreters, and personal hearing devices. The class witnesses included

---

[2] The court also viewed a video recording provided by the parties of Unit D1 at MCI-Shirley.

Rolando Jimenez, Louis Markham, George Skinder, Francis McGowan, Westley Cain, Carl Drew, Daniel McNair, and Harmon Sparks. *See* Dkt. ## 336-339.  These class members are identified by DOC as deaf or hard-of-hearing.  Plaintiffs also presented the deposition testimony of Karen DiNardo, a former DOC ADA compliance officer and the testimony of a designee of the Massachusetts Commission for the Deaf and Hard of Hearing, Sharon MacLean.  Finally, plaintiffs called three expert witnesses – Dr. Judy Anne Shepard-Kegl, Richard Lorenzo Ray, and as rebuttal witness, Gina Hilberry.

DOC called as witnesses its employees Abbe Nelligan (DOC's Assistant Deputy Commissioner of Reentry), Jeffrey Quick (DOC's Director of Resource Management), and Nolan Griffiths (DOC's Fire Safety Administrator).  DOC also presented an expert witness, Dr. Eileen Baker.

On October 18, 2023, after reviewing the trial transcripts and the parties' proposed findings of fact and rulings of law, the court heard the parties' closing arguments.  The court will now enter its final rulings.

<u>FACTUAL FINDINGS</u>

<u>The Parties</u>

(1) The remaining named plaintiffs[3] – Rolando Jimenez, Louis Markham, George Skinder, and Francis McGowan – represent approximately 600 hard-of-hearing or deaf inmates residing in various Massachusetts state correctional facilities. DOC's Proposed Findings of Facts and Rulings of Law (PF&R), Dkt # 355 ¶ 1.

(2) Rolando Jimenez (64 years old) testified that he has 80-85% hearing loss in both ears and requires bilateral hearing aids to hear speech and environmental sounds. **Day 1** Tr. 75:24-76:3, 76:25-77:17. Jimenez is unable to see well without glasses. *Id.* at 76:15-24. As Spanish is his first language, lipreading an English speaker is a challenge for him. *Id.* at 74:17-18. He can only hear the smoke detector when wearing his hearing aids. *Id.* at 83:19-24; 84:9-14; DOC's PF&R ¶ 3. Jimenez has been in DOC custody since February 9, 1982, and a resident of MCI-Norfolk since approximately April of 2015. Joint Stipulation of Facts (Stip.) Dkt #320-1 ¶1, ¶2.

(3) Louis Markham (70 years old) testified that he was born profoundly deaf in both ears but is fluent in American Sign Language (ASL), which is his best means of communication. **Day 3** Tr. 26:4-5; 45:2-25, 46:14-47:16. Markham's speech is unintelligible, and his lipreading and ability to read or

---

[3] Leonard Briggs, Eric Roldan, and Jennifer Ward are former named plaintiffs who are no longer in DOC custody.

write English is poor.  *Id.* at 47:2-10, 14-23.  Markham is unable to hear speech no matter the amplification but wears hearing aids to sense vibrations.  *Id.* at 44:14-22, 45:25.  Markham has been in DOC custody since February 16, 1979, housed at the Massachusetts Treatment Center (MTC), MCI-Norfolk, and currently at NCCI-Gardner in Unit T-1, Cell 104B.  Dkt #320-1 at ¶¶ 4-6.

(4)  George Skinder was diagnosed with severe to profound hearing loss at age 3 and communicates with Pidgin Signed English, a form of sign language. **DAY 3** Tr. 87:7-13, 90:10-23.  He wears bilateral hearing aids to enhance his ability to hear environmental sounds and understand his surroundings.  *Id.* at 88:1-3.  Skinder has been housed at MCI-Norfolk, MCI-Cedar Junction, NCCI-Gardner, and MCI-Shirley.  He has been incarcerated at the MTC three times: from August 9 to September 5, 2013, April 2 to November 29, 2018, and November 29, 2021 to the present.

(5) Francis McGowan was born profoundly deaf in both ears. *Id.* at 9:19-24.  His preferred language is ASL.  *Id.* at 10:24-25. He wears bilateral hearing aids to hear environmental noises but cannot hear speech.  *Id.* at 10:1-2*;* **Day 1** Tr. 36:6-8.  McGowan suffers with Parkinson's Disease and arthritis and is mobile using a wheelchair. **Day 3** Tr. 6:24-7:1. He has been incarcerated in MCI-Norfolk's Assisted Daily Living (ADL) or Clinical

Stabilization Unit (CSU) unit since 2017.  *See* Stip. ¶ 10; **Day 3** Tr. 6:3-5, 8:7-10.

(6) Class members Westley Cain, Carl Drew, Daniel McNair, and Harmon Sparks also testified regarding their hearing loss and its effect on their ability to converse or be aware of announcements or sounds within their assigned DOC facilities.  Cain, a 74-year-old prisoner housed at MCI-Norfolk, testified that he has hearing loss in his right ear, difficulties processing conversation, and that DOC has not tested him for hearing aids. **DAY 2** Tr. 31-33:16. Drew, a 68-year-old prisoner housed at MCI-Shirley, testified that he has hearing loss in both ears and wears hearing aids. **DAY 2** Tr. 4:25-19:6. Drew has been incarcerated at MCI-Shirley since April 8, 2004.  Stip. ¶ 20.  McNair, a 69-year-old prisoner currently housed at MCI-Norfolk, testified that he has worn hearing aids in both ears since 2016. **DAY 4** Tr. 3:22-4:25. Sparks, a 70-year-old prisoner housed at MCI-Norfolk, testified that he was diagnosed with hearing loss while serving in the military as a launch crewman in a rocket artillery unit.  He also has tinnitus.[4] DOC has provided Sparks with a "pocket talker"[5] which he uses only when

---

[4] "Tinnitus – a noise in the ears, such as ringing, buzzing, roaring or clicking."  *Dorlands Medical Dictionary* (28th ed.) at 1714.

[5] A pocket talker is a personal amplification device attached to a headset to help improve communications in difficult listening environments.

watching television or when sitting in a class as it amplifies background noise as well as speech which increases his inability to hear.  DOC has not fitted him with hearing aids.  **DAY 2** Tr. 4-9:15.

(7)    Defendant DOC is a Commonwealth executive department responsible for the operation of the state prison system and for the care and custody of the prisoners held in its fifteen facilities.  DOC receives significant federal financial assistance. *Id.* ¶¶ 29-30.  Defendants Carol A. Mici, Jennifer A. Gaffney, Suzanne Thibault, Steven Silva, Lisa Mitchell, and Kyle Pelletier are (or were) employees of DOC who were named in their official capacities and whose successors are subject to being substituted as parties to the case. *Id.* ¶ 31.

(8)  There are times when prisoners who utilize hearing aids do not wear them, such as during rest or sleep, showers, or when the aids are charging or sent out for repair.  **DAY 1** Tr. 78:1-18 (Jimenez); *Id.* at 18:6-12, 18:20-22 (Shepard-Kegl); **DAY 2** Tr. 5:14-17 (Drew); **DAY 3** Tr. 45:9-15

---

"It consists of the body of the hearing aid containing the microphone, amplifier and controls. A cord transmits the electrical output to a receiver, which converts this signal into sound. The receiver is attached to a mould, which holds it in place." https://vikaspedia.in/health/child-health/information-on-hearing-impairment-and-rehabilitation/aids-appliances/type-of-hearing-aids-it-s-care-maintenance#:~:text=Pocket%20Model%20%3A,which%20holds%20it%2oin%20place (last updated Dec. 10, 2019).

(Markham); *id.* at 10:10-11 (McGowan). Some prisoners' hearing aids malfunction because of moisture build-up. *E.g.*, **DAY 1** Tr. 78:19-79:21 (Jimenez); **DAY 2** Tr. 5:18-21 (Drew). Hearing aids can also become uncomfortable or bothersome, so inmates sometimes remove them for comfort. **DAY 1** Tr. 18:20-19:2 (Shepard-Kegl); *id.* at 78:13-18, 80:18-24 (Jimenez); **DAY 2** Tr. 5:22-6:2 (Drew); **DAY 3** Tr. 10:3-7 (McGowan); *id.* at 45:9-15 (Markham); *Id.* at 89:2-8 (Skinder); *id.* at 5:3-6 (McNair).  Many class members have had non-functioning hearing aids for months or even years while awaiting repairs or replacements.  **DAY 3** at 46:1-13 (Markham); **DAY 2** Tr. 6:24-7:11 (Drew); **DAY 3** Tr. 89:9-19, 92:21-93:1 (Skinder); **DAY 1** Tr. 80:13-15, 82:11-18 (Jimenez); **DAY 3** Tr. 10:12-23 (McGowan); **DAY 4** Tr. 5:21-6:6 (McNair).

(9)  Section .04 of the 103 DOC 730 Fire Prevention and Safety policy requires that fire and emergency evacuation procedures be developed for each DOC facility to be reviewed by the local fire authority.  **DAY 5** Tr. 51-52:16; Ex. #1.  The facilities have fire evacuation diagrams posted and emergency exits are prominently marked. *Id.* at 51:17-22.  DOC's orientation handbook for inmates also contains emergency evacuation information.  *Id.* at 90-91.

(10)  Section .05 of 103 DOC 730, requires that evacuation drills be regularly performed.  The DOC evacuates most inmates in fire drills held during the 7 am to 3 pm and 3 pm to 11 pm shifts.[6]  *See* Ex. 1; **DAY 5** Tr. 54:5-9.

(11)  Simulated drills occur during the 11 pm to 7 am shift in security risk housing and specialized medical units.  During those drills, a simulated incident involving a specific unit is called into the control room and inmate movement is locked down.  Only that unit is evacuated while two officers inspect the other units and the common area to ensure that all inmates and staff are accounted for.  To conclude the drill, a bed book check is conducted during which the bed book is compared against the evacuated inmates.[7]

(12)  In 2017, the 103 DOC 730 Fire Prevention and Safety policy was revised to add language addressing inmates who are identified as being deaf and/or hearing impaired, blind, and/or visually impaired, or who have other

---

[6] High-security housing units (such as SBCC), specialized medical units, such as the Shattuck Hospital Correctional Unit, infirmaries, and assisted daily living units utilize simulated drills rather than physically evacuating inmates during the fire drills.  DOC F&R ¶ 24, ¶ 26.

[7] The bed book is a binder with a page/card for each prisoner identifying their cell number and, among other things, indicating whether they are disabled.  The court observed several actual bed books when it visited MCI-Norfolk and had the benefit of a mock-up bed book offered as a demonstrative at trial.

serious physical disabilities. Deaf and hard-of-hearing inmates are identified during the initial intake screening. **DAY 5** Tr. 21:21-24. After an inmate is identified as being deaf or hard of hearing (or any other major disability), a red dot is added to the inmate's bed book card. However, the red dot does not specify the inmate's disability. *Id.* at 22:8-23:20 (Baker); 69:23-70:7 (Griffiths). In one unit at MCI-Norfolk, a corrections officer undertook to transfer certain information from the bed book to a poster placed over the door of the Unit office displaying red dots next to the names of disabled prisoners assigned to the unit. Some cells have placards fixed to the outer door indicating that cell houses a deaf or hard-of-hearing inmate.

(13) During an emergency, DOC's policy provides that prisoners are notified of the need to evacuate by the sounding of an alarm. Trial Ex. 1 at 730.03 (A)(7), 730.04(B)(3); **DAY 4** Tr. 23:25-24:5, 27:18-28:20 (Ray); **DAY 5** Tr. 38:3-20 (Griffiths). In most DOC facilities, once the alarm is sounded, prisoners are expected to self-evacuate to a designated area. *See* **DAY 5** Tr. 35:6-7, 53:7-64:14-16 (Griffiths). After the initial evacuation, corrections officers "sweep" the building and the Unit officer in charge uses the bed book to determine if any inmate is missing. *Id.* at 67:3-68:10-19

(Griffiths).[8]  The entire process – from the emergency notification, to the facilities sweep, and the bed book count – can take up to fifteen minutes. DOC Fire Administrator Griffiths opined that fifteen minutes "would be on the long end of an evacuation for [DOC]." *Id.* at 68.

(14) The configuration of alarms and visual emergency warnings varies among DOC facilities, and even among units within a facility.  All alarms have an audible component. *See* **DAY 5** Tr. 38:6-17.  Some facilities have visual alarms in common areas, such as dayrooms, but the visual components vary in brightness and are not visible from all cells.  See, e.g., **DAY 3** Tr. 98:5-99:9 (Skinder); *id.* at 5:22-6:12, 15:14-25 (McGowan).  Some of the dormitory-style units, such as those at NCCI-Gardner, have an alarm with a visual component in the sleeping area, which is a large open room with multiple beds or bunks. *See id.* at 104:8-16 (Skinder).  A handful of facilities have in-cell visual alarms. *See* **DAY 5** Tr. 139:7-18 (Quick) (testifying that some cells at DOC's Souza-Baranowski, Boston Prerelease Center, NCCI-Gardner, and MCI-Framingham facilities have in-cell visual alarms, however none of the prisoners who testified at trial had ever resided in one of these units).  The video recording of Unit D1 at MCI-Shirley shows windows on the

---

[8] The amount a time required to "sweep" the communal spaces and cells of handicapped inmates commonsensically depends on the number of red dots in the bed book of each unit. *Id.* 70:11-71:17 (Griffiths).

shower and cell doors making the central area alarms visible to attentive inmates inside.

(15)  A profoundly deaf inmate is unlikely to be able to hear an audible-only emergency alarm. **DAY 1** Tr. 43:21-44:3 (Shepard-Kegl);  **DAY 4** Tr. 24:6-21 (Ray). Whether a hard-of-hearing person can decipher an audible emergency alarm depends on the individual, their proximity to the alarm, whether they are wearing hearing aids, the background noise level, and other environmental factors. **DAY 4** Tr. 24:22-25:22 (Ray); **DAY 1** Tr. 41:9-15 (Shepard-Kegl); **DAY 2** Tr. 7:17-21; 13:21-14:14 (Drew); **DAY 3** Tr. 99:14-22 (Skinder); **DAY 1** Tr. 83:23-24, 84:9-14 (Jimenez); *Id.* at 17:6-8, 21:14-17 (Sparks).  Without hearing aids, Jimenez and Markham testified that they hear nothing. **DAY 1** Tr. 84:12-14 (Jimenez); **DAY 3** Tr. 44:14-22, 45:2-8 (Markham). Even when he has one functioning hearing aid, Jimenez is unable to discern where sound is coming from or who is talking to him. **DAY 1** Tr. 83:4-5 (Jimenez). Drew testified that he cannot hear the alarm without his hearing aids. **DAY 2** Tr. 13:21-23, 14:8-14 (Drew).

(16)  Several class members testified at trial that they cannot reliably hear the audible alarms if they occur when they are napping, sleeping, or in the shower.  *See* **DAY 1** Tr. 78:13-18, 80:18-24 (Jiminez); **DAY 3** Tr. 99:14-22 (Skinder); **DAY 4** Tr. 5:1-2 (McNair).

(17)  No inmate has been injured or killed in a fire in a DOC facility. **Day 5** Tr. 60:11-15, 138:7-10.

(18)  At trial, DOC submitted Fire Drill Reports for 2019-2021. *See* **DAY 5** Tr. 76:12-22, 79:16-81:6 (Griffiths); Exs. 31 at 1(a)-3(c).  While some of the drill reports indicate when responders reacted (typically within two to four minutes) and whether a sweep was conducted, *see* Dkt #355 ¶ 28, the reports do not indicate the amount of time expended in conducting the sweep or whether any stray inmates were located during the sweep.  **DAY 5** Tr. 76:12-76:22.

(19)  Several class members testified at trial that during fire drills they were late to evacuate or failed to evacuate at all because they did not perceive the evacuation order (unable to hear the audible alarm, unable to see a visual alarm, or were not personally notified by an officer). *See* **DAY 1** Tr. 23:19-24:1 (Sparks); 91:13-21, 92:21-22 (Jimenez); **DAY 3** Tr. 58:8-59:3 (Markham); **DAY 4** Tr. at 9:6-11 (McNair).

(20)  On September 4, 2014, Louis Markham submitted a "Request for Reasonable Accommodation of Special Need(s)" form to DOC.  Trial Ex. 17.

(21)  On September 8, 2014, Francis McGowan submitted a "Request for Reasonable Accommodation of Special Need(s)" form to DOC.  Trial Ex. 14.

(22)  On September 8, 2014, George Skinder submitted a "Request for Reasonable Accommodation of Special Need(s)" form to DOC specifically citing the need for visual fire alarms and emergency notifications.  Trial Ex. 21.

(23)  On May 19, 2015, Rolando Jimenez submitted a "Request for Reasonable Accommodation of Special Need(s)" form to DOC.  Trial Ex. 10.

(24)  At the request of DOC, DOC officials and representatives of the Massachusetts Commission for the Deaf and Hard-of-Hearing (Commission) met with several deaf and hard-of-hearing prisoners, including McGowan, Markham, and Jimenez, to discuss the issues raised by their grievances. **DAY 2** Tr. 48:8-9, 54:8-22, 55:18-56:4, 57:9-21, 58:20-59:22 (MacLean); Trial Exs. 12, 13; **DAY 5** Tr. 116:10-24, 118:10-20 (Nelligan).  The DOC officials attending included several Deputy Superintendents of DOC facilities, **DAY 2** Tr. 52:15-17, and the Director of Programming and Classification at Massachusetts Treatment Center (MTC). Trial Ex. 12.

(25)  Following these meetings, Sharon MacLean, a Commission case manager with over 30 years of experience working with deaf people, recommended to DOC that these prisoners be provided with visual alarms in cells, showers, and the common areas in their respective facilities.  **DAY 2**

Tr. 48:8-9, 54:8-22, 55:18-56:4, 57:9-21, 58:20-59:22 (MacLean); Trial Exs.
12, 13; **DAY 5** Tr. 116:10-24, 118:10-20 (Nelligan).  MacLean submitted her
recommendations in writing to DOC. **DAY 2** Tr.  55:18-56:4, 58:20-59:3
(MacLean); Trial Ex. 13.

(26)  DOC staff subsequently acknowledged the need of some deaf and
hard-of-hearing prisoners for visual alarms. Trial Ex. 24; DiNardo Dep. Tr.
at 275:25-278:21. At an August 2016 ADA committee meeting, DOC staff
identified a "system wide" need for providing deaf inmates access to visual
alarms.   Trial Ex. 24 (meeting minutes for DOC 2016 ADA Committee
Meeting, listing attendees as "J. Camacho, Director; A. Nelligan, Deputy
Director; K. Dinardo, Deputy Superintendent; L. Hermann-Gomes, Regional
Administrator; B. Berg, CQI MPCH; J. Silva, COI; Julie Urquhart, Clerk VI");
**DAY 5** Tr. 120:12-121:2 (Nelligan); DiNardo Dep. Tr. at 275:25-278:21.

(27)  Strobe alarms are commonly offered as an accommodation for
deaf and hard-of-hearing individuals, including in prisons.[9]   **DAY 4** Tr.

---

[9]  A strobe light is a pulsating light that emits a "visually loud" light
when triggered. **DAY 4** Tr. 31:14-19 (Ray). When an emergency occurs,
strobe lights flash brightly enough to notify anyone who can see them,
including deaf and hard-of-hearing prisoners. *Id*. at 30:13-31:7, 36:3-7; **DAY
1** Tr. 42:17-19, 43:16-20 ("[T]he deaf world also contains people who are
visually attuned because they can't hear. And that entire group, the sort of
culture or the value on things is visual.  Warning a person is something that
works if you do it in a visual way. They are attuned to it."); *id*. at 47:5-9, 47:14-
18 ("It's not a matter of, maybe you should do it. It's, this is for safety['s] sake,

32:13-23 (Ray) (Q: "Would you consider strobe alarms to be the standard accommodation in the deaf and hard-of-hearing communities? A: Yes, I would say yeah, that's standard."), *id.* at 32:24-33:8 (Ray) (testifying that he has advised several state prison systems to "provide strobe alarms as an accommodation for deaf and hard-of-hearing prisoners."). Strobe alarms provide reliable and automated emergency notifications. *Id.* at 32:1-12, 36:3-7 (Ray).

(28)   DOC denied the inmates' requests for accommodation of its current evacuation notification process asserting that to do so is an undue burden.

(29)   The Division of Capital Asset Management and Maintenance (DCAMM) is responsible for capital planning, public building construction, facilities management, and real estate services for the Commonwealth. DCAMM recommended in its 2011 master plan that "program accessibility can be met by targeting specific facilities in each custody level." **DAY 5** Tr. 182:15-19 (Quick).

---

a visual alarm. The thing that's going to tell people if you have an emergency here if they're deaf is a visual alarm. So that's the simplest things right there."); **DAY 5** Tr. at 17:12-15 (Quick) (Q: "And you would agree that something that's a flashing strobe would be easier to see than a small blinking light, wouldn't you?" A: "I think so.").

(30)  In 2017, Director Jeffrey Quick and the Division of Resource Management (DRM)[10] estimated the cost of installing visual alarms in the DOC facilities at between $22 and $23 million.   DOC's cost estimate contemplated the installation of visual alarms throughout the DOC facilities that were then housing inmates.  To compile the cost estimate, DRM used the square footage costs associated with a food service building then under construction at MCI-Shirley where a fire detection system was being installed as a guide.  DRM then compared the MCI-Shirley costs against the square footage of the housing units at existing DOC facilities.  The estimated renovation cost for MCI-Norfolk was based on a prior study, adjusted for current costs. **DAY 5** Tr. at 139-141:21, 175-176, **Day 6** Tr. 45:23-46:7.

(31)  DOC considered anticipated upgrades to the existing fire panel in the cost estimate if visual alarms were added.  However, DOC was unable to determine which, if any, panels would require upgrades.  DOC also pointed out that it was uncertain whether visual alarms would be compatible with its facilities' existing systems. **DAY 5** Tr. 140-142.  DOC also expressed concerns

---

[10] The DRM is responsible for the planning and management of all feasibility studies, design development, infrastructure and emergency repairs, and construction for the DOC.  *See* 103 DOC 740.01.

that any alterations to the buildings would trigger other ADA-required upgrades further increasing costs.[11] *See* Dkt #355 ¶ 68.

<u>The Parties' Recommendations and Contentions</u>

(32) The class representatives have suggested alterations to DOC's red dot system and various cost-saving means of providing access to DOC's emergency notification system short of installing visual alarms throughout the facilities. To accommodate the need for effective evacuation notification, the class representatives ask DOC to add visual alarms in a selected few of its facilities by clustering deaf and hard-of-hearing inmates in particular units, reducing the estimated cost total. Plaintiffs' experts also suggest providing inmates with several less-expensive notification devices suited to individual deaf and hard-of-hearing inmates' needs.

(33) DOC maintains that clustering is not an option in accommodating the class members because inmate placement is based on the capacity in which the inmate is held (pretrial/posttrial, civil commitment, mental health or substance abuse conditions) and his security classification. In DOC's words:

---

[11] As an example, DOC cites two recent projects that "triggered [ADA] obligations to upgrade" – installation of cells with anti-ligature features at MCI-Shirley and a gym roof replacement at MCI-Concord. *See* Dkt #355 ¶ 68.

The concept of clustering deaf and hard of hearing inmates in a particular unit or group of units would not maintain the integrity of the classification process. The DOC takes an individualized approach, using an objective point-based classification system, to determine an inmate's placement within the DOC. Four assessment tools are used, two for the female population and two for the male population. A COMPAS risk assessment is used to evaluate the risk for violence and recidivism posed by an individual. The risk review considers the individual's criminal history, substance abuse history, and vocational and educational background. First and foremost, the appropriate security level is determined by considering the inmate's sentence structure, criminal history, escape history, history of prior violence, educational history, age, and employment history. Additionally, the inmate's adjustment awaiting trial and program participation are considered. There may be reasons to vary from the preliminary custodial level as determined by using the assessment tool. For example, there are restrictions from being placed in minimum security unless the individual is within five years of sentence release. There are restrictions for anyone who may be subject to a review based upon having a sexual offense, for those who Immigration and Customs Enforcement are tracking, and for those whose crimes involve the loss of a life. In addition, staff may exercise discretion based upon the facts presented to place an individual in higher or lower custody than that for which the individual is preliminarily scored. These facts may include extremely problematic disruptive adjustments that are not adequately captured or an offense that is especially notorious or violent. Individuals may also manifest a positive adjustment, for example, by refraining from incurring disciplinary reports and engaging in programming. Having a pending case may restrict an individual's placement. An individual's gang affiliation may be a factor in placement. An individual's placement may be deferred pending the outcome of a disciplinary report.

Dkt #355 ¶ 46.

(34)   DOC does not dispute that being deaf or hard-of-hearing is a disability.  DOC's policy on facility access for disabled persons states that each superintendent will develop a plan, relying in part, but not exclusively, on department classification to explore options, such as a transfer to a more suitable institution or unit within an institution, which may be better equipped to deal with the needs of a particular disability.  **DAY 5** Tr. at 127:19-128:4 (Nelligan).  In making facility assignments, DOC considers medical, programmatic, security (*e.g.*, protective custody or predatory issues), and mobility issues; it also considers age, gender, and individual inmate requests.   *Id.* at 99:13-101:25,  122:17-21,  125:2-8,  130:11-131:1 (Nelligan).

(35)   Aging reduces an inmate's security classification score. Thus, prisoners in DOC custody who are age 50 or older (the overwhelming number of class members) are generally housed in medium or minimum-security facilities.  **DAY 5** Tr. 123:9-21 (Nelligan).  DOC admits that it has not researched whether other states' departments of correction cluster deaf and hard-of-hearing individuals.  *Id.* at 132:3-15 (Nelligan); *see also* **DAY 6** Tr. 27:2-15 (Hilberry) (testifying that she is aware of other states using clustering, including the Alabama Department of Corrections,).  Nor has it

provided fact specific evidence that clustering deaf and hard-of-hearing inmates in its current facilities is an unworkable accommodation.

(36)  There are also existing alternatives to hard-wired strobe alarms to alert deaf and hard-of-hearing inmates to emergency evacuations.  Plaintiffs introduced testimony regarding portable visual strobes and tactile alarms.[12] DOC's expert, Dr. Baker, acknowledged that tactile alarms would provide deaf and hard-of-hearing prisoners with access to emergency notifications. **DAY 5** Tr. 28:15-18.  According to plaintiffs' expert Ray, there are several kinds of tactile alarms available for DOC to test in its facilities.  **DAY 4** Tr. 49:9-50:4 ("I mean, we could probably write a book about all of the different technology that's available out there.").

## RULINGS OF LAW

(1)   Under the doctrine of constitutional avoidance — "the rule forbidding decision of properly presented constitutional questions, if the case may be disposed of on another ground . . . 'if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only

---

[12] A tactile emergency alarm is a personal notification device with a component that provides an intense vibration when an emergency alert occurs. The vibration is strong enough to alert anyone who can feel it, including deaf and hard-of-hearing prisoners. **DAY 4** Tr. 33:9-34:4 (Ray).

the latter.'" *Rescue Army v. Mun. Ct. of City of L.A.*, 331 U.S. 549, 569 n.33 (1947), quoting *Siler v. Louisville & Nashville R. Co.*, 213 U.S. 175, 191 (1909); *see also Sony BMG Music Ent. v. Tenenbaum*, 660 F.3d 487, 508 (1st Cir. 2011) ("Facing the constitutional question of whether the award violated due process . . . [t]he district court should first have considered the non-constitutional issue of remittitur, which may have obviated any constitutional due process issue and attendant issues.").

(2)  Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

(3)  State prisons are public entities for Title II purposes." *Sosa v. Mass. Dep't of Corr.*, 80 F.4th 15, 30 (1st Cir. 2023); *see also United States v. Georgia*, 546 U.S. 151, 154 (2006).

(4)  To establish a prima facie case of a Title II violation, a plaintiff must show by a preponderance of the evidence that: "(1) he is a 'qualified individual with a disability'; (2) he was 'excluded from participation in, or denied the benefits of a public entity's services, programs, or activities or was otherwise discriminated against'; and (3) this exclusion, denial of benefits,

or discrimination was 'by reason of [his] disability.'" *Sosa*, 80 F.4th at 30, quoting *Snell v. Neville*, 998 F.3d 474, 499 (1st Cir. 2021). Once this prima facie showing is made, the burden shifts to the public entity to prove by a preponderance of the evidence that accommodating the plaintiff would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens. *See* 28 C.F.R. § 35.150(a)(3); *id.* § 35.164.

(5) "The ADA defines 'disability' as either (a) a physical or mental impairment which substantially limits one or more of an individual's major life activities; (b) a record of such impairment; or (c) being regarded as having such an impairment." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 20 (1st Cir. 2004) (citing 42 U.S.C. § 12102(2)). Congress mandated that the definition of disability "shall be construed in favor of broad coverage of individuals . . . to the maximum extent permitted." 42 U.S.C. § 12102(4)(A).

(6) Hearing loss is a physical impairment. 28 C.F.R. § 35.108(b); *see also Mancini v. City of Providence by & through Lombardi*, 909 F.3d 32, 40 (1st Cir. 2018) (citing 29 C.F.R. § 1630.2(h)) (explaining that a "physical impairment" is "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems"). A major life activity includes hearing, speaking, reading, and communicating.

42 U.S.C. § 12102(2)(A). "The ADA 'addresses substantial limitations on major life activities, not utter inabilities.'" *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 22 (1st Cir. 2002), quoting *Bragdon v. Abbott*, 524 U.S. 624, 641 (1998). A physical impairment is substantially limiting if it presents "significant obstacles" to the major life activity, whether or not the physically impaired person is capable of performing the activity under certain circumstances. *See id*. This determination must be made "without regard to the ameliorative effects of mitigating measures" such as hearing aids, cochlear implants, or the use of other hearing devices or assistive technology. 42 U.S.C. § 12102(4)(E).

(7)  When a statute speaks with clarity to an issue, "judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished." *Sony BMG*, 660 F.3d at 500, quoting *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475 (1992).

(8)  Plaintiffs' hearing loss is a physical impairment that substantially limits one or more of their major life activities.  Plaintiffs are individuals with a disability under the ADA.  *See supra* ¶¶ 1-59. *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 264-265 (1st Cir. 1999) (plaintiff's hearing disability satisfied "undemanding requirement[]" that he was a qualified individual with a disability).

(9)  An individual with a disability is "qualified" for a public entity's program or service if he or she is someone "who, with or without reasonable modifications . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by" that public entity. 42 U.S.C. § 12131(2).  A prison's "services, programs, or activities" include emergency notifications.  *See* 28 C.F.R. pt. 35 app. B ("[T]itle II applies to anything a public entity does."); *Holmes v. Godinez*, 311 F.R.D. 177, 222, 226 (N.D. Ill. 2015) (construing emergency notification services as a program, activity, or service under Title II and noting that "all inmates . . . have the right to be notified of emergency situations").  Plaintiffs are qualified to receive DOC's emergency notifications.

(10)  Under Title II of the ADA, public entities have an affirmative obligation to "operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a); *see also Toledo v. Sanchez*, 454 F.3d 24, 32 (1st Cir. 2006) ("Title II imposes an affirmative obligation on public entities to make their programs accessible."); 28 C.F.R. § 35.152(b)(1) (correctional facilities "shall ensure that qualified inmates or detainees with disabilities shall not . . . be excluded from participation in, or be denied the benefits of, [its] services, programs, or activities").

(11)   Specifically, under Title II of the ADA, public entities have an affirmative obligation to "ensure that communications with" disabled individuals "are as effective as communications with others." 28 C.F.R. § 35.160(a)(1); see also 28 C.F.R. pt. 35 app. A. To fulfill its effective communication obligations, a public entity is required to "furnish appropriate auxiliary aids and services" where doing so is "necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity" offered by the public entity. *Pollack v. Reg'l Sch. Unit 75*, 886 F.3d 75, 81 (1st Cir. 2018), quoting 28 C.F.R. § 35.160(b)(1).

(12)   Plaintiffs' access to the emergency notification system must be "substantially equal to the services provided to non-disabled persons." *Segal v. Metro. Council,* 29 F.4th 399, 406 (8th Cir. 2022). *See Bearden v. Clark Cty.*, 2016 WL 1158693, at *2 (W.D. Wash. Mar. 24, 2016) (finding that 28 C.F.R. § 35.160 imposed on jail "affirmative obligation to 'take appropriate steps'" to ensure that a notification system was in place to communicate fire alarms to deaf inmates); *Civic Ass'n of the Deaf of N.Y.C., Inc. v. Giuliani*, 915 F. Supp. 622, 636 (S.D.N.Y. 1996) (construing 28 C.F.R. § 35.160 to require city to have a "means of communication" for emergency notifications that was "as effective as that available to hearing people"); 28 C.F.R. pt. 35

app. A ("The Department recognizes that the need for effective communication is critical in emergency situations.").

(13)   To assure meaningful access to the emergency notification system, the prison must make may need to reasonable accommodations for some of the deaf and hard-of-hearing inmates.  Access is not meaningful if plaintiffs must rely "on workaround and alternative means", *see Am. Council of the Blind of N.Y., Inc. v. City of N.Y.*, 495 F. Supp. 3d 211, 235 (S.D.N.Y. 2020), or requires plaintiffs "to seek out and rely upon the cooperation of other inmates", *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 74 (2d Cir. 2016).   Any accommodation must overcome "non-trivial temporal delays." *Id.* at 73.

(14)  DOC Regulation 103 DOC 408.07 states that inmates may initiate a request for reasonable accommodation in three ways – "by verbal or written request to any Department staff; by verbal or written request to or from medical/mental health staff for a medically prescribed accommodation; and by completion of the Request for Reasonable Accommodation Form."  Tr. Ex. 5.

(15)  The Department of Justice's interpretative guidance for ADA regulations concerning Title II expressly contemplate clustering deaf and hard-of-hearing prisoners in the same facility.  *See* 28 C.F.R. § 35, App. A

(2010) ("[I]f an inmate is deaf and communicates only using sign language, a prison may consider whether it is more appropriate to give priority to housing the prisoner in a facility close to his family that houses no other deaf inmates, or if it would be preferable to house the prisoner in a setting where there are . . . other sign language users with whom he can communicate"). Further, courts have found that placement of prisoners based on their disability in facilities that best meet their needs is permissible under the ADA as a way to ensure they are receiving appropriate accommodations and equal access to programs and services.

(16) "Adopting the well-established ADA and R[ehabilitation] A[ct] burden shifting framework here, the plaintiff 'bears the initial burdens of both production and persuasion as to the existence of an accommodation' that is facial[ly] reasonable[ ].  The burden of persuasion then shifts to the defendant to 'rebut the reasonableness of the proposed accommodation.' 'This burden of non-persuasion is in essence equivalent to the burden of showing, as an affirmative defense, that the proposed accommodation would cause [the defendant] to suffer an undue hardship.'" *Wright*, 831 F.3d at 76, quoting *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 190 (2d Cir. 2015) (internal quotation marks omitted).

(17)  DOC has failed to rebut plaintiffs' evidence that it can use a variety of alarm mechanisms to more safely alert deaf and hard-of-hearing inmates of emergency evacuation. DOC's cost estimate to install visual alarms in every housing unit in every housing building in its system overstates the burden/cost of providing the class with meaningful access to emergency notification.[13]  There are many less expensive options for DOC to explore (several suggested by plaintiffs' expert witnesses) which, in combination could satisfy its responsibilities to the class under Title II of the ADA and § 504 of the Rehabilitation Act.[14]

---

[13] DOC beta tested only four personal notification devices with tactile components in response to this litigation. **DAY 5** Tr. at 193:25-194:3 (Quick); *see also* **DAY 6** Tr. 23:16-18 (Hilberry); **DAY 4** Tr. at 45:13-15, *id.* at 49:9-50:4 (Ray).  DOC did not conduct beta testing in every DOC facility. **DAY 5** Tr. at 194:20-195:2 (Quick).  DOC has not consulted with any other correctional department to identify emergency devices that had been successfully used by other prisons, either before doing beta testing or prior to trial. *Id.* at 195:5-13 (Quick); *see also* **DAY 6** Tr. at 22:19-23:15, 25:13-23 (Hilberry); **DAY 4** Tr. at 47:1-13 (Ray).  DOC has not consulted with associations or organizations that advocate for the deaf and hard-of-hearing for guidance, information, or expertise in identifying emergency devices. **DAY 6** Tr. at 22:19-23:15 (Hilberry); **DAY 4** Tr. at 47:1-13 (Ray).  DOC has not consulted with vendors of emergency notification devices for suggestions or information in installing visual emergency alarm devices. **DAY 6** Tr. at 22:19-23:15 (Hilberry); **DAY 4** Tr. at 47:1-13 (Ray).

[14] For example, Japan has developed a smoke detector for deaf people that is based on the pungent smell of Japan's spicy green horseradish.  If it detects smoke, the alarm sprays out a synthesized wasabi smell that wakes up people who might have slept through a conventional fire alarm.  Assistant professor Makoto Imai from the Shiga University of Medical Science, who

ULTIMATE RULINGS AND ORDER

(1)  The court finds DOC in violation of Title II of the ADA and § 504 of the Rehabilitation Act.

(2) The DOC has failed to meet its burden of demonstrating that it has provided a satisfactory and reasonable accommodation to deaf and hard-of-hearing class members who require effective access to their facilities' system of alerting inmates to emergencies such as a fire.

(3)  As the prevailing party, the plaintiff class is entitled to relief both as to the individual class representatives and members of the class who now or in the future will require effective access to emergency notifications.

(4)  This relief will best be served by a binding institution-wide policy defining DOC's obligation to meet the needs of deaf and hard-of-hearing

---

built the alarm in collaboration with Seems, a company that makes perfume, says the smoke detector may save lives among the hard of hearing. "The proportion of the elderly among fire victims was nearly 50 percent. . . . The decline of hearing ability may be one of the causes for delay in noticing and getting away when a fire breaks out," he told Reuters.  The Wasabi smoke detector was tested on 14 people, including four deaf people. Except for one person with a blocked nose, all woke up within two minutes of the smell reaching them. *Wasabi Fire Alarm a Lifesaver for the Deaf*, Reuters (Mar. 17, 2008), https://www.reuters.com/article/us-japan-wasabi/wasabi-fire-alarm-a-lifesaver-for-the-deaf-idUST29421020080318/.

inmates for access to emergency notifications as well as the means by which such a policy is to be implemented,

(5)   Despite DOC's efforts and the policy initiatives described in findings 9-13, 24-26, *supra* (describing DOC fire safety policies and initiatives), there is no comprehensive policy presently in place that addresses the needs of all members of the class. *See, e.g.*, *supra* Finding #14. As best the court can tell, the present policy, while well-intentioned, is a patchwork of directives reflecting prior efforts to address the issue while ultimately deferring to the discretion of the superintendents of the various facilities.

(6)   The court recognizes that there is no one-size-fits-all remedy for the deficiencies in DOC's existing policies and practices.  This is particularly true given the architectural and engineering challenges posed by the variegated DOC facilities inventory which differ often radically, in provenance, age, and design standards.

(7)   While plaintiffs have suggested a plethora of possible changes in current DOC practices (*e.g.*, the clustering of deaf and hard of hearing inmates, the implementation of a more efficient system of hearing aid repairs, etc.) as well as technological adaptions (*e.g.*, visual alarms, portable strobes, tactile alarms, etc.).  The evidence and expert testimony presented

at trial, while helpful in deciding the issue of compliance, is insufficient to enable this court to make any definitive recommendation either as to a preferred practice or technology either in term of costs or overall effectiveness.

(8)  In its closing statement at trial, DOC, as an alternative to court-ordered relief, asked for an opportunity to take the initiative in revising its current policies and procedures to bring them in line with the ADA and the court's expectations.  The court thinks the request reasonable and will order as follows.

(9)  DOC will have one hundred twenty (120) days (by May 16, 2024) to prepare a comprehensive and institution-wide policy tailored to the necessity of providing effective emergency alerts to current and future deaf and hard of hearing inmates.  The court understands that such a policy must consider the varied circumstances of the individual inmates and the housing units to which they are assigned as well as the reasonable costs of any physical facility alterations.

(10)  Plaintiffs will thereafter have sixty (60) days (until July 15, 2024) to review and comment on the new policy with a view towards reconciling any differences that arise.

(11)  The policy will then be submitted to the court for its final review and approval.  Any remaining disputes (the court anticipates none) will be in the court's discretion referred to Magistrate Judge Page Kelley for her recommendation.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE